# EXHIBIT A

Byron L. Ames, Esq. (11498)
David J. Mahoney, Esq. (17143)
**AMES & AMES, LLP**
2750 Rasmussen Rd. #H-201
Park City, UT 84098
Tel: (435) 214-0303
Fax: (435) 216-9393
Bames@Amesfirm.com
Dmahoney@Amesfirm.com
*Attorney(s) for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| PRIME INSURANCE COMPANY,<br><br>              Plaintiff,<br>vs.<br><br>GKD MANAGEMENT, LP d/b/a A&G COMMERCIAL TRUCKING and GERALD WAYNE FIELDEN<br><br><br>              Defendants. | **COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>Case No.<br>Judge: |

**COMES NOW**, Plaintiff, PRIME INSURANCE COMPANY (hereinafter "PRIME" and/or "Plaintiff"), by and through their counsel, Ames & Ames, LLP, by way of Complaint against Defendants herein, alleges as follows:

### PARTIES

1.      Plaintiff, PRIME, is an insurance company incorporated under the laws of the State of Illinois, with its principal place of business in Utah.

1

2.      Upon information and belief, Defendant, GKD MANGAGMENT d/b/a A&G TRUCKING (hereinafter "GKD"), is a company with its principal place of business in Crump, Tennessee.

3.      Upon information and belief, Defendant, GERALD WAYNE FIELDEN (hereinafter "FIELDEN") is a resident of the State of Texas.

## JURISDICTION AND VENUE

4.      Jurisdiction and venue are proper in this Court and County pursuant to U.C.A. §§ 78B-3-304, 78B-6-401, and 78B-3-307.

5.      Pursuant to Policy No. SC19100975, Plaintiff PRIME and Defendant GKD contractually agreed to submit to jurisdiction and venue in any court within the State of Utah and have agreed that Utah law will be applied.

## GENERAL FACTUAL ALLEGATIONS

6.      Plaintiff repeats and re-alleges each and every paragraph set forth above and makes the same a part hereof by reference thereto.

**The Prime Policy:**

7.      PRIME issued a claims-made commercial business auto insurance policy to GKD in the form of Policy No. SC19100975, with a policy period of October 15, 2019 through October 15, 2020 (hereinafter the "Prime Policy"). (*See Prime Policy as **Exhibit 1**)*

8.      The Prime Policy provides:

> 15.  The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services primarily within the State of Utah. The Insured represents and acknowledges that the Insured has purposefully directed its actions to provide the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurer's services in the State of Utah. The Insured acknowledges that, by

2

entering into this Policy, the Insured is transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over the Insured regarding any issues arising out of this Policy. In addition, the Insured hereby consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between that parties related to any insurance coverage issues and any payments due to the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.
(*See Prime Policy*, ***Exhibit 1*** *at Coverage Conditions*)

9.      The Prime Policy provides liability coverage pursuant to, *inter alia*, the following pertinent

provisions:

   A.  Insuring Agreement

      1.  Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any SIR that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy Applies if caused by an Accident and resulting from the ownership, maintenance, or use of an Insured Auto as identified in the Policy, on the Declarations or any Endorsement if:
      ...
      e. The Insured Auto is in Commercial Business Use at the time of the Accident.
      (*See The Prime Policy*, ***Exhibit 1*** *at Pg.1*)

10.     Commercial Business Use is defined by the terms of the Pride Policy as:

   K.  "Commercial Business Use"

      1. If you are a motor carrier engaged in the business of transporting passengers or goods for hire, "Commercial Business Use" means the Insured Auto is being operated pursuant to the Insured's assignment to haul a specified load or is on standby for further deliveries. An Insured Auto is no longer in commercial business use when a delivery assignment has been completed and the Insured Auto is no longer under dispatch.
      (*See The Prime Policy*, ***Exhibit 1*** *at Pg. 20*).

11.     The Prime Policy contains the following relevant exclusions:

   A.  Liability Exclusions

      In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage

3

required under the financial responsibilities laws, in place of the invalid exclusion, for such Claim.

This Policy does not cover, and we will not be obligated to defend you against or pay Damages on your behalf for any of the following:

...

2. Bodily Injury to:

...

    b. Any independent contractor, volunteer or other person engaged in the course of the conduct of the Insured's business or insured activities;

...

3. Bodily Injury or Property Damage:

...

    b. Arising out of acts of an Insured or third-party general contractors, subcontractors, independent contractors, or property owners or their employees involving Claims or Suits alleging negligent hiring of employees or subcontractors, failure to contract with subcontractors, negligent supervision, or any liability relating to any independent contractor's service or failure to provide service.

...

11. Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

...

    c. The violation of any statute, ordinance, or regulation relating to the sale, gift, distribution, or use of alcoholic beverages or controlled substances; or

    d. The use of alcohol, narcotics, intoxicants, or illegal drugs.

...

15. Bodily Injury or Property Damage arising out of the use, operation, or maintenance of an Insured Auto by anyone other than an Insured.

...

21. Bodily Injury or Property Damage arising out of the acts of an Insured's employee or agent outside the scope of his or her employment duties.

22. Bodily Injury or Property Damage expected or intended from the standpoint of any Insured.

...

24. Any Claim for punitive or exemplary damages, fines, statutory penalties, or sanctions, whether imposed by law or otherwise, trebled or otherwise multiplied damages or any multiplied portion of a compensatory award, or the return or restitution of legal fees, costs, and expenses. Claims for or awards against any Insured for punitive or exemplary damages, fines, statutory penalties, or sanctions, whether imposed by law or otherwise, trebled or otherwise multiplied damages or any multiplied portion of a compensatory award are not covered by the Policy regardless of whether they are demanded or awarded based upon the conduct of an Insured or upon the conduct of others for whose conduct the Insured may be deemed to be vicariously liable.

4

...

30. Bodily Injury or Property Damage arising from the maintenance or use of an Insured Auto by anyone under the influence of alcohol, other intoxicants, controlled substances, or narcotics, unless administered by the advice of a physician.

...

33. Bodily Injury to any passenger in the Insured's vehicle.
(*See The Prime Policy*, **Exhibit 1** *at Pg. 3-8*)

12.     The Prime Policy includes pertinent conditions precedent to coverage, which in relevant part provides:

A.   Our obligation to make any payments under this Policy shall only arise after the payment by the Insured of any SIR amount as specified on the Declarations, has been timely tendered. The SIR amount shall apply separately to each and every Claim and to each and every Insured. The Insurer shall have no duty to make any payments for the defense or settlement of any Claim, or for the satisfaction of any judgment, until the Insured has paid the SIR. The Limits of Liability of this Policy include the amount of the SIR and are not in excess thereof.
(*See The Prime Policy*, **Exhibit 1** *at Pg. 13*)

B.   Other Insurance
1.   If other valid and collectible insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, is available to an Insured for a Loss covered under this Policy, then:
a.   This Coverage is excess over the other insurance, including any form of self-insurance or SIR; and
b.   We will have no duty to defend any Claim or Suit that any other insurer has a duty to defend. If no other insurer or issue of a form of self-insurance or SIR defends, we may undertake to do so, but we will then be entitled to enforce the Insured's rights against those other insurers, self-insurers, or self-insured entity for defense costs, contribution, or indemnity.
(*See The Prime Policy*, **Exhibit 1** *at Pg. 15*)

13.     At the time it issued the Prime Policy, Prime also filed MCS-90 Form in compliance with federal regulations. That Form, in the amount of $1,000,000, was attached to the Prime Policy. (*See MCS-90 Form Endorsement as* **Exhibit 2**).

14.     The Form states as follows, in relevant part:

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, within Sections 29 and 30 of the Motor

5

Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein describe, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.
(*See MCS-90*, ***Exhibit 2*** *at Pg. 2*).

## The Service Contract:

15.   On or about January 7, 2014, Defendant GKD d/b/a A&G Commercial Trucking, entered into a Service Contract with Evelyn Russell (hereinafter "Russell") for, *inter alia*, use of equipment, specifically a 1998 International Tractor (VIN No. 2H5FLAHN7WC043153). (*See Service Contract*, ***Exhibit 3*** *at Pg. 1*).

16.   Pursuant to the Service Contract, Russell is termed and identified as Independent Contractor, while GKD is termed and identified as Carrier. (*See Service Contract*, ***Exhibit 3*** *at Pg. 1*).

17.   Independent Contractor is defined to include "any person defined in 49 C.F.R. 1057.2(d) and any contractor, agent, employee, or driver of INDEPENDENT CONTRACTOR." (*See Service Contract*, ***Exhibit 3*** *at Pg. 1*).

18.     With respect to GDK's use of equipment, the Service Contract in pertinent part provides:

INDEPENDENT CONTRACTOR leases equipment unto CARRIER for CARRIER's exclusive possession, control, and for use for the duration of the contract for the limited purposes of complying with federal transportation law, and transporting CARRIER's traffic from the point of origin to the point of destination, unless CARRIER notifies INDEPENDENT CONTRACTOR of need for additional service. [] The loading of the equipment at point of evidence by an issued bill of lading automatically constitutes CARRIER's acknowledgment of its possession of the equipment.  The bill of lading shall act as INDEPENDENT CONTRACTOR'S receipt that the possession of the equipment is transferred to CARRIER. CARRIER assumes no responsibility for the use and operation of the equipment beyond the destination point. INDEPENDENT CONTRACTOR's arrival at the destination point, as evidence by a signed delivery receipt or other delivery document, automatically constitutes a return of the possession of the equipment from CARRIER to INDEPENDENT CONTRACTOR; [] INDEPENDENT CONTRACTOR agrees to furnish CARRIER a complete transportation service from origin to destination over INDEPENDENT CONTRACTOR'S choice of legal routes on all loads offered by CARRIER that are accepted by INDEPENDENT CONTRACTOR.[] *(See Service Contract,* **Exhibit 3** *at Pg. 2)*

19.     As pertains to insurance, the Service Contract in pertinent part provides:

CARRIER shall furnish public liability, property damage, and cargo insurance while the equipment is loaded and is transporting CARRIER'S traffic from point of origin to point of destination.[] For any other service, INDEPENDENT CONTRACTOR is required to obtain and pay for all insurance coverage unless otherwise specified [] including, but not limited to: [] Automotive liability, Bodily injury and Property damage insurance providing [] for public liability respecting INDEPENDENT CONTRACTOR'S use of equipment while not transporting CARRIER'S traffic; [] All insurance coverage on the operator, driver, or helpers, whether the equipment is transporting CARRIER'S traffic or otherwise [] and [] insurance coverage respecting INDEPENDENT CONTRACTOR'S liability of insurance coverage respecting INDEPENDENT CONTRACTOR'S liability arising out of the use and operation of said equipment, or the actions of INDEPENDENT CONTRACTOR, his operator, driver or helpers. *(See Service Contract,* **Exhibit 3** *at Pg. 2)*

20.     As pertains to independent contractor's responsibility, the Service Contract in pertinent part

provides:

Drivers, helpers, or other employees engaged by INDEPENDENT CONTRACTOR in the performance of INDEPENDENT CONTRACTOR'S obligations under this Agreement shall be solely under the control and direction of INDEPENDENT CONTRACTOR and CARRIER shall have no right to direct or control the hiring or discharge of such employees or the manner or means of performing duties for INDEPENDENT CONTRACTOR, nor shall CARRIER have any responsibility for their compensation, taxes, reports, and obligations

relating to their employment with INDEPENDENT CONTRACTOR; []. *(See Service Contract,* **Exhibit 3** *at Pg. 3)*

21.     With respect to identification of equipment, the Service Contract in pertinent part provides:

[] CARRIER shall deliver to INDEPENDENT CONTRACTOR all necessary identification signs for the equipment. These signs shall be displayed on this equipment only during such times as the equipment is loaded with CARRIER'S traffic from point of origin to point of destination, and at all other times, INDEPENDENT CONTRACTOR shall remove or cover up the signs on the equipment. *(See Service Contract,* **Exhibit 3** *at Pg. 4)*

22.     With respect to driver's logs, the Service Contract in pertinent part provides:

INDEPENDENT CONTRACTOR'S driver's logs shall indicate that he will initiate transportation "In Service" until CARRIER'S traffic is unloaded. Thereafter, INDEPENDENT CONTRACTOR shall not be "In Service" for CARRIER unless otherwise authorized []. *(See Service Contract,* **Exhibit 3** *at Pg. 5)*

23.     As respects operation, the Service Contract in pertinent part provides:

INDEPENDENT CONTRACTOR shall pay all costs of operations including but not limited to: [] wages and remuneration of operators, drivers, and helpers; public liability, property damage, and cargo insurance on equipment while not transporting CARRIER'S traffic, payments for injury or damages to operator, driver, and helpers[]. *(See Service Contract,* **Exhibit 3** *at Pg. 5)*

24.     As respects authorization, the Service Contract in pertinent part provides:

INDEPENDENT CONTRACTOR will not, for any purpose whatsoever, act or proposes to act as an agent, representative, or employee of CARRIER. *(See Service Contract,* **Exhibit 3** *at Pg. 6)*

**The Lease Agreement:**

25.     On or about August 5, 2018, Defendant FIELDEN entered into a Full Service and

Maintenance Lease (hereinafter "Lease Agreement" with Russell/Russell Tucking pertaining to

truck(s) owned by Russell.  *(See Service Contract,* **Exhibit 4** *at Pg. 1)*

26.     The Lease Agreement provides that Russell operates as a lessor of tractors used to transport

mobile homes, office building, and similar structures. *(See Service Contract,* **Exhibit 4** *at Pg. 1)*

8

27.     The Lease Agreement provides that Russell owns or has the right to the Vehicle leased to

FIELDEN, and pursuant to this Lease Agreement, FIELDEN agrees to provide transportation

services to A&G Trucking. *(See Service Contract, **Exhibit 4** at Pg. 1)*

28.     The Lease Agreement provides in pertinent part that Russell will provide, *inter alia*,

registration of the vehicle, required collision insurance and bobtail insurance per requirements of

A&G Trucking and Federal Motor Carrier Safety Administration Regulations. *(See Service Contract,*

***Exhibit 4*** *at Pg. 1)*

29.     As respects insurance, the Lease Agreement in pertinent part provides:

> Company [Russell] shall procure and maintain in force auto physical liability insurance,
> including comprehensive collision, and bobtail, for the protection of the public, not otherwise
> provided by A&G Trucking.[] *(See Service Contract, **Exhibit 4** at Pg. 6)*

**The June 23, 2020 Accident:**

30.     On June 23, 2020, FIELDEN, was operating a 1998 International Tractor, bearing VIN

Number 2HSLAHN7WC043153, in a manner commonly referred to as "bobtailing," on US

Highway 271 in Choctaw County, Oklahoma.

31.     At the time and place aforesaid, Michaelea Dianne Moss (hereinafter "Moss"), was a

passenger in the aforementioned vehicle operated by FIELDEN.

32.     At the time and place aforesaid, the vehicle operated by FIELDEN was caused to depart the

road, strike the ground, and roll before coming to a rest on the east edge of the southbound lanes of

US-271.

33.     Injuries were allegedly suffered by the passenger, Ms. Moss, in the accident.

34.     After the accident, FIELDEN refused to submit to a drug test pursuant to the requirements

of 49 C.F.R. § 382.303.

35.     Moss was a passenger in the FIELDEN vehicle upon unilateral invitation by FIELDEN to accompany him on his trip.

36.     Moss was not a passenger authorized by GKD to accompany FILEDEN, and she has no employment, agency, and/or contractor relationship with GKD.

37.     At the time of the subject June 23, 2020 accident, FIELDEN was not using, maintaining, or otherwise operating the subject tractor for a "Commercial Business Use;" the tractor was not on assignment to haul a specified load, on standby for further deliveries, or under dispatch for GKD business.

38.     FIELDEN had completed his GKD commercial business use delivery assignment the day prior, on June 22, 2020. (*See June 22, 2020 Bill of Lading and Delivery Sheet as **Exhibit 5***)

**The Insurance Claim:**

39.     On or about October 8, 2020, Ms. Moss filed suit against GKD and FIELDEN (the "Moss Complaint" and/or "Moss Lawsuit"). (*See Moss Complaint as **Exhibit 6***)

40.     PRIME has been providing for the defense of GKD and FIELDEN in that lawsuit, subject to a reservation of rights. (*See September 14, 2020 ROR Letter as **Exhibit 7***)

## CLAIM FOR DECLARATORY RELIEF

41.     Plaintiff repeats and re-alleges each and every paragraph set forth above and makes the same a part hereof by reference thereto.

42.     An actual dispute and controversy has arisen between Plaintiff and Defendants regarding whether there is coverage available under the Prime Policy for the lawsuit filed by Moss.

43.     A judicial determination is necessary and appropriate at this time to determine the rights and duties of the parties under the insurance policies.

**A.** **No Coverage Exists Under the Prime Policy for the Claims Alleged in the Moss Complaint Pursuant to Applicable Exclusions and a Lack of Coverage Provided Therein for Non-Commercial Business Use.**

44.     There is no coverage for the Moss lawsuit under the Prime Policy because, *inter alia*, the vehicle was not in Commercial Business Use at the time of the accident and Moss was a passenger in the vehicle at said time.

45.     Pursuant to Section I, Liability Coverage A(1)(e), the Prime Policy only provides coverage for bodily injury to which the policy applies if caused by an accident and resulting from the ownership, maintenance, or use of an insured auto as identified in the Prime Policy, on the declarations or applicable endorsement if the insured auto is being used in GDK's commercial business use at the time of the Accident.

46.     Moreover, Exclusion 33 precludes coverage for bodily injury to any passenger in the Insured's vehicle.

47.     Further, the Prime Policy coverage exclusions including, but not limited to,

  a.   Exclusion (3) for bodily injury arising from claims of negligent hiring, firing, retention, supervision, and/or entrustment;

  b.   Exclusions (11) and (30) for bodily injury arising from use of vehicle under the influence of or in any way by reason relating to an Insured's use of alcohol, narcotics, intoxicants, or illegal drugs;

  c.   Exclusion (15) for bodily injury arising out of use of the subject vehicle by anyone other than an Insured;

  d.   Exclusion (21) for bodily injury arising out of acts of an Insured's employee outside the scope of employment; and,

  e.   Exclusion (24) any claim for punitive or exemplary damages

11

all provide additional basis for no coverage under the Prime Policy for the Moss Lawsuit.

48.     Accordingly, there is no coverage for GKD or FIELDEN under the Prime Policy for claims made by Moss within the Moss Complaint in relation to the accident.

49.     As such, PRIME is not obligated to defend GKD or FIELDEN against the claims made in the Moss Compliant/Lawsuit.

**B. Prime's Obligations, If Any, Are Limited to Its Minimum Financial Responsibility Obligations Under the MCS-90 Endorsement.**

50.     At the time it issued the Prime Policy, PRIME also filed Form MCS-90 in compliance with federal regulations.

51.     To the extent that the MCS-90 endorsement only applies while the vehicle is being used to transport property in interstate commerce, and FIELDEN was not engaged in GKD's business at the time of the accident, PRIME should not be required to make payments for the Moss Lawsuit pursuant to the MCS-90 Form.

52.     To the extent that GDK's self-insured retention amount pursuant to the Prime Policy is in excess of the MCS-90 Form applicable $750,000.00 minimum limit set forth under federal law, PRIME should not be required to make payments for the Moss lawsuit pursuant to the MCS-90 Form.

53.     To the extent PRIME is required to make any payments for the Moss Lawsuit due to its obligations under the MCS-90, those obligations would be limited to the applicable $750,000.00 minimum limit set forth under federal law.

54.     Moreover, PRIME is entitled to reimbursement from GKD for any payments it is required to make as a result of the Moss Complaint.

55.     The MCS-90 Form provides that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company."

56.     Moreover, pursuant to the MCS-90 Form, GKD agreed to reimburse PRIME for any payment PRIME "would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement."

57.     Therefore, in the event PRIME is required to make any payments under the MCS-90 Form as a result of the June 23, 2020 accident, GKD is obligated to reimburse PRIME for those payments inasmuch as there is no coverage under the terms of the Prime Policy.

58.     Based on the foregoing, a judicial determination is necessary and appropriate at this time to determine the respective rights of Plaintiff and Defendants Pursuant to Utah Code Ann. §78B-6-408 and Rule 57 of the Utah Rules of Civil Procedure, Plaintiff requests a declaration from this Court that:

  a. There is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident because Moss was a passenger in the vehicle and/or the vehicle was not being used for GKD's commercial business use at the time of the accident;

  b. There is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident for claims as to bodily injury arising from negligent hiring, firing, retention, supervision, and/or entrustment;

  c. There is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident based upon FIELDEN'S refusal to submit to a drug test pursuant to the requirements of 49 C.F.R. § 382.303.

13

d.  There is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident based upon use of the subject vehicle by an individual other than an insured, namely, Moss;

e.  There is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident as any injury of Moss arose out of acts outside the scope of employment by a GKD employee;

f.  There is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident for any claim for punitive damages or exemplary damages;

g.  As coverage is precluded, PRMIE has no obligation under the terms of the Prime Policy to defend or indemnify Defendants GKD and/or FIELDEN for the Moss Lawsuit;

h.  As coverage is precluded, Defendants GKD and FIELDEN have no right of recovery against PRIME under the terms of the Prime Policy for the Moss Lawsuit claims;

i.  That the MCS-90 endorsement does not require PRIME to make any payments for the Moss Lawsuit as said endorsement only applies while the vehicle is being used to transport property in interstate commerce;

j.  That GDK's self-insured retention amount pursuant to the Prime Policy is in excess of the MCS-90 Form applicable $750,000.00 minimum limit set forth under federal law, as such, PRIME is not required to make payments for the Moss Lawsuit pursuant to the MCS-90 Form;

14

k.   In the event PRIME is required to make any payments for the Moss Lawsuit pursuant to the MCS-90 Form, those obligations are limited to $750,000.00;

l.   In the event PRIME is required to make any payments for the Moss Lawsuit pursuant to the MCS-90 Form, GKD is obligated to reimburse PRIME for those payments.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, PRIME prays for judgment against Defendants as follows:

1.   For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident because Moss was a passenger in the vehicle;

2.   For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident because the subject vehicle was not being used for GKD's commercial business use at the time of the accident;

3.   For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident for claims as to bodily injury arising from negligent hiring, firing, retention, supervision, and/or entrustment;

4.   For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident based upon FIELDEN'S refusal to submit to a drug test pursuant to the requirements of 49 C.F.R. § 382.303.

5.   For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident based upon use of the subject vehicle by an individual other than an insured, namely, Moss;

6.      For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident as any injury of Moss arose out of acts outside the scope of employment by a GKD employee;

7.      For a declaration that there is no coverage under the terms of the Prime Policy for the Moss Lawsuit arising out of the June 23, 2020 accident for any claim for punitive damages or exemplary damages;

8.      For a declaration that, as coverage is precluded, PRMIE has no obligation under the terms of the Prime Policy to defend or indemnify Defendants GKD and/or FIELDEN for the Moss Lawsuit;

9.      For a declaration that, as coverage is precluded, Defendants GKD and FIELDEN have no right of recovery against PRIME under the terms of the Prime Policy for the Moss Lawsuit claims;

10.     For a declaration that, the MCS-90 endorsement does not require PRIME to make any payments for the Moss Lawsuit as said endorsement only applies while the vehicle is being used to transport property in interstate commerce;

11.     For a declaration that, GDK's self-insured retention amount pursuant to the Prime Policy is in excess of the MCS-90 Form applicable $750,000.00 minimum limit set forth under federal law, and, as such, PRIME is not required to make payments for the Moss Lawsuit pursuant to the MCS-90 Form;

12.     For a declaration that, in the event PRIME is required to make any payments for the Moss Lawsuit pursuant to the MCS-90 Form, those obligations are limited to $750,000.00;

13.     For a declaration that, in the event PRIME is required to make any payments for the Moss Lawsuit pursuant to the MCS-90 Form, GKD is obligated to reimburse PRIME for those payments;

14. For a declaration that PRIME is not obligated to indemnify or pay any judgment or award of damages against Defendants GKD and/or FIELDEN in relation to the Moss Lawsuit;

15. For a declaration that PRIME owes no direct duties or coverage obligations to Defendant(s) GKD and/or FIELDEN

16. For a declaration that PRIME does not have an obligation to defend Defendant(s) GKD and/or FIELDEN against the claims made in the Moss Lawsuit;

17. For attorney fees and costs incurred herein, and;

18. For such other and further relief as the Court deems just and proper.

DATED this 7th day of July, 2021.

AMES & AMES, LLP

David J. Mahoney, Esq.

17

# EXHIBIT 1



**Prime Insurance Company**
8722 S. Harrison St. Sandy, UT 84070
P.O. Box 4439 Sandy, UT 84091
Phone: 800-257-5590 Fax: 877-585-2852
E-Mail: rmd@primeis.com
Website: www.primeis.com

Please Sign and Return this Form
Fax: 877-585-2852
Email: rmd@primeis.com

## Policy Receipt Form and Coverage Conditions Summary

**TO THE PRODUCER AND INSURED:** As a condition to continued coverage under the Policy, you must sign and return this form within 10 days of receipt of the Policy. This Form requires you to make certain acknowledgements regarding the coverage provided by the Policy. This form is not a complete summary of all terms and conditions of the Policy—you should read the Policy in its entirety. In the event this Form is not timely completed and returned, we reserve the right to cancel the Policy at any time upon notice to you.

Please verify the following information and correct it if necessary.

| | | | |
|---|---|---|---|
| **Insured:** | GKD Management LP | **Policy number:** | SC19100975 / |

**Physical Address:** 4092 Us Highway 64, Crump, TN 38327

**Mailing Address:**

| **Phone:** | 7316323566 | **Fax:** | **E-mail:** | |

Endorsements delivered: Endorsements Delivered: PAP-99-06, PCA-00-06 MCS-90, CA 21 20 10 13, PCA-99-44, PCA-99-03, PAP-99-16

**You understand, acknowledge, and agree as follows:**

1.  You have received a copy of the Policy and all Endorsements listed in the Declarations. We sent the Policy to your broker or agent who is responsible for providing the Policy to you. If you have not received the Policy, please contact your broker or agent immediately and request it.
2.  The Policy is a manuscript policy, which means it does not follow any standard insurance policy form. Please read the policy in its entirety.
3.  The Producer is acting as your agent and not the Insurers agent and is not authorized to bind coverage on the Insurers behalf.
4.  Coverage is limited to the activities and operations at those locations listed and defined in the Declarations and the Policy.
5.  You are responsible for ensuring that the Insurer has current address and contact information to reach you.
6.  You are required to give us notice within 72 hours of your discovery of any incident, occurrence, event, loss, or accident, which may lead to a claim at: cda@primeis.com or 877-353-2040.
7.  Claim Expenses reduce the available Limits of Liability under the Policy.
8.  Policy fees are non-refundable regardless of whether the Policy is cancelled. In addition, we have the right to collect additional premium equal to 25% of the total premium due for the Policy if you fail to comply with any premium audit request made by us at any time.
9.  If the Policy requires a Self-Insured Retention, it must be paid by the Insured in the event of any claim, per claim.
10.  You are authorized to execute this form and to bind the Insured identified in the Declarations. Your signature on this form constitutes the Insured's express acceptance of the terms and conditions of the Policy.
11.  Terrorism coverage was offered to you for an additional premium and you expressly rejected such coverage, unless expressly paid for and listed in the Declarations.
12.  Retroactive coverage was offered to you for an additional premium and you expressly rejected such coverage, unless expressly paid for and listed in the Declarations.
13.  In the event of any Claim, the premium for the Policy may become fully-earned and not subject to short-rate or pro-rata adjustment as more fully set forth in the specific terms and conditions of the Policy.
14.  The Insured acknowledges that the Policy has been placed pursuant to surplus lines insurance laws. As such, the Insurer's rates and forms are not subject to review by the state insurance department; the policy is not guaranteed by any guaranty fund; and a surplus lines tax is required by law to be collected on all surplus line insurance premiums.
15.  The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services primarily within the State of Utah. The Insured represents and acknowledges that the Insured has purposefully directed its actions to procure the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurers services in the State of Utah. The Insured acknowledges that, by entering into this Policy, the Insured is transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over the Insured regarding any issues arising out of this Policy. In addition, the Insured hereby consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between the parties related to any insurance coverage issues and any payments due the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.
16.  In my personal capacity, I undertake the obligation to pay within 15 calendar days all premiums and/or Self-Insured Retentions. My duty to pay such sums shall not be limited by sale, merger, dissolution, bankruptcy, insolvency or a change in management.

NOTE: If this Quote is being provided by Evolution Insurance Brokers ("EIB") for insurance placed with Prime Insurance Company ("Prime"), you are hereby informed that EIB is acting as a surplus lines broker for and on behalf of Prime. Certain agreements are in place between EIB and Prime that affect the types and nature of insurance offered through EIB. These agreements include Rick J. Lindsey serving as an officer of both EIB and Prime. You are further informed that nothing herein is meant to indicate that EIB is acting as an agent or broker on your behalf. All insurance decisions must be made independently by you and you are free to seek professional advice regarding such decisions.

**Acknowledged and Agreed:**

Dated: _____

_____
Insured signature

_____
Print insured name and title

_____
Producer signature

_____
Print producer name and title

Prime Insurance Company
8722 S. Harrison St.  Sandy, UT 84070
Phone: 800-257-5590  ◼  Fax: 877-452-6910
Website: www.primeis.com

October 14, 2019

GKD Management LP
A&G Commercial Trucking
4092 Us Highway 64
Crump, TN 38327

We are enclosing your **Insurance Policy**, as well as a **Policy Receipt** which must be signed and retured to us within the next 10 days in order to keep your policy in effect.

As you may already be aware,  Prime is a specialty insurance market providing customized coverages to meet the needs of our clients for their **HOME, WORK and PLAY** activities. In many cases, our clients are unable to obtain the coverage they require from other markets and we are pleased to be able to provide a range of insurance solutions and options. In order to do this effectively, we look for long-term partnerships with our Insured as we have for over 30 years. This means that when we extend coverage, possibly when no other carrier is willing or able to do so, we, in return, require our Insureds to be good partners to us. We require, for example, our Insured partners to follow all the terms and conditions, including all reporting requirements, of the policy during its entire term and during the pendency of any claims or lawsuits. We also require that our insured disclose and report to us any and all changes in operations, operators, and equipment (including any and all vehicles and drivers, if applicable), during the entire coverage period. Unlike other insurers, Prime takes this **Partnership Approach** very seriously and seek and expects full cooperation from its partners in all respects.

In addition to reading your policy and signing and returning the Policy Receipt Form to us within the next 10 days, our in-house Risk Management Department, ("RMD"), will be telephoning you to conduct a mandatory Risk Management discussion which takes approximately 30 minutes. This is a key aspect of the insuring process at Prime. If this required RMD call is something you would like to be proactive about, you are also welcome to initiate the call at **your convenience**  by calling us **TOLL FREE at 1-877-585-2851.** In this way, you can complete this particular requirement of ongoing coverage sooner and at your convenience.

We appreciate the opportunity to be your partner and look forward to your completion of these necessary additional next steps. Please use the enclosed contact information to reach out to us at any time to discuss any changes in your operations or insurance needs, to report or discuss incidents or claims, to discuss risk management issues, or for any other reason.

We also work with thousands of insurance agents and brokers across the country and would be happy to include an agent or broker of your choice in any conversation if you wish.

Thank you!

Very truly yours,

Julie Velarde
Prime Insurance Company
Contract & Policy Services
Phone: (800) 257-5590 Ext. 5010
Fax: (877) 452-6910
Email: policyservices@primeis.com



# Prime Insurance Company
## Declarations
**Page 1 of 3**

THIS INSURANCE POLICY (the "Policy") is being issued by an Insurer that may not be licensed by the state insurance department in this state and may not be subject to this state's supervision and may not be protected in the event of the insolvency of the insurer by this state's guaranty or security fund. This Policy issued may not be subject to any or all of the regulations of this state's insurance department pertaining to Policy form.

| | | |
|---|---|---|
| **Policy Number:** SC19100975 | **Customer Number:** | **C19-1071034** |

**Policy Period:**   From Effective Date:   10/15/2019   To Expiration Date:   10/15/2020   Retroactive Date:   10/15/2018
(All dates (12:01 a.m.) of the physical address of the Insured.)

**Name and Physical Address of the Insured:**

GKD Management LP

D.B.A.: A&G Commercial Trucking
4092 Us Highway 64
Crump, TN 38327

**Mailing Address:**

Same

,

**Policy Premium:**

| | |
|---|---|
| Premium: | ▇▇▇▇ |
| Insurer Inspection/Policy Fee: | ▇▇▇▇ |
| Surplus Lines Broker Fee | $0.00 |
| State Tax: | ▇▇▇▇ |
| SLSC: | ▇▇▇▇ |
| **Total:** | ▇▇▇▇ |

**40 % Premium Earned at Inception**

**Description of coverage afforded hereunder:**   Commercial Auto Liability - Composite Rate

**Endorsements and forms afforded to this policy:**   PAP-99-06, PCA-00-06 MCS-90, CA 21 20 10 13, PCA-99-44, PCA-99-03, PAP-99-16

**Producer:   McGriff Insurance Services**
4400 Harding Pike, Suite 400          Contact: Raymond Marvin Dunn
Nashville, TN 37205                        License No: 0903853

**Issuing Office:   Prime Insurance Company**
8722 S. Harrison St.
Sandy, UT 84070

**Address Notice of Claims to:   Claims Direct Access (CDA)**
8722 S. Harrison St.
Sandy, UT 84070



# Prime Insurance Company
## Declarations
### Page 2 of 3

| Commercial Auto: | | Line Premium: | |
|---|---|---|---|
| $1,000,000 | Per Accident  Primary $1M | $65,000 | UM Per Accident |
| $4,000,000 | Per Accident  Excess $1M Per Accident: $4M Aggrega | $65,000 | UIM Per Accident |
| $800,000 | SIR-BI  Combined SIR: BI and PD per Claim | | |
| Number of Vehicles: 148 | | | |

**Coverages:**
Extra-Heavy Truck Tractor: Per 100 Miles
Excess Auto Liability

| Insured Name: | GKD Management LP |
|---|---|
| Issuing Date: | 10/14/2019 |

Authorized Representative

"This insurance policy is being issued by an insurer that may not be licensed by the state insurance department in this state and may not be subject to this state's supervision and may not be protected in the event of the insolvency of the insurer by this state's guaranty or security fund. This policy issued may not be subject to any or all of the regulations of this state's insurance department pertaining to policy form."

**THIS INSURANCE CONTRACT IS REGISTERED AND DELIVERED AS A SURPLUS LINES POLICY UNDER THE SURPLUS LINE LAWS IN THE STATE WHERE THE NAMED INSURED IS LOCATED.  THE INSURANCE IS NOT ISSUED BY AN INSURANCE COMPANY REGULATED BY THE STATE WHERE THE INSURANCE IS ISSUED AND IS NOT PROTECTED BY ANY STATE INSURANCE GUARANTEE FUND.**

## SERVICE OF SUIT ENDORSEMENT

### PAP-99-06

**This Endorsement changes the terms and conditions of the Policy issued.  Please read it carefully!**

Pursuant to a statute of any state of the United States which makes provision therefore, Prime Insurance Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for the purpose in the statute, as its true and lawful attorney for the purpose of accepting service of process of any suit instituted by or on behalf of the Insured.

This Endorsement applies solely to service of process and does not modify any forum selection or choice of law provisions contained in the Policy.

# COMMERCIAL BUSINESS AUTO INSURANCE POLICY – COMPOSITE RATE

## PCA-00-06

**THIS CLAIMS MADE COMMERCIAL BUSINESS AUTO INSURANCE POLICY (the "Policy") is a manuscript policy, meaning it is a negotiated agreement between the Named Insured and the Insurer, and as such it may differ significantly from liability policies offered by other insurance companies. As a claims made insurance policy, this Policy contains very strict claim reporting requirements which must be followed as conditions precedent to coverage. The terms of this Policy are contractual and are not merely recitals and all information supplied by any Insured to obtain coverage, constitute warranties of the Insured to the Insurer.**

**Coverage is provided only for otherwise covered Claims which meet all of the following requirements:**

> **(1)  Which are first made against an Insured during the Policy Period, and**

> **(2)  Which result from an Accident occurring during the Policy Period, and**

> **(3)  For which written notice is given to the Insurer during the Policy Period in accordance with the specific informational and timeliness requirements specified in the Policy.**

**In addition, coverage is strictly limited to Insured Autos operated by Approved Drivers and operations and at those locations listed, described, and defined herein.  Various other provisions of this Policy restrict and limit the coverage provided.  Please read the entire Policy and all Endorsements carefully to determine your rights and duties and what is and is not covered.**

**Claim Expenses reduce the available Limits of Liability stated on the Declarations. In the event of any Claim, the total amount of any Policy premium charged is 100% earned and not subject to short-rate or pro-rata adjustment.**

**Throughout the Policy and any Endorsements, the words "you," "your," and "Insured" refer to the Insured and Named Insured. The term "Named Insured" refers only to the Named Insured. The words "we," "us," "our," and the "Company" refer to the Insurer.**

**Capitalized terms have specific meaning throughout the Policy as defined herein.**

### SECTION I — LIABILITY COVERAGE

A.  Insuring Agreement

1.  Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any SIR that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy applies if caused by an Accident and resulting from the ownership, maintenance, or use of an Insured Auto as identified in the Policy, on the Declarations or any Endorsement if:

a.  The Claim is first made against you during the Policy Period; and

b.  The Accident occurs during the Policy Period; and

c.  The Claim is reported to us in writing during the Policy Period in accordance with the specific informational and timeliness requirements specified in the Policy; and

d.  The Accident occurs within the radius of operation for the Insured Auto as identified on the Declarations or any Endorsement and within the United States of America; and

e.  The Insured Auto is in Commercial Business Use at the time of the Accident; and

    f.   The Insured Auto is being operated by an Approved Driver at the time of the Accident.

The date of an Accident is the date upon which the Accident that results in Bodily Injury or Property Damage occurs regardless of when the Bodily Injury or Property Damage is first discovered or first manifest or reported. Claims arising from Accidents occurring prior to the Policy Period are not covered regardless of when Damages are first manifest or discovered.

2.   We have both the right and the duty to provide for your defense with respect to a Claim covered by the Policy. We have the exclusive right to designate and appoint legal counsel to represent you and to otherwise control such defense. Notwithstanding anything to the contrary, our duty to provide for such defense will immediately terminate:

    a.   When the applicable Limits of Liability of the Policy is exhausted by payment of Damages and/or Claim Expenses (In no event shall Claim Expenses reduce the Limit of Liability shown on the Insured's Declarations to a sum less than the statutory minimum limits provided by law. The maximum Limit of Liability applies to a total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any injury or damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, and shall also include any hospital, medical, or funeral charges, and sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses for doctors, nurses, investigators, attorneys, and other persons, relating to any settlement, adjustment, investigation, or defenses of any Claim. Claim Expenses shall not include any charges for the Insurer's personnel salary or any part of the normal operating overhead of the Insurer.); or

    b.   If the Insured fails to pay any SIR obligation imposed by this Policy in a timely manner; or

    c.   If the Application, including any supplemental information related thereto, is discovered by us to contain any material inaccuracies, omissions, mistakes, misrepresentation, false statements or errors of fact, regardless of whether the misrepresentation was a result of the Insured's insurance broker or agent's error of omission, commission, mistake, negligence, fraud, or criminal conduct; or

    d.   If you violate any of the conditions set forth in this Policy; or

    e.   If Suit is brought outside of the United States of America or its territories.

3.   We have the sole right, but not the duty, under this Policy to settle those otherwise covered Claims for which the proposed amount to be paid as Damages does not exceed the applicable Limits of Liability.  Any such settlement will be binding upon the Insured and will not require the Insured's prior consent or ratification. Payment of settlement funds or expenses by us shall not relieve you of your duty to make timely payment of any applicable SIR.

4.   We will pay with respect to any Claim we defend:

    a.   Claim Expenses we incur; or

    b.   Costs of Suit pursuant to statute or order of court after a verdict is entered against the Insured in the Suit; and

    c.   Any judgment or part of a judgment that does not exceed our Limit of Liability; and

    d. All interest on any judgment that accrues after entry of the judgment and before we pay, tender, or deposit with the court that part of the judgment that does not exceed our Limits of Liability.

5.   Any of the above payments are part of and will reduce the Limits of Liability provided by this Policy.  Notwithstanding the foregoing, we have no obligation to defend any criminal investigation or prosecution of or criminal proceeding against any Insured.

6.   In the event that any of the terms, limitations, conditions, definitions, exclusions, or other provisions of this Policy or any Endorsement(s) attached to it are found by a court of competent jurisdiction to be

unenforceable or in contradiction to applicable law because of a financial responsibility requirement, the Named Insured agrees to reimburse us for any and all payments made by the Company on account of any Accident, Claim, or Suit involving a breach of the terms of the Policy, and for any payment that the Company would not have been obligated to make under the provisions of the Policy (including Claim Expenses we incur) but for the imposition of that financial responsibility requirement.

7.  Our duty to defend or indemnify is limited to Damages arising from Claims or Suits brought in the United States of America or its territories.

B.  Liability Exclusions

In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage required under the financial responsibilities laws, in place of the invalid exclusion, for such Claim.

This Policy does not cover, and we will not be obligated to defend you against or pay Damages on your behalf for any of the following:

1.  Any obligation of an Insured under workers' compensation, disability benefits, unemployment compensation law, or any similar law, or any law relating to any employer/employee benefits.

2.  Bodily Injury to:

    a.  Any Insured arising out of and in the course of the conduct of the Insured's business or insured activities; or

    b.  Any independent contractor, volunteer or other pe rson engaged in the course of the conduct of the Insured's business or insured activities; or

    c.  The spouse, child, parent, brother, or sister of any Insured, independent contractor or volunteer as a consequence of Bodily Injury to any Insured.

    This Bodily Injury Exclusion applies:

    (1)  Whether an Insured may be liable as an employer or in any other capacity; and

    (2)  To any obligation to share Damages with or repay someone else who must pay Damages because of the injury, including Damages awarded for contribution or indemnity suits.

3.  Bodily Injury or Property Damage:

    a.  Alleged by one Insured against any other Insured (if the Insured is an organization, this exclusion shall apply to any parent, subsidiary, or affiliated company of the Insured); or

    b.  Arising out of acts of an Insured or third-party general contractors, subcontractors, independent contractors, or property owners or their employees involving Claims or Suits alleging negligent hiring of employees or subcontractors, failure to contract with subcontractors, negligent supervision, or any liability relating to any independent contractor's service or failure to provide service.

4.  Claims or Suits brought by:

    a.  One Insured or any of its successors, assigns, subsidiaries, parent entities, agents, or affiliates against another Insured or any of its successors, assigns, subsidiaries, parent entities, agents, or affiliates; or

    b.  Any division or department of any of the entities described in subparagraph a of this section; or

    c.   Any officer, director, or employee of any of the entities described in subparagraph a. of this section.

5.   Claims related to or arising out of:

    a.   Employment policies or practices of an Insured including, but not limited to, refusal to employ, discrimination, failure to accommodate, termination, discharge, harassment, coercion, demotion, evaluation, reassignment, discipline, defamation, or humiliation; or

    b.   Employment benefit laws affecting an Insured; or

    c.   Wage or compensation disputes of any kind, including without limitation, any claims arising under the Fair Labor Standards Act, or any similar state or federal law; or

    d.   Employment of any person by the Insured in violation of the law as to age, or of any person under 14 years of age if there is no limiting legal age limit.

6.   Claims related to or arising out of the actual, alleged, or threatened commission of any act relating to sexual activity including, but not limited to, sexual abuse, molestation, or harassment. Claims arising out of or related to such sexual activity are excluded from coverage:

    a.   Whether or not caused or committed by or at the direction of the Insured, its employees, patrons, patients, guests, or other persons lawfully or unlawfully on the Insured's premises or who lawfully or unlawfully come in contact with the Insured's patients, patrons, or employees, or guests;

    b.   Notwithstanding that the Claim may allege negligent hiring or entrustment, placement, training, or supervision, failure to provide adequate security or any other allegation of intentional, negligent, or reckless conduct which facilitated or permitted the sexual activity to occur; and

    c.   Whether or not any Bodily Injury or Property Damage sustained by any person as a result of such activity was expected or intended by the person who engaged in the activity.

7.   Claims related to or arising out of actual or alleged assault and/or battery, whether caused by or at the direction of the Insured, the Insured's employees or patrons, or from any cause whatsoever. This Policy further excludes claims, accusations, or charges of negligent hiring, placement, training, or supervision regarding any actual or alleged assault and battery. No coverage is provided for Claims alleging negligent hiring or entrustment, training or supervision, failure to provide adequate security, or other allegations of intentional, negligent, or reckless conduct related to actual or alleged assault and/or battery.

8.   Personal Injury.

9.   Advertising Injury.

10.  Bodily Injury or Property Damage for which an Insured is obligated to pay Damages by reason of the assumption of liability under any contract or agreement. This exclusion does not apply to liability for Damages:

    a.   Assumed in a contract or agreement specifically approved by the Insurer by Endorsement, provided the Bodily Injury or Property Damage occurs subsequent to execution of the contract or agreement; or

    b.   That the Insured would have in the absence of the contract or agreement.

11.  Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

    a.   Causing or contributing to the intoxication of any person; or

    b.   The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

  c. The violation of any statute, ordinance, or regulation relating to the sale, gift, distribution, or use of alcoholic beverages or controlled substances; or

  d. The use of alcohol, narcotics, intoxicants, or illegal drugs.

12. Bodily Injury or Property Damage resulting from the handling of property:

  a. Before it is moved from the place where it is accepted by an Insured for movement into or onto the Insured Auto; or

  b. After it is moved from the Insured Auto to the place where it is finally delivered by an Insured;

  c. Resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the Insured Auto; or

  d. Owned, loaned, or transported by or in the care, custody, or control of an Insured.

13. Bodily Injury or Property Damage arising out of the use of firearms by, on behalf of, or at the direction of any Insured.

14. Bodily Injury or Property Damage arising out of the ownership, boarding, or use of any kind of animal, whether or not domesticated.

15. Bodily Injury or Property Damage arising out of the use, operation, or maintenance of an Insured Auto by anyone other than an Insured.

16. Bodily Injury or Property Damage directly or indirectly resulting from acts, treatments, services, lack of services, errors or omissions, or other actions provided by an Insured outside of the Policy Period regardless of the date the Bodily Injury or Property Damage was first manifest, discovered or reported.

17. Coverage or indemnity for any Claim or Suit arising prior to, during and/or subsequent to the Policy Period, based directly or indirectly upon, and arising out of, or related to:

  a. Asbestos, asbestos fibers, asbestiform talc, or any material and/or substance containing asbestos, asbestos fibers, or asbestiform talc or any asbestos related to Bodily Injury or Property Damage, or exposure to asbestos, asbestos fibers, asbestiform talc fibers, asbestiform talc in any form, and/or manifestation of any asbestos related to Bodily Injury, including but not limited to asbestos, mesothelioma, and/or bronchogenic carcinoma; or

  b. Any alleged act, error, omission, or duty involving asbestos, asbestos fibers, asbestiform talc, or any material and/or substances containing asbestos, asbestos fibers, or asbestiform talc, its use, exposure, presence, existence, detection, removal, elimination, or avoidance; or

  c. The use, exposure, presence, existence, detection, removal, elimination, or avoidance of asbestos, asbestos fibers, asbestiform talc or any material and/or substances containing asbestos, asbestos fibers, or asbestiform talc in any environment, building, or structure.

18. Any Claim related to, caused by, or arising from Pollution.  This exclusion applies to any Pollution arising out of the actual, alleged, or threatened spilling, discharge, dispersal, seepage, migration, release, or escape of Pollutants at any time, including without limitation, the following:

  a. Pollution at or from any premises, site, or location that is or was at any time owned or occupied by, or rented, or loaned to any Insured; or

  b. Pollution at or from any premises, site, or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing, or treatment of waste or Pollutants; or

c.  Pollutants which are or were at any time transported, handled, stored, treated, disposed of, or processed by or for any Insured or any person or organization for whom any Insured may be legally responsible; or

d.  Pollution at or from any premises, site, or location on which any Insured or any contractors or subcontractors working directly or indirectly on any Insured's behalf are performing operations; and

e.  Pollution arising out of any fuel or other fluids from any Covered Auto, including without limitation, any overturn, collision, damage, mechanical defect or leakage, or during work performed on any such vehicle.

f.  Any Loss, Claim, cost, or expense arising out of any:

(1)  Request, demand, or order (including consent decrees, consent orders, or administrative procedures) that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants; or

(2)  Claim or Suit by or on behalf of a governmental authority seeking recovery for testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of Pollutants.

Clean up costs incurred by or on behalf of any Insured for fuel spills from any Covered Auto are not covered by this Policy.

19.  Any Claim related to, caused by, or arising from Hazardous Materials.  This exclusion applies to any Hazardous Materials arising out of the actual, alleged, or threatened spilling, discharge, dispersal, seepage, migration, release or escape of Hazardous Materials, including without limitation:

a.  The handling, transportation, transfer, storage, disposal, processing, treatment, or releasing or exposure to Hazardous Materials.

b.  Any Loss, Claim, cost, or expense arising out of any:

(1)  Request, demand, or order (including consent decrees, consent orders, or administrative procedures) that any Insured or others test for, monitor, clean up, remove, contain, treat, or neutralize, or in any way respond to, or assess the effects of Hazardous Materials; or

(2)  Claim or Suit by or on behalf of a governmental authority seeking recovery for testing for, monitoring, cleaning up, removing, containing, treating, or neutralizing, or in any way responding to, or assessing the effects of Hazardous Materials.

Clean up costs incurred by or on behalf of any Insured for Hazardous Materials spills from any Covered Auto are not covered by this Policy.

20.  Bodily Injury or Property Damage arising out of your willful violation of a penal statute or ordinance.

21.  Bodily Injury or Property Damage arising out of the acts of an Insured's employee or agent outside the scope of his or her employment or duties.

22.  Bodily Injury or Property Damage expected or intended from the standpoint of any Insured.

23.  Bodily Injury or Property Damage arising out of the rendering or failure to render professional services and/or first-aid or medical services.

24.  Any Claim for punitive or exemplary damages, fines, statutory penalties, or sanctions, whether imposed by law or otherwise, trebled or otherwise multiplied damages or any multiplied portion of a compensatory award, or the return or restitution of legal fees, costs, and expenses. Claims for or awards against any Insured for punitive or exemplary damages, fines, statutory penalties, or sanctions, whether imposed by law or otherwise, trebled or otherwise multiplied damages or any multiplied portion of a compensatory

award are not covered by the Policy regardless of whether they are demanded or awarded based upon the conduct of an Insured or upon the conduct of others for whose conduct the Insured may be deemed to be vicariously liable.

25. Any Claim seeking relief other than for monetary damages including, but not limited to, claims for injunctions, temporary restraining orders, or other equitable relief or requiring any Insured to take any action other than the payment of compensatory monetary damages for Bodily Injury or Property Damage as defined herein.

26. Any Claim filed under:

    a. The Racketeer Influenced and Corrupt Organization Act; or

    b. The Employee Retirement Income Security Act.

27. Any Claim related to, caused by, or arising from mold and fungi including, but not limited to:

    a. Any sums that any Insured becomes legally obligated to pay as Damages because of Bodily Injury, Property Damage, Personal Injury, Advertising Injury, or Medical Payments directly or indirectly relating to the actual, potential, alleged, or threatened presence of mold, mildew, or fungi of any kind whatsoever, or any materials containing them at anytime; or

    b. Any Loss, cost, or expense to:

        (1) Any Insured or any other person or organization, that they may incur in testing for, monitoring, removing, treating, or in any way responding to the actual, potential, alleged, or threatened presence of mold, mildew, or fungi of any kind whatsoever, or any materials containing them, whether as a result of a request, demand, statutory, or regulatory requirement or otherwise; or

        (2) Any Insured or any other person or organization, that they may incur in connection with any Claim or Suit on behalf of any governmental authority or any person or organization relating to the actual, potential, alleged, or threatened presence of mold, mildew, or fungi of any kind whatsoever, or any materials containing them.

    The Company neither assumes nor has any duty or obligation to defend any Insured with respect to any Claim or Suit seeking any Damages related to or resulting from mold, mildew, or fungi.

28. Any Claim related to, caused by, or arising from war or terrorism including, but not limited to:

    Any loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss, including:

    a. War, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

    b. Any act of terrorism, including, but not limited to, the use of force or violence and/or the threat thereof, of any person or group, whether acting alone or on behalf of or in connection with any organization or government, committed for political, religious, ideological, or similar purposes, including the intention to influence any government and/or to put the public, or any section of the public, in fear.

    This exclusion also excludes loss, damage, cost, or expense of any nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing, or in any way related to acts of war or terrorism.

    In the event any portion of this exclusion is found to be invalid or unenforceable, the remainder shall remain in full force and effect. War and terrorism coverage through an Endorsement in compliance with

the U.S. Terrorism Risk Insurance Act of 2002, as amended, may be purchased for an additional premium.

29. Bodily Injury or Property Damage resulting from the ownership, maintenance, or use of an Insured Auto while the Insured Auto is being used in any professional or organized racing or demolition contest or stunting activity, while practicing for such contest or activity, or while that Insured Auto is being prepared for such a contest or activity.

30. Bodily Injury or Property Damage arising from the maintenance or use of an Insured Auto by anyone under the influence of alcohol, other intoxicants, controlled substances, or narcotics, unless administered by the advice of a physician.

31. Bodily Injury or Property Damage:

   a. Arising out of, resulting from, caused by, or contributed to by exposure to silica products of any kind, including silica dust or silica in any form or silica in combination with other particulate suspension(s) or dust(s) other than silica;

   b. Any damages or any loss, cost, or suit by or on behalf of any governmental authority or any other alleged responsible party because of any request, demand, order, or statutory or regulatory requirement that any Insured or any other person or entity should be, or should be responsible for:

      (1) Assessing the presence, absence, or amount or effects of silica, particulate suspension(s), or dust(s);

      (2) Identifying, sampling, or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of, or mitigating silica, particulate suspension(s), or dust(s); or

      (3) Responding to silica, particulate suspension(s), or dust(s) in any way other than as described above.

   c. Any supervision, instructions, recommendations, warnings, or advice given or which should have been given in connection with any of the subsections above; or

   d. Any obligation to share damages with or repay someone else who must pay damages as described in any of the subsections above.

32. Bodily Injury or Property Damage arising from an accident that occurs while the Insured Auto is being used in any Ridesharing Operations, unless such operations are part of those specified activities or operations specifically listed and described under this Policy. For purposes of this Exclusion, Ridesharing Operations include any service that arranges or provides one-time, real-time shared rides for a fee.

33. Bodily Injury to any passenger in the Insured's vehicle.

34. Any Claim arising after the Insured provides inaccurate or incomplete information under the Composite Rate Reporting requirements set forth in Section IV or otherwise fails to comply with those requirements.

35. Any Claim arising while the Insured is not current on any premium amounts due under the Policy.

36. Any Claim involving, or arising out of, the use of a vehicle insured by this Policy in violation of federal or state hours-of-service regulations, including but not limited to regulations related to documenting or tracking such time.

37. Claims or Damages arising out of Cyber Liability.  For purposes of this exclusion, Cyber Liability means a data breach, whether inadvertent or intentional, in which a third party's private or confidential information in the possession of any Insured is exposed, stolen or destroyed, regardless of whether the data breach is the result of conduct of the Insured.  Cyber Liability, as used in this exclusion, includes any damage to

data or tangible property arising from a computer virus.  Cyber Liability also includes cyber extortion or network shutdowns.

38. Any Suit brought on behalf of a class or putative class.

## SECTION II — PHYSICAL DAMAGE COVERAGE

A.  Insuring Agreement

1.  If Physical Damage coverage is listed on the Declarations or any Endorsement and the associated premium has paid for such coverage, subject to all other terms and conditions of the Policy, we will pay for Physical Damage to any Insured Auto with Physical Damage coverage and otherwise covered under this Policy:

   a.  Should an Accident causing Physical Damage result from those specified activities or operations to which this Policy is limited; and

   b.  If such Accident occurs during the Policy Period (including any Policy Period extended by a specifically identified Retroactive Date) stated on the Declarations and within the United States of America or its territories; and

   c.  The Claim arising out of the Accident is reported to us in writing during the Policy Period.

2.  We will only cover Physical Damage:

   a.  Caused by fire, lightning, explosion, theft, vandalism; or

   b.  Caused by collision of an Insured Auto with another object or the Insured Auto's overturn.

3.  Towing & Labor including Storage

   If an Insured Auto has Physical Damage as the result of an Accident as described above and must be towed from the location of the Accident to a place where it can be repaired or stored, we will pay for the towing and associated labor and storage costs but only up to the limit shown on the Declarations or any Endorsement. This limit of coverage applies per Accident. Any payment under this Endorsement will reduce the stated amount limit available on the Policy for that particular Auto. If there is no value shown on the Declarations or any Endorsement then there is no coverage for towing and associated labor and storage.

B.  Physical Damage Exclusions

1.  We will not cover any Claim or make any payment for:

   a.  Physical Damage caused by, arising from, or related to Physical Damage identified in any exclusion under Section I. B. "Liability Exclusions" of this Policy; or

   b.  Physical Damage which is the direct result of wear and tear, freezing, mechanical or electrical breakdown; or

   c.  Physical Damage which is the direct result of blowouts, punctures, or other road damage to tires.

2.  We will not cover Physical Damage to:

   a.  Tapes, records, discs, or other similar audio, visual or data electronic devices designed for use with audio, visual, or data electronic devices;

   b.  Any device designed or used to detect speed-measuring equipment such as radar or laser detectors and jamming apparatus intended to elude or disrupt speed measurement equipment;

c.  Any electronic equipment designed for the reproduction of sound, including, but not limited to radios and stereos, tape decks or compact disc players, or any other electronic equipment that receives or transmits audiovisual or data signals, including, but not limited to, citizen band radios, television monitor receivers, telephones, video cassette recorders, audio cassette recorders, two-way mobile radios, scanning monitor receivers, or personal computers, tapes, records, discs, or other media or accessories used with equipment previously described; or

d.  Any accessories used with the electronic equipment described in subparagraph c. above.

Exclusions under this Section 2 shall not apply to:

e.  Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the Insured Auto at the time of the Physical Damage, or such equipment is removable from a housing unit which is permanently installed in the Insured Auto at the time of the Physical Damage, and such equipment is designed to be solely operated by use of the power from the Insured Auto's electrical system, in or upon the Insured Auto; or

f.  Any other electronic equipment that is:

(1)  Necessary for the normal operation of the Insured Auto or the monitoring of the Insured Auto's operating system; or

(2)  An integral part of the same unit housing any sound reproducing equipment described in a. above and permanently installed in the opening of the dash or console of the Insured Auto normally used by the manufacturer for installation of a radio.

3.  Any Physical Damage is excluded hereunder regardless of any other cause or event that may have concurrently contributed to such Physical Damage.

4.  We will not cover any Physical Damage to an Insured Auto caused by or resulting from someone causing you to voluntarily part with the Insured Auto by trick or scheme or under false pretenses; or your acquiring an Insured Auto from a seller who did not or does not have legal title.

5.  We will not cover Physical Damage to any Insured Auto while used in any professional or organized competition driving, racing, or experimental driving or stunting activity, while practicing for such contest or activity, or while that Insured Auto is being prepared for such a contest or activity.

C.  Limit of Insurance

The most we will pay for Physical Damage in any one Accident is the lesser of:

1.  The ACV of the damaged or stolen Insured Auto as of the time just prior to the Physical Damage occurring; or

2.  The cost of repairing the Insured Auto with parts of like kind and quality; or

3.  The cost of replacing the Insured Auto with a similar auto.

Any payment method will be adjusted for depreciation and physical condition as of the time of the Physical Damage. If payment is made in accordance with 1. or 3. above, you retain salvage of the Insured Auto and we will adjust any payment due to you to reflect the value of the salvage.

D.  Deductible

For each Insured Auto, our obligation to pay for, repair, return, or replace damaged or stolen property will be reduced by any applicable deductible shown on the Declarations.

E.  Loss Payment – Theft

At our option, we may:

1.  Pay for, repair, or replace damaged or stolen property; or

2.  Return the stolen property, at our expense, and pay for any damage that results to the Insured Auto from the theft; or

3.  Take all or any part of the damaged or stolen property at an agreed or appraised value.

F.  No Benefit to Bailee

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing, or transporting property for a fee regardless of any other provision of this Policy.

G.  Replacement Parts

The Insurer, in its sole discretion, has the right and privilege to use non-OEM replacement parts for the repair or replacement of any Insured Auto in lieu of parts manufactured by the vehicle or equipment manufacturer.

## SECTION III — WHO IS AN INSURED?

A.  The "Named Insured" is the person and/or entity expressly designated on the Declarations or in any Endorsement.  If the person or entity designated as the Named Insured is:

1.  An individual, the individual and the individual's spouse are Insureds, but only with respect to the conduct of business of which the individual and/or the spouse are the sole owners.

2.  A partnership or joint venture, the Named Insured is an Insured; however, the partnership or joint venture's partners or members are also Insureds, but only with respect to the conduct of business of the partnership or joint venture.

3.  A limited liability company, the limited liability company is an Insured; however, the limited liability company's members are also Insureds, but only with respect to their involvement with the limited liability company's business, and the limited liability company's managers are Insureds, but only with respect to their duties as the limited liability company's managers.

4.  An organization other than a partnership, joint venture, or limited liability company, such organization is the Insured; however, the organization's executive officers and directors are Insureds, but only with respect to their duties as the organization's officers or directors. Such organization's stockholders are also Insureds, but only with respect to their liability as stockholders.

B.  An "Insured" is also any Approved Driver of an otherwise Insured Auto who is maintaining or operating the Insured Auto for Commercial Business Use.

## SECTION IV — COMPOSITE RATE REPORTING

In order for coverage to apply under the Policy, the TOTAL NUMBER OF AUTOS, AVERAGE NUMBER OF AUTOS, GROSS RECEIPTS, TOTAL MILEAGE, TOTAL GALLONS OF FUEL, or any other type of rating method as stated on the Declarations, along with supporting documentation must be completed and submitted to the Insurer at the end of the Policy term for coverage to be provided under the Policy. The Insured may be required to pay additional premium based on the information received and as outlined in Paragraph N. Composite Rate Audit of SECTION VII – CONDITIONS. In the event the reporting form is not provided, or is not accurate, or payment is not received in a timely manner, coverage may be cancelled or coverage may be denied by the Insurer.

**SECTION V — LIMITS OF LIABILITY**

A.  The Limits of Liability shown on the Declarations and the conditions set forth below fix the most we will pay regardless of the number of:

1.  Insureds; or

2.  Claims made or Suits brought; or

3.  Persons or organizations making Claims or bringing Suits.

B.  Each Accident Limit of Liability listed on the Declarations or any Endorsement is the most we will pay for any combination of Damages and/or Claim Expenses because of all Bodily Injury and Property Damage arising out of any one Accident. Claim Expenses reduce the available Limits of Liability.  In no event shall Claim Expenses reduce the Limit of Liability shown on the Insured's Declarations to a sum less than the statutory minimum limits provided by law. The maximum Limit of Liability applies to a total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any injury or damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, and shall also include any hospital, medical, or funeral charges, and sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses for doctors, nurses, investigators, attorneys, and other persons, relating to any settlement, adjustment, investigation, or defenses of any Claim. Claim Expenses shall not include any charges for the Insurer's personnel salary or any part of the normal operating overhead of the Insurer.

C.  This Policy is subject to any and all Sub-limits identified in this Policy, including any identified on the Declarations or on any included Endorsement.

D.  All Claim settlement costs and Claim Expenses are included within the Limits of Liability shown on the Declarations and are not in addition to such Limits of Liability. The Limits of Liability apply to the total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any Bodily Injury or Property Damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, any hospital, medical, or funeral charges, and any sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses of doctors, nurses, investigators, attorneys, and other persons relating to any settlement, adjustment, investigation, or defense of any Claim.

E.  The following items affect our Limits of Liability as outlined:

1.   The Insured understands and agrees that the Insurer has no obligation under the coverage provided by the Policy to notify the Insured of the possibility that the maximum coverage payable is or may be exhausted by any Accident or combination of Accidents that occur or may occur during the Policy Period.  The Insured, in his, her, or its sole discretion, must determine if additional coverage should be purchased, and the Insurer has no duty to make a determination or advise the Insured concerning additional coverage.

F.  Notwithstanding anything contained in this Policy to the contrary, the Insurer's financial obligation imposed by the coverage with respect to all Claims, including any Claim Expenses and other related costs, incurred hereunder shall not exceed the amount specified on the Declarations as the Limit of Liability.

G.  Amounts payable under paragraphs B, C, and D of this section above shall directly diminish the respective Limits of Liability as stated on the Declarations.

H.  This Policy has been issued to the Insured in response to a request for coverage from the Insured, and its retained broker, if applicable. Various optional insurance has been offered to Insured by Insurer, including different types of insurance and different limits of liability, and Insured and its broker have expressly selected the type and amount of coverage desired. As such, Insured, and its retained broker if applicable, are solely responsible for determining the type and amount of insurance needed for Insured's operations and the amount of insurance required by any federal or local laws which may apply to Insured's specific operations. In no event shall Insurer be responsible for determining the type and amount of insurance required by federal or local laws which may apply to Insured's specific operations, and Insurer makes no warranty that this Policy

complies with all laws that may apply to Insured's various business operations. In the event any court, arbitrator or regulatory agency reforms or revises this Policy to comply with laws applicable to the type or amount of insurance required by Insured's specific operations, Insured and its broker shall indemnify and hold Insurer harmless from any increased limit of liability or other exposure created by such reformation or revision, including attorney fees and costs arising therefrom.

## SECTION VI — SELF-INSURED RETENTION (SIR) OBLIGATION

A.  Our obligation to make any payments under this Policy shall only arise after the payment by the Insured of any SIR amount as specified on the Declarations, has been timely tendered. The SIR amount shall apply separately to each and every Claim and to each and every Insured. The Insurer shall have no duty to make any payment for the defense or settlement of any Claim, or for the satisfaction of any judgment, until the Insured has paid the SIR. The Limits of Liability of this Policy include the amount of the SIR and are not in excess thereof.

B.  The Insured will pay 100% of the SIR on each and every Claim for Damages and/or Claim Expenses before any payment is due pursuant to the terms of this Policy. The SIR applies to each and every Claim regardless of whether a claimant presents multiple Claims. The following obligations and restrictions apply to the SIR:

1.  The Insurer may assume control and defense of all Claims, Suits, and proceedings which, at its sole discretion, may involve this Policy. Such assumption of the control and defense of any Claim, Suit, or proceeding by the Insurer, including the selection and/or appointment of defense counsel by the Insurer, shall not affect the Insured's responsibility to pay the SIR.

2.  A separate SIR shall be paid for each Claim. Multiple Claims arising from the same event shall be subject to multiple SIRs.

3.  The Insurer, at its sole discretion and without the consent of the Insured, may agree to the payment of all or any part of the SIR in satisfaction of Claim Expenses, settlements, Damages, or judgments.

4.  The Insurer, at its sole discretion, may pay the amount of the SIR from its own funds in satisfaction of Claim Expenses, Damages, settlements or judgments. In the event the Insurer chooses to make such payment, the Insured shall reimburse the Insurer within 15 days of the mailing of a demand by the Insurer.

5.  The Insurer, at its sole discretion, may direct the Insured to pay all or any part of the SIR to a third party in satisfaction of Claim Expenses incurred or Damages paid or of settlement or judgment amounts. The Insured shall make any required SIR payment within 15 days of the Insurer's direction to make such payment.

6.  In the event the Insured fails to reimburse the Insurer for any SIR amount advanced by the Insurer and the Insurer incurs collection expenses, the Insurer shall be entitled to recover such collection expenses, including reasonable attorneys' fees and expenses, from the Insured to the extent permitted by law.

7.  The Insurer has the right, but not the duty, to settle any covered Claim for which the proposed amount to be paid in Damages and Claim Expenses does not exceed the applicable Limits of Liability. Such settlements are binding on the Insured and do not require the Insured's prior consent or ratification.

    a.  Any settlement agreed to by the Insurer pursuant to its settlement right shall be subject to cancellation by the Insurer if the Insured fails to pay the SIR timely.

    b.  If any settlement agreed to by the Insurer is not concluded due to the failure of the Insured to pay the SIR for any reason, the liability of the Insurer for all Claims Expenses, Damages, and/or settlement and judgment amounts shall be limited to the amount for which the Claim could have been settled but for the Insured's failure to tender the SIR.

8.  This Policy shall not apply to any Claim first reported to the Insurer while the Insured is in default in the payment of any SIR due from the Insured.

9. Failure to timely pay the SIR as required shall be considered to be the same as failure to pay premium when due, and the Insurer may, at its sole discretion, cancel the Policy for such non payment subject to the same notice requirements as set forth in the Policy for cancellation for non-payment of premium.  Such cancellation shall not relieve the Insured of its duty to pay any SIR, and the Insurer may offset any return premium due the Insured against any unpaid SIR and take any other necessary steps to collect any unpaid SIR.

## SECTION VII — CONDITIONS

A. Notice of Accident, Potential Claim, Claim, or Suit

1. As an express condition precedent to coverage under this Policy, you must give us immediate written notice, as soon as possible and in no event later than 72 hours, of any accident, event, occurrence, loss, or Accident which might give rise to a Claim covered by this Policy. Written notice must be given to: Claims Direct Access, P.O. Box 4439, Sandy, Utah 84091-4439, U.S.A. Phone: (877) 585-2849 or (801) 304-5530; Fax: (877) 452-6909 or (801) 304-5536, and include:

   a. How, when, and where the incident, event, occurrence, loss, or Accident took place; and

   b. The names and addresses of any injured persons and witnesses; and

   c. The nature and location of any injury or damage arising out of the Accident.

2. You and any other involved Insured must:

   a. Immediately or at the earliest practicable moment, and in no event later than 10 days after receipt by you, send us copies of any demands, notices, summonses, or legal papers received in connection with any Claim or Suit and act in all diligence and prudence to resolve the Claim or Suit; provided, however, that no settlement in excess of any applicable SIR will be agreed to by the Insured without the Insurers' express written consent;

   b. Authorize us to obtain records and other information;

   c. Cooperate with us in the investigation, settlement, or defense of the Claim or Suit—the Insurer may require that the Insured submit to examination or questioning, attend hearings, depositions, and trials—additionally, in the course of investigation or defense, the Insurer may require written and/or sworn statements concerning the Claim; and

   d. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured, or which provides similar benefits to the Insured, because of injury or damage to which this Policy may also apply.

3. No Insured will, except at his own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our prior consent in excess of any applicable SIR without prior written consent of the Insurer.

4. You must also do the following:

   a. Promptly notify the police if the covered Auto or any of its equipment is stolen;

   a.  Take all reasonable steps to protect the covered Auto from further damage and keep a record of your expenses;

   b.  Permit us to inspect the covered Auto and records proving the Loss before its repair or disposition; and

   c.  Not admit any liability during the Accident investigation.

B. Legal Action Against Us

No person or organization has a right under this Policy to:

1. Join the Insurer as a party or otherwise bring them into a Suit asking for Damages from an Insured; or

2. Sue the Insurer under this Policy unless all of the terms of the Policy have been fully complied with by the Insured.

A person or organization may sue the Insurer to recover on an Agreed Settlement or a final judgment obtained after an actual trial against an Insured, but the Insurer will not be liable for Damages that are not payable under the terms of this Policy or that are in excess of the applicable Limits of Liability available to an Insured.

C. Other Insurance

1. If other valid and collectible insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, is available to an Insured for a Loss covered under this Policy, then:

   a. This Coverage is excess over the other insurance, including any form of self-insurance or SIR; and

   b. We will have no duty to defend any Claim or Suit that any other insurer has a duty to defend.  If no other insurer or issuer of a form of self-insurance or SIR defends, we may undertake to do so, but we will then be entitled to enforce the Insured's rights against those other insurers, self-insurers, or self-insured entity for defense costs, contribution, or indemnity.

2. When both this Policy and other insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, apply to the Loss on the same basis, we will not be liable under this Policy for a greater proportion of the Loss than that stated in the applicable contribution provision below:

   a. If all such other insurance provides for contribution by equal shares, we shall not be liable for a greater proportion of such Loss than that which would be payable if each Insurer or self-insured entity contributes an equal share until the share of each Insurer or self-insured entity equals the lowest applicable Limits of Liability under any one policy or the full amount of the Loss is paid.  With respect to any amount of the Loss not so paid, each remaining Insurer or self-insured entity will then contribute an equal share of the remaining amount of the Loss until each such Insurer has paid its limit in full or the full amount of the Loss is paid.

   b. If all such other insurance does not provide for contribution by equal shares, the Insurer shall not be liable for a greater proportion of such Loss than the applicable Limits of Liability under this Policy bears to the total applicable Limits of Liability of all other valid and collectible insurance applicable to such Loss.

3. If this Policy and any other policy or coverage contract issued to you by us or any company affiliated with us apply to the same Accident, the Limit of Liability or any applicable Sub-limits under all of the policies and coverage contracts shall not exceed the highest applicable Limit of Liability or Sub-limit under any one policy or coverage contract.  This condition does not apply to any policy or coverage contract issued by us, or an affiliated company, specifically to apply as excess insurance over this Policy.

D. Premium

1. We will compute the premium for this Policy in accordance with our rules and rates at the time coverage is issued or renewed on behalf of the Insured.

2. The premiums shown on this Policy as the advance premiums are minimum-earned and deposit premiums only. At the close of each audit period, we will compute the earned premium for the Policy Period shown on the Declarations. Audit premiums are due and payable on notice to the Insured. If the

sum of the advance and audit premiums paid for the Policy Period is greater than the earned premium charge, any prepaid premium charges become the fully earned premiums for the Policy Period.

3. The Insured must keep records of the information we need for coverage charge computation and send us copies at such times as we may request them.

4. In the event of any Claim, the minimum, fully-earned premium for the Policy will be 100% of the total premium stated on the Declarations, and such minimum, fully-earned premium will replace any other minimum-earned premiums charged and will not be subject to short-rate or pro-rata adjustment.

5. In the event the Insured fails to tender the required premium amount and the Insurer incurs collection expenses, the Insurer shall be entitled to recover all costs of collection including, but not limited to reasonable attorneys' fees, costs, and expenses from the Insured.

E. Insured's Representations and Warranties

By accepting this Policy, you represent, warrant, and agree that:

1. The completed Application and any supplemental applications or other documentation provided to obtain this Policy do not contain any material inaccuracies, omissions, mistakes, misrepresentation, false statements or errors of fact, regardless of whether the information was provided by you or your broker or agent;

2. You understand the information provided in and with your Application for insurance has been relied upon by the Insurer in pricing coverage and issuing the Policy and the Application, along with any other information provided by you, forms a part of the Policy; and

3. The Policy is a "manuscript policy," which means it does not follow any "standard" insurance policy form and represents a negotiated agreement between you and the Insurer, and you had the opportunity to seek the advice of legal counsel with regard to the negotiations for and the execution and performance of the Policy; and

4. Any insurance broker or agent involved in obtaining the Policy represents you and not the Insurer, and the broker or agent is not authorized to bind coverage on behalf of the Insurer, and you do not assume the broker or agent has any implied or apparent authority to bind the Insurer; and

5. You are subject to all the Policy provisions, terms, and conditions.

F. Transfer of Rights of Recovery Against Others To Us

If an Insured has rights to recover all or a part of any payment for Damages or Claim Expenses we have made under this Policy from any person or organization, those rights are hereby transferred to the Insurer. The Insured must do nothing after the Loss to impair these rights. At our request, the Insured will bring Suit or transfer those rights to us and will do all things we request to assist us to enforce those rights and collect payments made under the Policy.

G. Non-Assignable

No interest, coverage, or rights under this Policy may be assigned or transferred to any other person or entity without the prior written consent of the Insurer. This Policy is issued to the Insured as owned and managed at the time of the Application and does not transfer upon a change in ownership or management without prior written approval of the Insurer.

H. Cancellation

1. Except as indicated in the Declarations or any Endorsement, by entering into this Policy, neither the Insurer nor the Insured are bound to continue coverage through the entire Policy Period and either may cancel the Policy for any reason, subject to the terms and conditions of this Policy, including without limitation, the conditions regarding earned and returnable premiums.

2. The Insured shown on the Declarations may cancel this Policy by mailing a request to cancel to the Insurer.

3. The Insurer may cancel this Policy by mailing first class or by hand delivery to the Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium or upon your failure to pay any premium or any other cost or fee required to be paid under the terms of this Policy; or

   b. 10 days before the effective date of cancellation if we cancel for any other reason, unless a longer period of time is specifically required by applicable law.

4. In the event this Policy is cancelled by the Insurer for nonpayment of premium, any other policy issued to the Insured by the Insurer, or one of its affiliates, will also become subject to cancellation with 10-days notice, or as required by applicable law.

5. The Insurer will mail or deliver any notice of cancellation or any other notice to be delivered under this Policy to the Insured's mailing address shown on the Declarations or on any written Endorsement changing such address.

6. Notice of cancellation will state the effective date of cancellation and the Policy Period will end on that date.

7. If this Policy is cancelled by the Insurer, Prime will refund any unearned premium on a Pro-rata Basis, subject to all other terms and conditions relating to minimum earned and returnability of premium.

8. If this Policy is cancelled by the Insured, Prime will refund any unearned premium on a Short Rate Basis, subject to all other terms and conditions relating to minimum earned and returnability of premium.

9. In the event a Claim is made against an Insured any time prior to cancellation the total premium will be deemed fully earned.

10. If notice is mailed, a prepaid proof of mailing is sufficient proof of notice to the Insured. Notice deposited in the mail in the manner described above shall be effective when so deposited.

11. This Policy is not subject to automatic renewal. The Insurer has no obligation to offer you insurance in the future and has no obligation to provide you with further notice of the expiration of this Policy. The Insurer may, at its option, offer you terms for future separate policies.

12. At no time will cancellation of this Policy for any reason require the Insurer to refund an amount of premium over or above the minimum, fully earned premium set out in this Policy.

I.  Changes

This Policy, including any Endorsements, contains all of the agreements between the Insured and the Insurer concerning the insurance provided by the Policy. The coverage terms can be amended or waived only by Endorsement issued by us and made a part of the Policy.

Endorsements adding additional Insureds, coverage, or otherwise materially changing the Policy will require additional premium to be collected from the Insured before the Endorsement will become effective. Additional premium associated with any Endorsement will be calculated by the Insurer based upon its then current rates; although, no specific rate is guaranteed to the Insured.

J.   Examinations, Inspections, and Surveys

The Insurer has the right, but is not obligated to:

1.   Examine and audit your books and records as they relate to this Policy at anytime during the Policy Period and up to three years thereafter;

2.   Make inspections and surveys of the Insured and its operations, premises, equipment, property, and books at anytime;

3.   Prepare reports on the results of the inspections and surveys, and provide copies of said reports to the Insured; and

4.   Recommend and/or require changes, repairs, or other acts to be completed as a condition precedent to continued coverage under the Policy.

The inspections, surveys, reports, or recommendations relate to the insurability of an Insured and the coverage charge to be made. We do not make safety inspections, undertake to provide legal advice or opinions, or perform the duty to any person or organization to provide for the health or safety of workers or the public, and we do not warrant that conditions of the Insured's premises or other working environment under the Insured's control are safe or healthy, or comply with any or all federal, state, county, or local laws, regulations, codes, or standards. This limitation of our service applies not only to us, but also to any rating, advisory rating service, or similar organization or individuals that may provide insurance inspections, surveys, reports, or recommendations at the request of the Insurer.

K.   Appraisal for Physical Damage Loss

If there is a disagreement on the value of the Insured Auto or the amount of the Damage or Loss, either of us may make written demand for an appraisal of the value of the Insured Auto or the amount of Damage or Loss. In this event, each party shall select an independent, competent, and impartial appraiser.  After completing their own respective evaluations, the appraisers shall confer with each other.  If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the value of the property or the amount of Damage or Loss. If the appraisers fail to agree, the two appraisers will select an independent, competent and impartial umpire. If the appraisers cannot agree on the selection of the umpire, either may request that a judge of a Utah court having jurisdiction make the selection. Upon selection of an umpire, the appraisers will submit their differences to the umpire. A decision agreed to by any two will be binding.  Each party will pay its chosen appraiser, and bear the other expenses of the appraisal and umpire equally. The appraisal will not determine issues of coverage.  If there is an appraisal, we still retain our right to deny the claim.

L.   Ultimate Net Loss

All claim settlement costs, defense costs, and related costs ("Claim Expenses") are included expenses within the maximum Limit of Liability shown on the Insured's Declarations, and not in addition to such maximum Limit of Liability. However, in no event shall Claim Expenses reduce the Limit of Liability shown on the Insured's Declarations to a sum less than the statutory minimum limits provided by law.  The maximum Limit of Liability applies to a total sum which the Insured, or the Insurer, become legally obligated to pay by reason of any injury or damage for which coverage is provided by the Policy, including any supplementary payment either through adjudication or compromise, and shall also include any hospital, medical, or funeral charges, and sums paid or payable as salaries, wages, compensation, fee charges, interest, or expenses for doctors, nurses, investigators, attorneys, and other persons, relating to any settlement, adjustment, investigation, or defenses of any Claim.  Claim Expenses shall not include any charges for the Insurer's personnel salary or any part of the normal operating overhead of the Insurer.

M.   Concealment, Misrepresentation, or Fraud

This Policy is void in the case of fraud by you at anytime as it relates to this Policy, and is also void if you or any other Insured at anytime intentionally conceal or misrepresent a material fact concerning this Policy, an Insured Auto, your interest in an Insured Auto, or a Claim under this Policy.

N.  Composite Rate Audit

The initial premium for this Policy represents a minimum estimated premium based upon the exposures you told us you would have when you requested coverage. The final premium amount due will be determined by a composite rate audit to be conducted at the end of the Policy term. This audit may take the form of a request of you to provide proof of exposures by completing a self-audit form and supplying any type of supporting business records (such as proving gross receipts) or an audit conducted by our agent by physically inspecting your books and records. In the event you fail to comply with any composite rate audit request, including failing to provide any requested information, you authorize us to assume additional exposures and charge and collect from you the greater of an additional premium equal to 25% of the original premium and the actual amount due based upon any composite rate audit findings. You also expressly agree to pay any costs associated with our efforts to collect any additional premium due from you.  Under no circumstance will the minimum estimated premium be reduced as the result of any composite rate audit—the original premium represents a minimum premium for the Policy.

O.  False or Fraudulent Claim

If any Insured shall make any Claim under this Policy knowing such Claim to be false or fraudulent, as regards amount or otherwise, this Policy shall become null and void and all coverage hereunder shall be forfeited.

P.  Given the unique features of the coverage being provided to the Insured, coverage has been quoted, bound and issued with the express condition that the Insured acknowledge receipt and acceptance of the terms and conditions of coverage by returning the Receipt Form provided herewith.  Coverage is subject to cancellation in the event the Insured fails to acknowledge receipt and acceptance of the terms and conditions of coverage by returning the Receipt Form provided.

## SECTION VIII — DEFINITIONS

A.  "Accident" means an incident, event, or circumstance which is unexpected and unintended from the standpoint of any Insured.

B.  "Actual Cash Value" or "ACV" means:

1.  The amount it would cost to repair or replace property with material of functionally like kind and quality, less allowance for physical deterioration, wear and tear, obsolescence and depreciation.

2.  When the Damage or Loss to the property creates a total Loss, Actual Cash Value means the market value of the property in a used condition equal to that of the destroyed property.

3.  Otherwise Actual Cash Value means the market value of functionally identical property less reasonable deduction for physical deterioration, wear and tear, obsolescence and depreciation.

C.  "Advertising Injury" means injury arising out of one or more of the following offenses:

1.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

2.  Oral or written publication of material that violates a persons right of privacy;

3.  Misappropriation of advertising ideas or style of doing business; or

4.  Infringement of copyright, trademark, patent, title, or slogan.

D.  "Agreed Settlement" means a settlement and/or release of liability signed and/or authorized in writing by the Insurer.

E.  "Application" means the application for insurance coverage form, and any information provided therewith, completed by or for or on behalf of the Insured requesting insurance coverage from the Insurer.

F.   "Approved Driver(s)" means drivers hired in compliance with the hiring practices and driver management standards on file with the Company.

G.   "Auto" means a land motorized vehicle, trailer, or semi-trailer designed for travel on public roads, including any attached machinery or equipment. Auto does not include Mobile Equipment.

H.   "Bodily Injury" means physical injury to a person's body, including death, but shall exclude:

1.   Sickness or disease sustained by any person or death resulting therefrom; and

2.   Mental or emotional distress, mental anguish, humiliation, embarrassment, mental anxiety, or other emotional, psychological or mental injury, or any physical manifestation thereof.

I.   "Claim(s)" means any demand for Damages, including a written demand, a civil action, Suit, or institution of arbitration proceeding.

J.   "Claim Expenses" mean:

1.   All fees, costs, and expenses charged by any lawyer or other service provider designated by the Insurer to represent the Insured; and

2.   All other fees, costs, and expenses, including the Insurer's own internal fees, costs, and expenses, or those of an affiliate, resulting from the investigation, adjustment, defense, and appeal of a Claim, as authorized by the Company.

The determination of the Insurer as to the reasonableness of Claim Expenses shall be conclusive on the Insured. All Claim Expenses reduce the available Limits of Liability.

K.   "Commercial Business Use"

1.   If you are a motor carrier engaged in the business of transporting passengers or goods for hire, "Commercial Business Use" means the Insured Auto is being operated pursuant to the Insured's assignment to haul a specified load or is on standby for further deliveries. An Insured Auto is no longer in commercial business use when a delivery assignment has been completed and the Insured Auto is no longer under dispatch.

2.   If you are not a motor carrier, "Commercial Business Use" means the Insured Auto is being used or operated in the course and scope of the specified activities or operations to which this Policy is limited.

L.   "Damage(s)" means a compensatory sum, monetary judgment, award, or settlement an Insured is or may reasonably become legally obligated to pay as the result of an Accident, but does not include fines or statutory penalties, sanctions, whether imposed by law or otherwise, punitive, exemplary, treble damages, or any multiplied portion of a compensatory award, nor the return or restitution of legal fees, costs, and expenses.

M.   "Declarations" means the summary of coverage provided in conjunction with this Policy setting forth essential terms that are expressly deemed a part of this Policy.

N.   "Endorsement" means any additional coverage or limitation of coverage contained in any attachment or addendum to this Policy.  Any Endorsement is an indispensable and indivisible part of this Policy.

O.   "Hazardous Materials" means any nuclear, radioactive, toxic, or explosive material, substance, or waste, and any by-products thereof, and the explosive, toxic, and dangerous properties of such material, substance, or waste and any byproducts thereof.

P.   "Insured Auto" means an auto that is owned by or leased by you and is being used in Commercial Business Use. Insured Autos are subject to the audit-reporting requirements set forth above.

Q.  "Limit(s) of Liability" means the maximum amount the Insurer will be obligated to pay for an otherwise covered Claim, including payment for Claim Expenses, Damages, or any other sums due under this Policy, the amount of which is set forth on the Declarations.

R.  "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1.  Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

2.  Vehicles maintained for use solely on or next to premises you own or rent;

3.  Vehicles that travel on crawler treads; or

4.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    a.  Power crane, shovels, loaders diggers, or drills; or

    b.  Road construction or resurfacing equipment such as graders, scrapers, or rollers.

S.  "Personal Injury" means injury, other than Bodily Injury, arising out of one or more of the following offenses:

1.  False arrest, detention, or imprisonment;

2.  Malicious prosecution, discrimination, or civil rights violations, wrongful or retaliatory discharge;

3.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy;

4.  Oral or written publication of material that slanders or libels a person's or organization's goods, products, or services; or

5.  Oral or written material that violates a person's right of privacy.

T.  "Physical Damage" means damage to tangible property you own, use, rent, or lease.  Physical Damage does not include diminution in value or loss of use.

U.  "Policy" means the Policy issued by the Insurer to the Insured including all Endorsements thereto.

V.  "Policy Period" means the period of time beginning on the "Effective Date," as stated on the Declarations, and ending on the earlier of the initial "Expiration Date," as stated on the Declarations, and any effective cancellation date pursuant to the terms of the Policy.

W.  "Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, Hazardous Materials or any other waste, including materials to be recycled, reconditioned, or reclaimed.

X.  "Property Damage" means:

1.  Damage to tangible property, including all resulting loss of use of that property, other than property you own, use, rent, or lease. All such loss of use shall be deemed to occur at the time of the Accident that caused it; or

2.  Loss of use of tangible property, other than property you own, use, rent, or lease, that is not otherwise damaged. All such loss shall be deemed to occur at the time of the Accident that caused it.

3.  For purposes of this definition, tangible property does not include cash, checks, money orders or other financial instruments, or computer or electronic data of any kind.

Y.  "Property Damage Cleanup Sublimit" means the most we will pay for costs to clean up or remove debris or spilled cargo which impedes or impairs property not owned by an Insured, which is caused by an Accident that is covered by this Policy.

Z.  "Pro-rata Basis" means unearned premium shall be calculated by multiplying the number of days remaining on the policy by the daily rate.  The daily rate shall be determined by dividing the premium shown on the Declarations or any Endorsement by the number of days in the Policy Period.  Any outstanding SIRs or other amounts owed by the Insured to the Insurer shall be deducted from any unearned premium.

AA. "Retroactive Date" means any date expressly identified on the Declarations as the Retroactive Date.  An expressly identified Retroactive Date shall be considered the Effective Date for determining the Policy Period.  If no Retroactive Date is expressly identified on the Declarations, no coverage is provided for any period of time before the Effective Date.

BB. "Self-Insured Retention" or "SIR" means the amount set forth on the Declarations that the Insured will pay for each and every Claim for any combination of Damages and/or Claim Expenses otherwise covered under this Policy.  The Insured will pay 100% of the Self-Insured Retention before any payment is due pursuant to the terms of this Policy.

CC. "Short Rate Basis" means unearned premium shall be calculated according to the following Short Rate Cancellation Table. Any outstanding SIRs or other amounts owed by the Insured to the Insurer shall be deducted from any unearned premium.

### Short Rate Cancellation Table

| Days Insurance in Force | Short Rate Earned Percentage | Days Insurance in Force | Short Rate Earned Percentage | Days Insurance in Force | Short Rate Earned Percentage | Days Insurance in Force | Short Rate Earned Percentage |
|---|---|---|---|---|---|---|---|
| 1 | 5% | 66 - 69 | 29% | 154 - 156 | 53% | 256 - 260 | 77% |
| 2 | 6 | 70 - 73 | 30 | 157 - 160 | 54 | 261 - 264 | 78 |
| 3 - 4 | 7 | 74 - 76 | 31 | 161 - 164 | 55 | 265 - 269 | 79 |
| 5 - 6 | 8 | 77 - 80 | 32 | 165 - 167 | 56 | 270 - 273 | 80 |
| 7 - 8 | 9 | 81 - 83 | 33 | 168 - 171 | 57 | 274 - 278 | 81 |
| 9 - 10 | 10 | 84 - 87 | 34 | 172 - 175 | 58 | 279 - 282 | 82 |
| 11 - 12 | 11 | 88 - 91 | 35 | 176 - 178 | 59 | 283 - 287 | 83 |
| 13 - 14 | 12 | 92 - 94 | 36 | 179 - 182 | 60 | 288 - 291 | 84 |
| 15 - 16 | 13 | 95 - 98 | 37 | 183 - 187 | 61 | 292 - 296 | 85 |
| 17 - 18 | 14 | 99 - 102 | 38 | 188 - 191 | 62 | 297 - 301 | 86 |
| 19 - 20 | 15 | 103 - 105 | 39 | 192 - 196 | 63 | 302 - 305 | 87 |
| 21 - 22 | 16 | 106 - 109 | 40 | 197 - 200 | 64 | 306 - 310 | 88 |
| 23 - 25 | 17 | 110 - 113 | 41 | 201 - 205 | 65 | 311 - 314 | 89 |
| 26 - 29 | 18 | 114 - 116 | 42 | 206 - 209 | 66 | 315 - 319 | 90 |
| 30 - 32 | 19 | 117 - 120 | 43 | 210 - 214 | 67 | 320 - 323 | 91 |
| 33 - 36 | 20 | 121 - 124 | 44 | 215 - 218 | 68 | 324 - 328 | 92 |
| 37 - 40 | 21 | 125 - 127 | 45 | 219 - 223 | 69 | 329 - 332 | 93 |
| 41 - 43 | 22 | 128 - 131 | 46 | 224 - 228 | 70 | 333 - 337 | 94 |
| 44 - 47 | 23 | 132 - 135 | 47 | 229 - 232 | 71 | 338 - 342 | 95 |
| 48 - 51 | 24 | 136 - 138 | 48 | 233 - 237 | 72 | 343 - 346 | 96 |
| 52 - 54 | 25 | 139 - 142 | 49 | 238 - 241 | 73 | 347 - 351 | 97 |
| 55 - 58 | 26 | 143 - 146 | 50 | 242 - 246 | 74 | 352 - 355 | 98 |
| 59 - 62 | 27 | 147 - 149 | 51 | 247 - 250 | 75 | 356 - 360 | 99 |
| 63 - 65 | 28 | 150 - 153 | 52 | 251 - 255 | 76 | 361 - 365 | 100 |

DD. "Sub-limit" means a limited portion of the Limit of Liability under the Policy, identified for a specific Accident, person, or type or nature of Loss covered under this Policy. Sub-limits effective under the Policy are identified on the Declarations or in Endorsements attached to the Policy. All Sub-limits are expressly subject to and deplete any other applicable Sub-limit(s) and the Limit of Liability. Sub-limits are within, and not in addition to, the Limit of Liability. Both Sub-limits and the Limit of Liability are reduced by Claims Expenses. Specific Sub-limits are further defined as follows:

1. Any "Per Person" Sub-limit limits the portion of the Limit of Liability the Insurer may be obligated to pay as the result of Bodily Injury and/or Property Damage sustained by any person involved in an otherwise covered Accident to such person, together with all Damages claimed by other person(s) through, or as a result of, the Bodily Injury and/or Property Damage sustained by the person involved in the Accident, including but not limited to Claims for Loss of consortium or other Damages by immediate family members, relatives, or third parties.

2. Any "Per Accident" Sub-limit limits the portion of the Limit of Liability the Insurer may be obliged to pay as the result of Bodily Injury and/or Property Damage claimed by all persons as a result of an Accident. Any Per Accident Sub-limits are expressly subject to any applicable Per Person Sub-limits.

EE. "Suit" means any proceeding seeking recovery for Damages for Bodily Injury or Property Damage, including:

1. Any civil action filed in a court of law;

2. An arbitration proceeding to which you must submit or do submit with our consent; or

3. Any other alternative dispute resolution proceeding to which you submit with our consent.

## SECTION IX — REIMBURSEMENT

In the event we provide a defense for an Insured under the Policy and it is at any time determined that any Claim or theory of recovery for which a defense has been provided by us is not covered under the Policy, we expressly reserve the right to seek reimbursement of any Damages and/or Claim Expenses associated with any such Claim or theory of recovery from the Insured, including reimbursement on a prorate basis for that portion of any Claim or theory of recovery not covered if multiple Claims or theories of recovery have been asserted.

## SECTION X — SEVERABILITY

The provisions of this Policy are severable. If any portion, provision, or part of this Policy is held, determined, or adjudicated to be invalid, unenforceable, or void for any reason whatsoever, each such portion, provision, or part shall be severed from the remaining portions, provisions or parts of this Policy and shall not affect the validity or enforceability of any remaining portions, provisions, or parts.

## SECTION XI — MUTUAL AFFIRMATION

Pursuant to the signature, facsimile or otherwise, appearing on the Application, quote, warranty form, Policy, or any other document provided to the Insurer to obtain insurance coverage, the parties affirm that all provisions serve to embody and articulate the entire agreement between the parties hereto, and that the parties unqualifiedly accept and agree to abide by the terms and conditions of the Policy.

## SECTION XII — GOVERNING LAW

This Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies, or obligations provided for in this Agreement, shall be construed and enforced in accordance with the laws of Utah.

## SECTION XIII — U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL NOTICE TO CERTIFICATE HOLDERS

No Company shall be deemed to provide cover and no Company shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that Company to any sanction, prohibition or restriction under the United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

**SECTION XIV — CONSENT TO EXCLUSIVE JURISDICTION**

The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services within the State of Utah. The Insured represents and acknowledges that the Insured has purposefully directed its actions to procure the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurer's services in the State of Utah. The Insured acknowledges that, by entering into this policy of insurance, the Insured is deemed to be transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over it regarding any issues arising out of this Policy. In addition, the Insured hereby understands and consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between the parties related to any insurance coverage issues and any payments due the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.

**FORM MCS-90**   Revised 01/05/2017                                      **OMB No.: 2126-0008   Expiration: 01/31/2020**

| **USDOT Number:** 857474 | **Date Received:** 10/15/2019 |
|---|---|

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.



United States Department of Transportation
**Federal Motor Carrier Safety Administration**

### Endorsement for Motor Carrier Policies of Insurance for Public Liability
### under Sections 29 and 30 of the Motor Carrier Act of 1980

# FORM MCS-90

**Issued to** GKD Management LP                                      **of** Tennessee
*(Motor Carrier name)*                                               *(Motor Carrier state or province)*

**Dated at** 12:00 noon   **on this** 15th   **day of** October   , 2019

**Amending Policy Number:** SC19100975            **Effective Date:** 10/15/2019

**Name of Insurance Company:** Prime Insurance Company

**Countersigned by:** Ju e D. Ve arde
*(authorized company representative)*

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown *(check only one)*:

( • ) *This insurance is primary and the company shall not be liable for amounts in excess of $* _____ *for each accident.*

( ) *This insurance is excess and the company shall not be liable for amounts in excess of $* _____ *for each accident in excess of the underlying limit of $* _____ *for each accident.*

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 800 257 5590

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, DC).

**Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs.**

*(continued on next page)*

## DEFINITIONS AS USED IN THIS ENDORSEMENT

**Accident** inc udes continuous or repeated exposure to conditions or which resu ts in bodi y injury, property damage, or environmenta damage which the insured neither expected nor intended.

**Motor Vehicle** means a and vehic e, machine, truck, tractor, trai er, or semitrai er prope ed or drawn by mechanica power and used on a highway for transporting property, or any combination thereof.

**Bodily Injury** means injury to the body, sickness, or disease to any person, inc uding death resu ting from any of these.

**Property Damage** means damage to or oss of use of tangib e property.

**Environmental Restoration** means restitution for the oss, damage, or destruction of natura resources arising out of the accidenta discharge, dispersa , re ease or escape into or upon the and, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This sha inc ude the cost of remova and the cost of necessary measures taken to minimize or mitigate **damage to human health, the natural environment, fish, shellfish,** and wi d ife.

**Public Liability** means iabi ity for bodi y injury, property damage, and environmenta restoration.

The insurance po icy to which this endorsement is attached provides automobi e iabi ity insurance and is amended to assure comp iance by the insured, within the imits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the ru es and regu ations of the Federa Motor Carrier Safety Administration (FMCSA).

n consideration of the premium stated in the po icy to which this endorsement is attached, the insurer (the company) agrees to pay, **within the limits of liability described herein, any final judgment** recovered against the insured for pub ic iabi ity resu ting from neg igence in the operation, maintenance or use of motor vehic es **subject to the financial responsibility requirements of Sections** 29 and 30 of the Motor Carrier Act of 1980 regard ess of whether **or not each motor vehicle is specifically described in the policy** and whether or not such neg igence occurs on any route or in any territory authorized to be served by the insured or e sewhere. **Such insurance as is afforded, for public liability, does not apply** to injury to or death of the insured's emp oyees whi e engaged in the course of their emp oyment, or property transported by the insured, designated as cargo. t is understood and agreed that no condition, provision, stipu ation, or imitation contained in the po icy, this endorsement, or any other endorsement thereon,

or vio ation thereof, sha re ieve the company from iabi ity or **from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition,** inso vency or bankruptcy of the insured. However, a terms, conditions, and imitations in the po icy to which the endorsement **is attached shall remain in full force and effect as binding between** the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, c aim, or suit invo ving a breach of the terms of the po icy, and for any payment that the company wou d not have been ob igated to make under the provisions of the po icy except for the agreement contained in this endorsement.

t is further understood and agreed that, upon fai ure of the **company to pay any final judgment recovered against the insured** as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compe such payment.

The imits of the company's iabi ity for the amounts prescribed in this endorsement app y separate y to each accident and any payment under the po icy because of anyone accident sha not operate to reduce the iabi ity of the company for the payment of **final judgments resulting from any other accident.**

*(continued on next page)*

## SCHEDULE OF LIMITS — PUBLIC LIABILITY

| Type of carriage | Commodity transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehic e weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehic e weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portab e tanks, or hopper-type vehic es with capacities in excess of 3,500 water ga ons; or in bu k Division 1.1, 1.2, and 1.3 materia s, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group , Hazard Zone A materia ; in bu k Division 2.1 or 2.2; or highway route contro ed quantities of a c ass 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bu k on y; with a gross vehic e weight rating of 10,000 or more pounds). | Oi  isted in 49 CFR 172.101; hazardous waste, hazardous materia s, and hazardous substances defined in 49 CFR 171.8 and  isted in 49 CFR 172.101, but not mentioned in (2) above or (4) be ow. | $1,000,000 |
| **(4)** For-hire and Private ( n interstate or foreign commerce, with a gross vehic e weight rating of  ess than 10,000 pounds). | Any quantity of Division 1.1, 1.2, or 1.3 materia ; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group , Hazard Zone A materia ; or highway route contro ed quantities of a C ass 7 material as defined in 49 CFR 173.403. | $5,000,000 |

* he schedu e of  m ts shown does not prov de coverage.  he  m ts shown  n the schedu e are for  nformat on purposes on y.

POLICY NUMBER:

**COMMERCIAL AUTO**
**CA 21 20 10 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TENNESSEE UNINSURED MOTORISTS COVERAGE

For a covered "auto" licensed or principally garaged in, or "auto dealer operations" conducted in, Tennessee, this endorsement modifies insurance provided under the following:

AUTO DEALERS COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy on the inception date unless another date is indicated below.

| |
|---|
| **Named Insured:** |
| **Endorsement Effective Date:** |

**SCHEDULE**

| | | |
|---|---|---|
| "Bodily Injury" and "Property Damage" | $ | Each "Accident" |
| | or | |
| "Bodily Injury" | $ | Each "Accident" |
| This endorsement provides "bodily injury" and "property damage" Uninsured Motorists Coverage unless an "X" is entered below. | | |
| ☐ If an "X" is entered in this box, this endorsement provides "bodily injury" Uninsured Motorists Coverage only. | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A. Coverage**

1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured", or "property damage" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

2. With respect to damages resulting from an "accident" with a vehicle described in Paragraph **(2)** of the definition of "uninsured motor vehicle", we will pay under this coverage only if **a.** or **b.** below applies:

    **a.** The limit of any applicable liability bonds or policies has been exhausted by payments of judgments or settlements; or

    **b.** A tentative settlement has been made between an "insured" and the insurer of an owner or operator of a vehicle described in Paragraph **(2)** of the definition of "uninsured motor vehicle" and we have been given written notice of such tentative settlement as described in Paragraph **E.4.b.**

3. Any judgment for damages arising out of a suit brought without our written consent is not binding on us.

**B. Who Is An Insured**

If the Named Insured is designated in the Declarations as:

1. An individual, then the following are "insureds":

    **a.** The Named Insured and any "family members".

**b.** Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

**c.** Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

**2.** A partnership, limited liability company, corporation or any other form of organization, then the following are "insureds":

**a.** Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

**b.** Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

**c.** The Named Insured for "property damage" only.

**C. Exclusions**

This insurance does not apply to:

**1.** Any claim settled without our consent. However, this exclusion does not apply to a settlement made with the insurer of an owner or operator of a vehicle described in Paragraph **(2)** of the definition of "uninsured motor vehicle" in accordance with the procedure described in Paragraph **A.2.b.**

**2.** The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law.

**3.** The direct or indirect benefit of any insurer of property.

**4.** "Bodily injury" sustained by:

**a.** The individual Named Insured while "occupying" or when struck by a vehicle owned by that Named Insured that is not a covered "auto" for Uninsured Motorists Coverage under this Coverage Form.

**b.** Any "family member" while "occupying" or when struck by any vehicle owned by that "family member" that is not a covered "auto" for Uninsured Motorists Coverage under this Coverage Form.

**c.** Any "family member" while "occupying" or when struck by any vehicle owned by the Named Insured that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy.

**5.** Property contained in or struck by any vehicle owned by the Named Insured or, if the Named Insured is an individual, any "family member" which is not a covered "auto".

**6.** The first $200 of the amount of "property damage" to the property of each "insured" as the result of any one "accident". This exclusion does not apply if:

**a.** We insure the Named Insured's covered "auto" for both collision and uninsured motorists "property damage" coverage; and

**b.** The operator of the "uninsured motor vehicle" is positively identified and is solely at fault.

**7.** Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

**8.** "Property damage" for which the "insured" has been or is entitled to be compensated by other property or physical damage insurance.

**9.** Punitive or exemplary damages.

**10.** "Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**D. Limit Of Insurance**

**1.** Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for all damages resulting from any one "accident" is the limit of Uninsured Motorists Coverage shown in the Schedule.

**2.** The most we will pay for all damages resulting from "bodily injury" to an "insured" when the "insured" is "occupying" an "auto" not owned by the "insured", or is not "occupying" any "auto", is the highest limit of Uninsured Motorists Coverage on an "auto" owned by the "insured".

**3.** No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form, any Liability Coverage form, and any Medical Payments Coverage endorsement attached to this Coverage Part.

   © Insurance Services Office, Inc., 2012   CA 21 20 10 13

We will not make a duplicate payment under this coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation law, disability benefits or similar law.

**4.** We will not pay for a loss which is paid or payable under Physical Damage Coverage.

**E. Changes In Conditions**

The Conditions are changed for Uninsured Motorists Coverage as follows:

**1. Other Insurance** in the Auto Dealers and Business Auto Coverage Forms and **Other Insurance – Primary And Excess Insurance Provisions** in the Motor Carrier Coverage Form are replaced by the following:

**a.** If there is other applicable insurance available under one or more Coverage Forms, policies or provisions of coverage, the maximum recovery for damages under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any one Coverage Form or policy providing coverage.

**b.** Subject to Paragraph **a.,** with respect to "bodily injury" to an "insured":

**(1)** While not "occupying" a vehicle, only the Uninsured Motorists Coverage applicable to a vehicle, under which the injured person is an "insured", that provides the highest limit of Uninsured Motorists Coverage, will apply. No other Coverage Form, policy or provision of coverage with lesser limits of Uninsured Motorists Coverage will apply. If two or more Coverage Forms, policies or provisions of coverage provide the highest limit of Uninsured Motorists Coverage, they will share the loss equally.

**(2)** While "occupying" a vehicle owned by that "insured", only the Uninsured Motorists Coverage applicable to that vehicle will apply, and no other Coverage Form, policy or provision of coverage will apply.

**(3)** While "occupying" a vehicle not owned by that "insured", the following will be the priorities of recovery:

| First Priority | The Uninsured Motorists Coverage applicable to the vehicle the "insured" was "occupying" at the time of the "accident". |
|---|---|
| Second Priority | If the first priority is exhausted, only the Coverage Form, policy or provision of coverage applicable to a vehicle under which the "insured" is a named "insured", that provides the highest limit of Uninsured Motorists Coverage. |
| Third Priority | If the first and second priorities are exhausted, only the Coverage Form, policy or provision of coverage applicable to a vehicle under which the "insured" is other than a named "insured", that provides the highest limit of Uninsured Motorists Coverage. |

If two or more Coverage Forms, policies or provisions of coverage in the second or third priority provide the highest limit of Uninsured Motorists Coverage, they will equally share the loss applicable to that priority. No Coverage Forms, policies or provisions of coverage with lesser limits of Uninsured Motorists Coverage will apply to the second or third priority.

**2. Duties In The Event Of Accident, Claim, Suit Or Loss** in the Business Auto and Motor Carrier Coverage Forms and **Duties In The Event Of Accident, Claim, Offense, Suit, Loss Or Acts, Errors Or Omissions** in the Auto Dealers Coverage Form are changed by adding the following:

**a.** Promptly notify the police if a hit-and-run driver is involved.

**b.** Promptly send us copies of the legal papers if a suit is brought.

**c.** A person seeking coverage from an insurer, owner or operator of a vehicle described in Paragraph **F.2.c.(2)** of the definition of "uninsured motor vehicle" must notify us in writing of a tentative settlement between the "insured" and the insurer as described in Paragraph **E.4.b.** and allow us, within 30 days of receipt of both notices, to advance payment to that "insured" in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such vehicle.

**3. Transfer Of Rights Of Recovery Against Others To Us** is changed by adding the following:

If we make any payment and the "insured" recovers from another party, the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid.

Our rights under this provision do not apply with respect to a tentative settlement between an "insured" and the insurer of an owner or operator of a vehicle described in Paragraph **(2)** of the definition of "uninsured motor vehicle", for which we have been notified in accordance with Paragraph **A.2.b.,** to which we:

**a.** Consent to the tentative settlement; or

**b.** Fail to advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

If we advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification:

**a.** That payment will be separate from any amount the "insured" is entitled to recover under the provisions of Uninsured Motorists Coverage; and

**b.** We also have a right to recover the advance payment, unless judgment is rendered in favor of the owner or operator of an "uninsured motor vehicle".

**4.** The following is added:

**Arbitration**

**a.** If we and an "insured" disagree whether the "insured" is legally entitled to recover damages from the owner or operator of an "uninsured motor vehicle", or do not agree as to the amount of damages that are recoverable by that "insured", then the matter may be arbitrated. However, disputes concerning coverage under this endorsement may not be arbitrated and shall be decided by a court of competent jurisdiction.

**b.** If a tentative settlement is made between an "insured" and the insurer, owner or operator of the "uninsured motor vehicle" for the full limits of all liability policies or bonds available to the party on whose behalf the tentative settlement is made, and:

**(1)** We receive written notice from the "insured", sent certified mail return receipt requested or by some other method with written verification, of the "insured's":

**(a)** Intent to accept the offer thereby releasing the party on whose behalf the offer is made; and

**(b)** Agreement to submit the uninsured motorists claim to binding arbitration.

**(2)** We receive written notice from the insurer of the "uninsured motor vehicle", sent certified mail return receipt requested or by some other method with written verification of the offer, and such insurer:

**(a)** Provides verification of coverage upon request; and

**(b)** Confirms to us that the owner or operator of the "uninsured motor vehicle" agrees to cooperate in connection with the arbitration of the uninsured motorists claim;

**(3)** We consent to the tentative settlement in writing, sent certified mail return receipt requested or by some other method with written verification, within 30 days from receipt of both notices described in Paragraphs **(1)** and **(2)** above, thereby waiving our right to recover payment from the owner or operator of an "uninsured motor vehicle" in exchange for their written agreement to cooperate in connection with the arbitration;

© Insurance Services Office, Inc., 2012

then all issues of tort liability and damages arising out of the ownership, maintenance or use of the "uninsured motor vehicle" shall be arbitrated. However, if the settlement does not release all parties alleged to be liable to the "insured", arbitration of the uninsured motorists claim shall not be conducted until all such parties have been fully and finally disposed by settlement, final judgment or otherwise.

**c.** We and an "insured" must agree to arbitration and to be bound by the results of that arbitration. In this event, both parties will agree on an arbitrator. If they cannot agree, either party may request that a judge of a court of record for the county where arbitration is pending designate three (3) potential arbitrators; the parties shall then agree upon one of the three.

**d.** Unless we and an "insured" agree otherwise, arbitration will be in the county in which the "insured" lives. Rules of evidence applicable to the state courts where the arbitration is conducted will apply.

**e.** The arbitrator's expense will be paid by:

**(1)** The "insured", if the arbitrator's award is less than or equal to the total amount collected by the "insured" from settlements or judgments, if any, and the offer made by us at least 15 days prior to arbitration; or

**(2)** Us, if the arbitrator's award exceeds the total amount collected by the "insured" from settlements or judgments, if any, and the offer made by us at least 15 days prior to arbitration.

**F. Additional Definitions**

As used in this endorsement:

**1.** "Property damage" means injury or destruction of:

**a.** A covered "auto";

**b.** Property contained in the covered "auto" and owned by the Named Insured or, if the Named Insured is an individual, any "family member"; or

**c.** Property contained in the covered "auto" and owned by anyone else "occupying" the covered "auto".

**2.** The following are added to the **Definitions** section:

**a.** "Family member" means a person related to an individual Named Insured by blood, marriage or adoption, who is a resident of such Named Insured's household, including a ward or foster child.

**b.** "Occupying" means in, upon, getting in, on, out or off.

**c.** "Uninsured motor vehicle" means a land motor vehicle or "trailer":

**(1)** For which no liability bond or policy at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged;

**(2)** That is an underinsured motor vehicle. An underinsured motor vehicle is a land motor vehicle or "trailer" for which the sum of the limits of liability available for payment to an "insured" under all policies, bonds and securities applicable at the time of the accident:

**(a)** Is less than the Limit of Insurance for this coverage; or

**(b)** Has been reduced by payments to persons other than the "insured" to an amount which is less than the limit of liability for this coverage;

**(3)** For which an insuring or bonding company denies coverage or is or becomes insolvent; or

**(4)** For which neither the driver nor owner can be identified. The vehicle or "trailer" must either:

**(a)** Hit an "insured", a covered "auto" or a vehicle an "insured" is "occupying"; or

**(b)** Cause "bodily injury" or "property damage" without hitting an "insured", a covered "auto" or a vehicle an "insured" is "occupying".

If there is no physical contact with such vehicle or "trailer", the facts of the "accident" must be proven by clear and convincing evidence. We will only accept corroborating evidence of the claim other than the evidence provided by occupants in the covered "auto" or in the vehicle an "insured" is "occupying".

However, "uninsured motor vehicle" does not include any vehicle:

**(1)** Owned by, or furnished or available for the Named Insured's regular use or, if the Named Insured is an individual, that of any "family member";

**(2)** Owned or operated by a self-insurer under any applicable motor vehicle law, except as a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;

**(3)** Designed for use mainly off public roads while not on public roads; or

**(4)** While located for use as a premises.

© Insurance Services Office, Inc., 2012

# APPROVED DRIVER ENDORSEMENT

## PCA-99-44

**This Endorsement changes the terms and conditions of the Policy, please read it carefully.**

The Named Insured is responsible for following each of the procedures set forth in this Endorsement and for making sure that all drivers operating an Insured Auto meet each of the requirements set forth herein. In the event the Named Insured does not follow the procedures set forth herein and/or in the event a driver of an Insured Auto does not meet the requirements of this Endorsement, the Insurer will have no duty to defend or indemnify any Insured for any Claim or Loss.  In the event the Insurer is required by state or federal law to make any payments for a Claim or Loss involving a driver who does not qualify as an Approved Driver, the Insured shall be liable to reimburse the Insurer for all Claims Expenses incurred and all payments made relating to such Claim or Loss, including all costs and attorney fees incurred in obtaining such reimbursement.

    **A.   Mandatory MVR Review by Insured:**

      1.   **For existing drivers, the Insured must obtain and review a Motor Vehicle Record ("MVR") for each** driver at the inception of the Policy to ensure each driver meets the qualifications set forth in this Endorsement.  The Insured must then review the MVR for each driver on an annual basis to ensure the driver remains in compliance with the qualifications set forth in this Endorsement.

      2.   For new drivers hired after the inception date of this Policy, the Insured must obtain and review an MVR and ensure the driver meets each of the qualifications set forth in this Endorsement. Thereafter, the Insured must conduct an annual review of the MVR and ensure that the driver remains in compliance with the qualifications set forth in this Endorsement.

    **B.   Driver Qualifications:**

      To qualify as an Approved Driver without additional underwriting and premium, the driver must meet each of the following qualifications as of the inception date of the Policy and annually thereafter:

      1.   **The driver must have a current driver's license, or Commercial Driver's License ("CDL") if** required.

      2.   **The driver may not have had any driver's license or CDL disqualifications or suspensions** within the past five years, unless by reason of:

         a.   Delinquent child support payments;
         b.   Failure to provide proof of insurance; or
         c.   Failure to pay non-traffic related fines.

      3.   The driver must have at least two years of CDL commercial driving experience if operating a vehicle that requires a CDL.

      4.   The driver must be between the ages of 23 and 65.

      5.   The driver must have no driving under the influence or driving while intoxicated charges within the past five years.

      6.   The driver must have no felony charges involving a vehicle within the past five years.

      7.   The driver must have no incidents of refusing to submit to a blood alcohol concentration test when pulled over within the last five years.

8.  The driver must have no reckless driving, careless driving or exhibition driving charges within the past five years.

9.  The driver must have no positive drug tests within the past five years.

10. The driver must have no at-fault motor vehicle accidents within the past three years.

11. The driver must have no speeding violations 20 mph or over within the past three years.

**C.  Drivers Not Meeting Qualifications Subject to Underwriting and Additional Premium:**

In the event the Insured wishes to hire or continuing using a driver who does not meet the qualifications set forth herein, or who has fallen out of compliance with the qualifications set forth herein, the Insured may submit the driver's information to the Insurer for further underwriting review.  In this case, the Insurer will quote an associated additional premium and/or surcharge which must be paid in advance of the driver qualifying as an Approved Driver.

**D.  Mandatory Reporting of Incidents and Potential Claims:**

As a condition precedent to coverage, the Insured must report any incident, accident or potential claim involving an Approved Driver as set forth more fully in the Conditions section of the Policy. In addition, the Insured must report any violation or occurrence which takes an Approved Driver out of compliance with the driver qualifications set forth herein.

## SCHEDULED DRIVERS ENDORSEMENT

## PCA–99–03

**This Endorsement changes the terms and conditions of the Policy issued.  Please read it carefully!**

No Coverage shall be provided under this Policy for any covered Auto which is being used or operated by anyone other than the driver(s) or operator(s) scheduled on this Policy.  The Insured hereby warrants that each and every person scheduled on this Policy below is over the age of 23 and under the age of 65, unless otherwise authorized by an underwriter and scheduled on the Policy.

**New drivers and operators will not be added to this Policy until provided the Insured provides in writing the driver's name, date of birth, and driver's license number to the Insurer. Acceptance by Insurer is subject to underwriting** approval and may require additional premium.

### Named Driver or Operator Listing

| No. | Name | D.O.B. | License Number | State | Notes |
|-----|------|--------|----------------|-------|-------|
| 0 | Approved Drivers | | See PCA-99-44 | TN | |

Special Note: All other drivers excluded.

## GENERAL CHANGE ENDORSEMENT
### PAP-99-16

**This Endorsement changes the terms and conditions of the Policy issued.  Please read it carefully!**

Subject to all of the terms and conditions of the Policy, unless expressly changed hereby, this Endorsement and any attached Endorsement(s) are to be deemed and form a part of the following Policy:

**SC19100975**

**Reference No:**

Insured:  **GKD Management LP**
**D.B.A.  A&G Commercial Trucking**

Insurer:    **Prime Insurance Company**

At its agency located in Sandy, Utah          Endorsement Effective Date:  **10/15/2019**

Mountain Standard Time

Endorsement type date:  **10/14/2019**

The undersigned hereby represents, acknowledges, and agrees that the Policy is amended through the inclusion of this Endorsement, and any attached Endorsement(s), as follows:

- In the event of any Claim, the minimum, fully-earned premium for the vehicle involved in the accident will be 100% of the Vehicle's annual premium and not subject to short-rate or pro-rata adjustment.

- $4,000,000 Excess Liability is subject to an $4,000,000 Annual Aggregate limit.

- One SIR (combined for BI and PD) applies to each Claim. Multiple Claims arising from the same event shall be subject to one SIR.

**Premium:**

**State Tax:**
**SLSC:**

**Total:**

All other terms and conditions of the policy remain unchanged.

Endorsement: **1**

_____
Authorized Signature

# EXHIBIT 2

**FORM MCS-90**   Revised 01/05/2017                                      **OMB No.: 2126-0008   Expiration: 01/31/2020**

| **USDOT Number:** 857474 | **Date Received:** 10/15/2019 |

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

 United States Department of Transportation
**Federal Motor Carrier Safety Administration**

### Endorsement for Motor Carrier Policies of Insurance for Public Liability
### under Sections 29 and 30 of the Motor Carrier Act of 1980

# FORM MCS-90

**Issued to** GKD Management LP                                              **of** Tennessee
*(Motor Carrier name)*                                                         *(Motor Carrier state or province)*

**Dated at** 12:00 noon   **on this** 15th   **day of** October   , 2019

**Amending Policy Number:** SC19100975            **Effective Date:** 10/15/2019

**Name of Insurance Company:** Prime Insurance Company

                                          **Countersigned by:** Julie D. Velarde
                                                                *(authorized company representative)*

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown *(check only one)*:

◉ *This insurance is primary and the company shall not be liable for amounts in excess of* $ 1,000,000.00 _____ *for each accident.*

◯ *This insurance is excess and the company shall not be liable for amounts in excess of* $ _____ *for each accident in excess of the underlying limit of* $ _____ *for each accident.*

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 800-257-5590

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, DC).

| **Filings must be transmitted online via the Internet at** http://www.fmcsa.dot.gov/urs. |

*(continued on next page)*

**FORM MCS-90**   Revised 01/05/2017   OMB No.: 2126-0008   Expiration: 01/31/2020

## DEFINITIONS AS USED IN THIS ENDORSEMENT

*Accident* includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

*Motor Vehicle* means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

*Bodily Injury* means injury to the body, sickness, or disease to any person, including death resulting from any of these.

*Property Damage* means damage to or loss of use of tangible property.

*Environmental Restoration* means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

*Public Liability* means liability for bodily injury, property damage, and environmental restoration.

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon,

or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

*(continued on next page)*

## SCHEDULE OF LIMITS — PUBLIC LIABILITY

| Type of carriage | Commodity transported | January 1, 1985 |
|---|---|---|
| (1) For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| (2) For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| (3) For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,000 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| (4) For-hire and Private (In interstate or foreign commerce, with a gross vehicle weight rating of less than 10,000 pounds). | Any quantity of Division 1.1, 1.2, or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

*The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

# EXHIBIT 3

.D Management L.P.
dba A & G Commercial Trucking

# A & G Commercial Trucking
## 4092 Hwy 64 E.
## Crump, TN 38327

Assigned Unit No. _5991_

# SERVICE CONTRACT

Between: A & G Commercial Trucking,    (hereinafter called CARRIER), and

_Evelyn Russell_ (Name)          _4612 FM269_ (Address)

_Pickton_ (City)          _TX  75471_ (State/Zip)          (Telephone)

(Federal I.D. and Social Security Number)

hereinafter called INDEPENDENT CONTRACTOR.

EQUIPMENT DESCRIPTION:

|  | YEAR | MAKE | VIN | LICENSE | STATE |
|---|---|---|---|---|---|
| TRACTOR | 1998 | INTL | 2HSFLAHN7WC043153 | R008310 | TX |

OR EQUIPMENT AS LISTED ON ATTACHED APPENDIX C OF THIS CONTRACT

The terms and conditions of the service agreement are:

1. DEFINITIONS: INDEPENDENT CONTRACTOR as used herein means any person defined in 49 C.F.R. 1057.2(d) and any contractor, agent, employee, or driver of INDEPENDENT CONTRACTOR.  CARRIER as used herein means any person engaged in the transportation of property as a motor carrier subject to regulation in intrastate or interstate transportation.

Page - 1

2. AUTHORIZATION TO SIGN. INDEPENDENT CONTRACTOR AND CARRIER agree that any contractor, agent, employee, or driver of INDEPENDENT CONTRACTOR to whom the Agreement is entrusted is hereby duly authorized to sign and perform this Agreement on behalf of INDEPENDENT CONTRACTOR. If signature for INDEPENDENT CONTRACTOR is not the owner, then owner must provide signator with notarized power of attorney.

3. CARRIER'S USE OF EQUIPMENT. INDEPENDANT CONTRACTOR leases equipment unto CARRIER for CARRIER'S exclusive possession, control, and for use for the duration of the contract for the limited purposes of complying with federal transportation law, and transporting CARRIER'S traffic from the point of origin to the point of destination, unless CARRIER notifies INDEPENDENT CONTRACTOR of need for additional service. Notice will be provided pursuant to Paragraph 19. The loading of the equipment at point of evidence by an issued bill of lading automatically constitutes CARRIER'S acknowledgment of its possession of the equipment. The bill of lading shall act as INDEPENDENT CONTRACTOR'S receipt that the possession of the equipment is transferred to CARRIER. CARRIER assumes no responsibility for the use and operation of the equipment beyond the destination point. INDEPENDENT CONTRACTOR'S arrival at the destination point, as evidenced by a signed delivery receipt or other delivery document, automatically constitutes a return of the possession of the equipment from CARRIER to INDEPENDENT CONTRACTOR; and the signed delivery receipt or other delivery documents is CARRIER'S receipt. INDEPENDENT CONTRACTOR agrees to furnish CARRIER a complete transportation service from origin to destination over INDEPENDENT CONTRACTOR'S choice of legal routes on all loads offered by CARRIER that are accepted by INDEPENDENT CONTRACTOR. INDEPENDENT CONTRACTOR will: (a) provide service without transferring, or storage of the shipment, unless prior approval of CARRIER is provided; (b) Will either make timely delivery of loads and notify CARRIER; or will notify CARRIER if the delivery requirements of the consignor and/or consignee cannot be provided. If INDEPENDENT CONTRACTOR is unable to complete delivery, then INDEPENDENT CONTRACTOR will allow CARRIER the use of the loaded trailer for completion of the delivery; and (c) provide service in a manner consistent with the state weight, length, and height laws, and will not accept loads in excess of the limits allowed by states through which the equipment must travel. Failure to perform service consistent with (a) through (c) will be subject to indemnification as provided in Paragraph 13.

4. INSURANCE. CARRIER shall furnish public liability, property damage, and cargo insurance while the equipment is loaded and is transporting CARRIER'S traffic from point of origin to point of destination. The cost of this insurance shall be charged back to INDEPENDENT CONTRACTOR in accordance with Appendix B. For any other service, INDEPENDENT CONTRACTOR is required to obtain and pay for all insurance coverage unless otherwise specified on an addendum attached hereto, including, but not limited to: (a) Automotive liability, Bodily Injury and Property Damage insurance providing combined single-limit coverage of $500,000 for public liability and property damage respecting INDEPENDENT CONTRACTOR'S use of equipment while not transporting CARRIER'S traffic; (b) Cargo insurance respecting the use of equipment while not transporting CARRIER'S traffic; (c) All insurance coverage on the operator, driver, or helpers, whether the equipment is transporting CARRIER'S traffic or otherwise; (d) All insurance coverage for collision, fire, theft, or other occurrence of catastrophe respecting said equipment whether the equipment is transporting CARRIER'S traffic or otherwise; and (e) All overall "umbrella" type of insurance coverage respecting INDEPENDENT CONTRACTOR'S liability of insurance coverage respecting INDEPENDENT CONTRACTOR'S liability arising out of the use and operation of said equipment, or the actions of INDEPENDENT CONTRACTOR, his operator, driver, or helpers.

BASIS FOR COMPENSATION. CARRIER agrees to pay INDEPENDENT CONTRACTOR for transportation service pursuant to Appendix A and the deductions as authorized in Appendix B. CARRIER may amend, change, or alter Appendix A at any time by notifying the other party by Registered Mail, Return Receipt requested twenty (20) days prior to the effective date of the amendment, change, or alteration.

6.  PAYMENT. Payment to INDEPENDENT CONTRACTOR shall be made within fifteen (15) days after receipt of: (1) bill of lading and/or shipping order, (2) delivery receipt, (3) log sheets, (4) trip manifest, (5) detention report, (6) fuel receipts, and (7) damage and accident report, except if service is terminated pursuant to Paragraph 10. CARRIER shall provide to INDEPENDENT CONTRACTOR a Contractor's Settlement Statement and a copy of the rated freight bill, if requested (subject to CARRIER'S right to delete names of shippers and consignees.) INDEPENDENT CONTRACTOR shall have the right to examine copies of CARRIER'S tariff or contract rates during ordinary business hours at CARRIER'S principal place of business, currently in Ashland, Missouri. The Settlement Statement shall include the following deductions paid for by the CARRIER: Advances, administrative fees, permits, charges for transfer or money, deductions as set forth in this Agreement and Appendix B. INDEPENDENT CONTRACTOR shall be afforded copies of those documents which are necessary to determine the validity of the charge.

7.  PURCHASE OR RENTAL SERVICE. INDEPENDENT CONTRACTOR is not required to purchase or rent any products, equipment, or service, from CARRIER as a condition to entering this Agreement.

8.  ESCROW FUND. INDEPENDENT CONTRACTOR shall be required to deposit with CARRIER as escrow funds the sum of $1500.00 per unit, which may be applied in payment to CARRIER for the following items: any claims, demands, judgments, damage, loss, or costs or expenses incurred by CARRIER pursuant to Paragraphs 10 through 19 herein; instructional materials, any deductions authorized by this agreement, and any monies owed to CARRIER at termination of this Agreement. CARRIER shall account to INDEPENDENT CONTRACTOR on the settlement sheet the amount and description of any deduction or addition, and INDEPENDENT CONTRACTOR has a right to demand an accounting of said escrow funds. At the termination of this Agreement, CARRIER shall make all proper deductions from said escrow fund and make a final accounting to INDEPENDENT CONTRACTOR, and return the balance to INDEPENDENT CONTRACTOR within ninety days (90) days of the termination of this Agreement, providing all documents from third parties have been received. Failure to give proper notification of termination of this contract as provided in Paragraph 20 will result in INDEPENDENT CONTRACTOR forfeiting his escrow Fund.

9.  INDEPENDENT CONTRACTOR'S RESPONSIBILITY. Drivers, helpers, or other employees engaged by INDEPENDENT CONTRACTOR in the performance of INDEPENDENT CONTRACTOR'S obligations under this Agreement shall be solely under the control and direction of INDEPENDENT CONTRACTOR and CARRIER shall have no right to direct or control the hiring or discharge of such employees or the manner or means of performing duties for INDEPENDENT CONTRACTOR, nor shall CARRIER have any responsibility for their compensation, taxes, reports, and obligations relating to their employment with INDEPENDENT CONTRACTOR; provided, however, INDEPENDENT CONTRACTOR represents that the service provided under this Agreement will be consistent with that required by the Federal Motor Carrier Safety Regulations. Before using a driver on equipment under a Service Agreement with CARRIER, the INDEPENDENT CONTRACTOR shall submit to CARRIER a qualification file for the driver which must contain an application signed by the INDEPENDENT CONTRACTOR, and also signed by the INDEPENDENT CONTRACTOR'S driver, which will contain the following: (a) the drivers name, address, date of birth and social security, (b) the address at which the driver has resided during the three (3) years preceding the date on which the application is

submitted;  (c) The date on which the application is submitted; (d) The issuing State, number and expiration date of each motor vehicle operator license or permit that has been issued to the driver; (e) The nature and extent of the driver's experience in the operation if motor vehicles including the type of equipment (such as buses, trucks, truck tractors, semi-trailers, full trailers) which he/she has operated; (f) A list of all motor vehicle accidents (no matter what type vehicle) in which the driver was involved during the three (3) years preceding the date the application is submitted, specifying the date and nature of each accident and any fatalities or injuries it causes; (g) A list of all violations of motor vehicle laws or ordinances (other than violations involving only parking) of which the driver was convicted or forfeited bond or collateral during the three (3) years preceding the date the application is submitted; (h) A statement setting forth in detail the facts and circumstances of any denial revocation or suspension that has been issued to the privilege to operate a motor vehicle that has been issued to the driver, or a statement that no such denial revocation, or suspension has occurred; (i) A list of the names and addresses of all of the driver's prior employers during the ten (10) years preceding the date this request is submitted, together with the dates he was employed, and his reason for leaving the employ of each employer. The driver's signature certifying that the information contained in the request is true and complete; (k) The original or legible copy of the driver's Certificate of Physical Examination; (1) A legible photocopy of the driver's commercial motor vehicle operator's license; (m) A Road Test Report on which the person who gives the road test shall rate the performance of the person who takes the road test on each operation or activity which is part of the test; (n) A certificate of Road Test completed by the person who gave the road test (o) State of Prior seven days of service; (p) A driver's license; (q) A "General Waiver" or "release of Information" signed by the driver to be used by the CARRIER in the investigation into the driver's background; (r) A drug test of the driver, acceptable to the CARRIER. The driver's qualifications must be ascertained by CARRIER before the driver is permitted to operate a unit.  INDEPENDENT CONTRACTOR represents that the driver or operator, furnished for said equipment is familiar with and will obey all applicable state and federal laws and regulations; that the furnishings of said operator or driver will not result in a violation of any said laws or regulations; that driver or operator will correctly load the trailer and secure the load; operator or driver will comply with CARRIER in achieving compliance with said laws and regulations, and will promptly file with CARRIER all log sheets, physical examinations, certificates, accident reports and other reports, documents, and data required by law. INDEPENDENT CONTRACTOR hereby waives any claim against CARRIER for injuries incurred. INDEPENDENT CONTRACTOR further understands and agrees that INDEPENDENT CONTRACTOR is fully and solely responsible for, and warrants that he/she shall comply with all applicable laws pertaining to: payment of withholding and payment of taxes on invoice; highway use, fuel or mileage taxes; unemployment insurance; workers compensation; social security; employees disability, and any other such taxes with respect to such drivers, helpers, or other persons engaged by the INDEPENDENT CONTRACTOR.

10.  PAYMENT FOR LAST LOAD.  Payment of INDEPENDENT CONTRACTOR for his last load is contingent upon CARRIER receiving the documents identified in Paragraph 6 and the return of all identification signs.

11.  IDENTIFICATION OF EQUIPMENT.  Upon commencement of this Agreement, CARRIER shall deliver to INDEPENDENT CONTRACTOR all necessary identification signs for the equipment.  These signs shall be displayed on this equipment only during such times as the equipment is loaded with CARRIER'S traffic from point of origin to point of destination, and at all other times.  INDEPENDENT CONTRACTOR shall remove or cover up the signs on the equipment.

INDEPENDENT CONTRACTOR'S USE OF CARRIER'S TRAILER. In the event INDEPENDENT CONTRACTOR or his drivers shall operate equipment and during the operation thereof shall be pulling a trailer owned by, leased or interchanged to CARRIER, and said trailer shall be damaged, INDEPENDENT CONTRACTOR agrees to reimburse CARRIER for such damages. In such instances when INDEPENDENT CONTRACTOR does utilize CARRIER'S trailer for the benefit of himself or a third party, INDEPENDENT CONTRACTOR will pay CARRIER $__N/A__ for such use. CARRIER shall have the right to offset such trailer usage from INDEPENDENT CONTRACTOR'S settlement.

13. CARRIER AS INDEPENDENT CONTRACTOR'S TRAILER LEASE PAYMENT. Where it becomes necessary for CARRIER to guaranteed payment of INDEPENDENT CONTRACTOR'S trailer lease payments, INDEPENDENT CONTRACTOR shall authorize CARRIER to deduct the trailer lease payments from INDEPENDENT CONTRACTOR'S settlement. INDEPENDENT CONTRACTOR shall remain fully responsible for all terms and conditions of the agreement with the trailer lessor, including, but not limited to, insurance deductibles, property damage to trailer, maintenance, monthly payments and mileage payments, and all other conditions of the trailer lease. INDEPENDENT CONTRACTOR shall indemnify CARRIER against all losses, suits, damages, and claims arising out of CARRIER'S obligations under the trailer lease, and INDEPENDENT CONTRACTOR authorizes CARRIER to deduct such amounts from INDEPENDENT CONTRACTOR'S escrow account in accordance with Paragraph B and Appendix B.

14. DEDUCTIONS. INDEPENDENT CONTRACTOR agrees to reimburse and otherwise indemnify CARRIER and hold CARRIER harmless for a loss sustained or a cost incurred by CARRIER pursuant to expenses identified as authorized deductions in Appendix B.

FINES. INDEPENDENT CONTRACTOR shall pay fine incurred by INDEPENDENT CONTRACTOR, his drivers, helpers, or any employee or agent of INDEPENDENT CONTRACTOR by reason of INDEPENDENT CONTRACTOR'S violation of or failure to adhere to any federal state, or provincial law, municipal ordinance, regulation, or rule of any regulatory agency imposing such fine, expense or cost. CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when the trailers are outside of INDEPENDENT CONTRACTOR'S control except when such fines result from the acts or omission of the INDEPENDENT CONTRACTOR.

16. PROCEDURES FOR COMPLETING DRIVER'S LOGS. INDEPENDENT CONTRACTOR'S driver's logs shall indicate that he will initiate transportation "In Service" until CARRIER'S traffic is unloaded. Thereafter, INDEPENDENT CONTRACTOR shall not be "In Service" for CARRIER unless otherwise authorized pursuant to Paragraph 18 and, therefore, INDEPENDENT CONTRACTOR'S logs shall indicate that he is either: (a) "On Duty": for INDEPENDENT CONTRACTOR, or (b) "On Duty": in serving a third party.

17. COSTS OF OPERATION. INDEPENDENT CONTRACTOR shall pay all costs of operations including but not limited to: fuel mileage, tolls, permits, accessorial services, ferries, escort, flagmen, licenses, tags, base plates and any unused portions thereof maintenance costs, lubricants, tires including changing and/or repair; wages and remuneration of operators, drivers, and helpers; public liability, property damage, and cargo insurance on equipment while not transporting CARRIER'S traffic, payments for injury or damages to operator, driver, and helpers and to equipment, whether the same occurred while the equipment was transporting CARRIER'S traffic or otherwise; workers compensation, unemployment insurance, social security or other similar taxes, insurance or benefits on operators, drivers, or helpers, and in connection therewith INDEPENDENT

CONTRACTOR shall make all payroll tax deductions, or any other so related and required deductions, axle, weight or other type of taxes, fees or exactions required of or on said equipment or the use of operation thereof including all reports connected with such matters, damages to cargo or property; fines and penalties arising out of the use of said equipment; highway use, fuel and mileage taxes; and any other taxes required by any federal, state, provincial or municipal law. In the event CARRIER is called upon to pay any of INDEPENDENT CONTRACTOR'S costs of operation, such payment shall be considered as an advance to INDEPENDENT CONTRACT and CARRIER is hereby authorized to reimburse it self out of any monies due or becoming due to INDEPENDENT CONTRACTOR. INDEPENDENT CONTRACTOR warrants that he has obtained and paid for all tags and fees required for the vehicle covered by this Agreement.

18. INSPECTION AND MAINTENANCE ON EQUIPMENT. INDEPENDENT CONTRACTOR warrants that the equipment is complete with all required accessories and is in good, safe, and efficient operating condition and shall be so maintained at the INDEPENDENT CONTRACTOR'S expenses throughout the duration of this Agreement. INDEPENDENT CONTRACTOR agrees to: (a) Systematically inspect, repair, and maintain the equipment in a safe operating condition in accordance with the rules and regulations if the Federal Department of Transportation, Federal Highway Administration; (b) To submit to the CARRIER a: "Monthly Vehicle Maintenance" report; (c) To submit to the CARRIER a "Monthly Vehicle Inspection" report which indicates the condition of the equipment and the maintenance performed; (d) To submit the equipment to the CARRIER for the CARRIER'S inspection at any time deemed necessary by the CARRIER; (e) To submit to the CARRIER all necessary information and documents of title or registration so as to enable that CARRIER to correctly identify the equipment; and (f) To submit to the CARRIER any and all out-of-service citations or notices of repair, provided by any federal or state agency: (g) To submit to the CARRIER a receipt as evidence of the repairs set forth in the out-of-service citation or notice of repair.

19. AUTHORIZATION. INDEPENDENT CONTRACTOR will not, for any purpose whatsoever, act or proposes to act as an agent, representative, or employee of CARRIER.

20. DURATION OF SERVICE AGREEMENT. This Agreement shall commence at the date and hour when executed. CARRIER may terminate their Agreement at any time INDEPENDENT CONTRACTOR; (a) Fails to maintain vehicle in operating condition in accordance with the regulations of the Federal Department of Transportation, Federal Highway Administration; (b) Fails to make available a competent driver, properly qualified under the rules and regulation of the Federal Department of Transportation, Federal Highway Administration; (c) Fails to comply with substantial provisions of this Agreement; (d) Fails to maintain insurance consistent with Paragraph 4; and (e) Delivers to CARRIER all identification signs, license plates, permits, certification, bills, documents, and all other personal property of CARRIER. Either party may terminate this Agreement by notifying the other party by Registered Mail Return Receipt requested, and the termination shall be effective 14 days after the notified party has received the Registered Mail.

21. APPLICABLE LAW; JURISDICTION AND VENUE. This Agreement shall be interpreted under the laws of the State of Missouri. Any waiver of one or more provisions of this Agreement shall not constitute a waiver of the entire Agreement. INDEPENDENT CONTRACTOR and CARRIER irrevocably consent to the jurisdiction and venue of any court of general jurisdiction located in Boone County, Missouri, with respect to any claim, controversy, cause of action, or dispute arising out of or relating to this Agreement.

AGREEMENT AND COPIES.  The foregoing Agreement plus any attachments hereto constitute the complete agreement between INDEPENDENT CONTRACTOR and CARRIER, and no contractor, employee, or agent of either party shall have authority to alter or vary the terms hereof or vary the terms, hereof except as listed in Appendix A or to make any representations or commitments not included herein.  This Agreement shall be executed in triplicate, and each copy shall be considered an original.  One executed copy shall be delivered to and retained by INDEPENDENT CONTRACTOR, one copy shall be retained by CARRIER, and one copy shall be carried on the equipment during the period of this Agreement unless a statement as provided in 49 C.F.R. & 1057.11 (c) (2) is carried on equipment instead.

IN WITNESS WHEREOF, the CARRIER and INDEPENDENT CONTRACTOR do hereby sign this Agreement this ___7th___ day of ___January___, 201_4_ at ___4:30 pm___which date and hour shall be the effective date of this Agreement.


INDEPENDENT CONTRACTOR: _____

By: _____


CARRIER:  A & G Commercial Trucking

By: _____


Page – 7

# EXHIBIT  4

## FULL SERVICE AND MAINTENANCE LEASE

This Full Service and Maintenance Lease ("Lease") is entered into this day of _8-5-18_ 2018 by and between Mark or Lyn Russell/Russell Trucking having its principal place of business at 4612 Farm Road 269, Pickton, Texas, 75471 ("Company") and _Gerald Fielden_ (Lessee/Operator's Name) of _200 Hollie Ci_ (address), _Sulphur Springs_ (city), _Texas_ (state) _75482_ (zip code) ("Lessee/Operator"). Company owns or has the right to:

Year: _Any truck owned by Mark or Lyn Russell_

Make: _____

VIN: _____

(the "Vehicle").

WHEREAS, Company operates as a lessor of tractors used to transport mobile homes, office building, and similar structures with its principal place of business at the address set forth above,

WHEREAS, Company owns or has the right to the Vehicle and desires to lease the Vehicle to the Lessee/Operator; and

WHEREAS, Lessee/Operator agrees to pay Company for the use of the Vehicle under the terms and conditions set forth in this Agreement to provide transportation services to A&G Trucking.

NOW, THEREFORE in consideration of the following mutual covenants and agreements, the parties agree as follows:

**1. SERVICES AND RESPONSIBILITIES REGARDING MAINTENANCE**

    A. The Company will provide the following services and expenses on the Vehicle:

        i. All maintenance and preventative service, including oil, oil changes, antifreeze testing, and washing;

        ii. Annual Department of Transportation Inspection;

        iii. Registration of Vehicle;

        iv. Required collision insurance and bobtail insurance, per requirements of A&G Trucking and Federal Motor Carrier Safety Administration regulations;

        v. Towing fees by a wrecker in the event that the Vehicle becomes inoperable due to malfunction of said Vehicle, not to include malfunction

Scanned with Ca

due to driver error or Lessor's failure to notify Company of service or maintenance need.

B. The Lessee/Operator shall provide;

    i.  Timely reporting to Company any and all problems that may arise from use of the Vehicle, including but not limited to excessive tire wear, unusual oil or fuel consumption, overheating, body damage, improper power lift functions or if the Vehicle becomes inoperable due to improper use of Vehicle by driver;

    ii.  Towing and wrecker fees resulting from accidents, regardless of fault, misjudgment of road or weather conditions, and assistance required when Vehicle become immobile from being driven off the road;

    iii.  Daily inspection of vehicle to be performed and documented as required by federal regulations;

    iv.  Daily inspection of oil and water levels.

2.    **TERM.** The term of this Agreement shall on date set above and shall continue until terminated in writing by either Company or Lessee/Operator, as provided below.

3.    **PAYMENT FOR LEASE OF VEHICLE.** Lessee/Operator shall tender weekly payment in the amount of fifty percent (50%) of the net amount paid by A&G Trucking to the Lessee/Operator (hereinafter "Lease Payment"). The net amount equals the gross amount paid less the fuel used and the escort fees paid by A&G Trucking. The gross amount equals the line haul pay based on miles on the freight bill and added detour miles, deadhead pay, and miscellaneous pay, including but not limited to lights, tires, and site drop fees. Moneys paid for the Vehicle to tow another tractor will be treated as income and included in the gross amount. Money paid for the Vehicle to be towed by another tractor will be deducted from the gross amount paid.

    A. To allow for the proper calculation of the Lease Payment Amount and timely payment of same, Lessor/Operator shall be responsible for timely submitting on a weekly basis the required documentation to A&G Trucking by facsimile. Such documentation includes but is not limited to all fuel receipts, service receipts, and tire repairs.

    B. Lessee/Operator shall execute a power of attorney allowing Company to act as its agent with A&G Trucking.

    C. The lease payment owed shall be paid weekly through a deduction taken by A&G from the moneys owed Lessee/Operator. Lessee shall authorize or allow Company to authorize, as its agent, the deduction of the Lease Payment form the funds owed to the Lessee/Operator and have the Lease Payment paid directly to Company. The Lease Payment is to be tendered to Company prior to A&G tendering payment of moneys owed to Lessee/Operator, whether by check or credit.

FULL SERVICE & MAINTENANE LEASE

Scanned with Ca

D. Upon request of the Lessee/Operator, Company shall provide an accounting to the Lessee/Operator of the Lease Payment within fourteen (14) calendar days. The accounting shall provide an itemization of the gross amount calculated for loads and the amounts deducted for escort fees and fuel expense to determine the net amount.

**4. RELATIONSHIP OF PARTIES.** The parties intended that a lease relationship be created by this agreement. Other than the Company having a power of attorney on behalf of Lessee/Operator with A&G Trucking, there is no agency relationship between the parties. Company is interested only in the results to be achieved under the Agreement; and Lessee shall have and exercise the sole and exclusive right to control the ways, means and manner of conducting the work and services incident to the performance of this Agreement. However, the results of each Job performed by Lessee under this Agreement must be satisfactory to A&G Trucking. **Lessee/Operator is not to be considered an agent authorized to transact business or enter into agreements or otherwise make commitments on behalf of Company.** Further, **Lessee/Operator is not to be considered an employee of Company** and none of the benefits provided by Company to its employees, including, but not limited to workers' compensation and unemployment insurance, will be available from or provided by Company for Lessee/Operator and Lessee/Operator shall not be treated as an employee under this Agreement for federal or state tax purpose and understands that he/she/it is responsible to pay Lessee's/Operator's taxes including income tax and self-employment (social security) tax, if any. Neither federal, nor behalf of Lessee/Operator. In this regard, Lessee/Operator hereby assumes full control and responsibility for all hours worked, wages, salaries, workers' compensation, unemployment insurance, federal and state taxes, fringe benefits and all other costs relating to the use of drivers provided by Lessee/Operator pursuant to this Agreement. Lessee/Operator is responsible for the Occupational Accident Insurance, as may be required by law and A&G Trucking.

**5. VEHICLE AND EQUIPMENT**

**5.1 Vehicle.** Lessee shall be require to furnish and maintain, at his/ her own expense, the Vehicle and other required equipment needed for use in performing delivery services for A&G Trucking under this Agreement, subject to the terms of this Agreement. It is expressly understood and agreed that Lessee is an independent contractor for the Vehicle provided pursuant to this Agreement, and that Lessee agrees to defend, indemnify and hold Company harmless for any claims, suits or actions, including reasonable attorney's fees, arising out of the operation of the Vehicle pursuant to this Agreement. Proof of such control and responsibility shall be submitted by Lessee to Company as required by Company and may include but not be limited to, proof of payment of payroll tax for Lessee's drivers. Lessee shall, at its sole cost and expense, provide all equipment ready to operate and fully roadworthy, including the necessary licenses, cab cards, vehicle identification stamps, state base plates and shall furnish all necessary supplies and

equipment necessary or required for the safe and efficient operation of such Vehicle including other expenses incident to such operation including but not limited to, highway use taxes, weight taxes, state property, fuel taxes, ferry and toll charges and detention and accessorial charges not collected by Company because of Lessee's failure to provide the required documentation. Lessee shall identify the Vehicle in accordance with the requirements of the Department of Transportation (DOT) and appropriate stat regulatory agencies. Lessee further agrees to keep the Vehicle in clean appearance, at its sole cost and expense.

5.2 **Possession of Vehicle.** Lessee shall assume complete responsibility for the operation of the equipment, subject to the terms of the Agreement, for the duration of the Agreement.

5.3 **Chargebacks by A&G Trucking.** Lessee is responsible for all charge backs assessed by A&G Trucking that are assigned to the Vehicle.

5.4 **Fines, Tickets and Accidents.** Lessee agrees to pay all fines, including but not limited to, parking and traffic fines and penalties imposed for violation of any law or regulation the state or any locality in which Lessee/Operator operates, the Department of Transportation where such violation results, at least partially, form the acts or omissions of Lessee/Operator. In addition, Lessee shall immediately report any accident or potential claim to Company involving operations under this Agreement, including Lessee's written report of such accident or claim. In the event Lessee fails to notify Company of the accident within one (1) hour from the time of the accident or claim, Lessee shall be liable for any and all damages, fines, claims by third parties and reasonable attorney's fees. Lessee shall cooperate fully with Company in any legal action, regulatory hearing or other similar process arising from the operation of the Vehicle and the relationship created by this Agreement or the services performed hereunder. Lessee shall, upon Company's request, provide written reports or affidavits, attend hearings and trails and assist in securing evidence or obtaining the attendance of witnesses. Lessee shall provide Company with any assistance as may be necessary for Company or Company's representatives or insures to investigate, settle or litigate any accident claim or potential claim by or against Company.

5.5 **Equipment.** If Lessee does not possess all equipment required for operation of the Vehicle and/or performance of services provided hereunder, Lessee may lease such equipment firm Company as set forth on Exhibit "A" and shall maintain same in good and proper working order during the term of this Agreement. Lessee agrees to return any Company equipment provided for its use by Company in the same good condition as received by Lessee, reasonable wear and tear accepted, along with any and all other equipment and property belonging to Company immediately upon Company's request or upon termination of this Agreement at a time and place designated by Company. In the event the equipment is not in as good a condition as it was delivered by Company, Lessee hereby authorizes Company to restore the equipment to proper condition and to deduct or

Scanned with Ca

charge Lessee for such repairs or reconditioning. In the event Lessee for any reason fails to comply with this provision, Lessee agrees to reimburse Company for all reasonable expense and costs incurred by Company in recovery of its equipment and/or property from Lessee or its drivers. Lessee agrees that in the event that it is necessary for the Company to enter onto private property to recover its Vehicle and/or property, Lessee does hereby irrevocably grant Company or its duly authorized agents, permission to do so and further agrees to save and hold harmless Company and its duly authorized agents, from any form of liability whatsoever in connection with such repossession. Lessee shall be liable for, and pay, the entire amount for each incident involving direct, indirect and consequential damage including but not limited to, towing charges, replacement cost for a total loss, and reasonable attorney's fees, arising out of, or in connection with Lessee's use of the Vehicle, other equipment of Company's or equipment of another carrier.

6. **DRIVERS.** It is Lessee's responsibility to provide a driver, authorized, approved, and acceptable to A&G Trucking, for the Vehicle. The driver must be qualified to operate a commercial motor vehicle and meet all qualifications required by A&G Trucking to operate the Vehicle. Lessee hereby acknowledges that A&G Trucking must approve each driver to operate specific Vehicle in this lease and such approval must be obtained prior to the driver operating the Vehicle.

6. **INDEMNIFICATION.**

7.1 **Indemnity.** The use of the Vehicle or any Company equipment by Lessee/Operator under this Agreement will be performed entirely at Lessee/Operator's risk. Lessee agrees to indemnify and hold harmless Company and its agents, employees, successors, and assigns against any and all cost of defense, liability or loss, and against any and all lawsuits, claims or actions based upon, arising from, brought or made for an account of any actual or alleged injuries or damages of any kind (including death) to persons or property caused by or sustained in connection with Lessee's performance (including acts and/or omissions of Lessee or Lessee's employees or agents) of this Agreement and possession, custody, and control of this Vehicle, including, but not limited to, any and all attorney's fees, court costs and expenses incurred by Company in the defense of any such suits, claims or actions. Lessee shall further assume full responsibility for, and shall indemnify and hold Company harmless against any and all liability or loss in connection with the payment federal, state and local taxes or contributions imposed or required by unemployment insurance, social security and income tax law, with respect to Lessee under any obligations of this Agreement, and Company prevails, Lessee agrees to pay Company's attorney's fees, expenses and court costs incurred in securing such performance or payment by Lessee.

A. **Repairs to Vehicle Due to Negligence or Driver Error.** Lessee is responsible for payment of repairs, parts, and labor resulting from the negligent operation of the Vehicle or driver error. If payment is not received for the cost of

the repairs within thirty (30) days of demand by Company, Lessee hereby authorized Company, as its agent, to receive moneys from A&G Trucking owed to Lessee and such moneys are to be credited against the amount owed for repairs, parts and labor.

7.2 Insurance. In conjunction with the above Agreement of Lessee to indemnify the Company and to ensure Lessee's ability to comply, Company shall procure and maintain in force auto physical liability insurance, including comprehensive, collision, and bobtail, for the protection of the public, not otherwise provided by A&G Trucking. Lessee shall reimburse Company for fifty percent (50%) of the cost of the deductible coverage insurance, if obtained by Company. Company will provide a copy of the insurance policies for which Lessee is charged for premiums, upon request by Lessee. Additionally, Company will provide Lessee with a certificate of insurance with the following information: the name of the insurer; the policy number; the effective date of the policy; the amounts and types of coverage; the cost to the Lessee for each type of coverage; and the deductible amount.

**8. CONDUCT AND DOT REGULATION COMPLIANCE.** Lessee and/or its drivers shall be required to comply with and adhere to any all Department of Transportation (DOT), Federal Motor Carrier Safety Administration (FMCSA), Transportation Security Administration (TSA) or other federal, state, and local requirements.

**9. TERMINATION.** Either party with or without cause may terminate this Agreement by giving written notice to the other of the intent to terminate. This Agreement may be terminated for any reason, including but not limited to the Lessee no longer providing services for A&G Trucking, by giving one (1) day's written notice to that effect to the other party either personally, by mail, or by fax machine at the address or fax number shown on the end of this Agreement. Lessee shall, upon the termination of this Agreement, remove all of his/her/its property from the Vehicle immediately and return the Vehicle, along with all Company equipment and property, to Company at its principal office or at location designated by Company. Company may pursue all other remedies allowed by law or authorized in the Agreement against Lessee for failure to perform its obligations under this Agreement, including reimbursement for any expenses associated with such failure. The failure on the part of the Lessee to allow Company to remove and recover the Vehicle and other property or equipment (leased or owned) belonging to Company shall constitute a breach of this Agreement which breach shall entitle Company to recovery of damage under this Agreement.

**10. GOVERNING LAW.** Notwithstanding anything to the contrary herein, the terms of this Agreement shall be governed by the laws of the State of Texas. Each party hereto agrees to submit to the personal jurisdiction and venue of the state and federal courts having jurisdiction over Hopkins County, Texas, for the resolution of all disputes arising in connection with the interpretation, construction, and enforcement of this Agreement,

Scanned with Ca

and hereby waives the claim or defense therein that such courts constitute an inconvenient forum.

**11. ASSIGNABILITY.** The Lessee may not assign his/her/its interest in or delegate his/her/its duties under this Agreement. The rights and obligations of the Company hereunder may be assigned.

**12. NOTICES.** All notices, demands, and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing given to the other party at the address set forth on the first page of this Agreement or as expressly designated by either party in a subsequent written notice. Such notice shall be deemed effective when either: (a) personally delivered to the intended recipient; (b) sent by certified mail, return receipt requested, addressed to the intended recipient; (c) deposited into the custody of a nationally recognized overnight delivery service such as Federal Express; or (d) sent by facsimile provided that receipt for such facsimile, is verified by the sender and followed by a notice sent in accordance with one of the other provision set forth above.

**13. ENTIRE AGREEMENT; MODIFICATION.** This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and may not be modified or amended in any way except in writing by the parties hereto.

**14. SEVERABILITY.** In the event any portion or portions of this Agreement are declared to void for illegality, then the remaining portions of this Agreement shall remain and shall be valid and binding.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on or as of the date and year first above written.

**COMPANY:**

Mark or Lyn Russell/Russell Trucking
4612 FM 269
Pickton, Texas 75471
Telephone: (903)348-0316 or (903)348-0555
Facsimile: (903)866-2120

By: _(signature)_
Printed Name:

Title: Owner

**LESSEE/OPERATOR:**

Gerald W. Fielden
205 Holke Cr.
Sulphur Springs, Tx 75482

By: _(signature)_
Printed Name:

# EXHIBIT 5

**STRAIGHT BILL OF LADING – SHORT FORM – ORIGINAL - NOT NEGOTIABLE**

| NAME OF CARRIER | | CARRIER'S NO. | DATE | SHIPPER'S NO. |
|---|---|---|---|---|
| GKD MGMT LP DBA A&G Commercial Trucking | | 142178 | 6/22/2020 | L116337 |

RECEIVED, subject to the classifications and lawfully filed tariffs in effect on the date of this Bill of Lading,

the property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned and destined as indicated below which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in Uniform Freight Classifications in effect on the date hereof, if this is a rail or a rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment.

Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

| FROM: | | | TO: | |
|---|---|---|---|---|
| SHIPPER | LEGACY HOUSING OUTLET - FTW | | CONSIGNEE | SHADY LANE MHP |
| (ORIGIN) | 4801 MARK IV PARWAY | | STREET | 4720 S. RANGELINE RD |
| | FT WORTH, TX 76106 | | DESTINATION | JOPLIN, MO 64804 |
| | 817-624-6448 | | | 417-623-2323 |

| DELIVERING CARRIER | Fielden, Jr, Gerald  W | ROUTE | | VEHICLE NUMBER | 5991 |
|---|---|---|---|---|---|

| PIECES | HM | KIND OF PACKAGE, DESCRIPTION OF ARTICLES, SPECIAL MARKS AND EXCEPTIONS | WEIGHT | CHARGES (FOR CARRIER USE ONLY) |
|---|---|---|---|---|
| 0 | | MANUFACTURED HOUSING L116337 | 0 | |
| 0 | | SIZE:  16 68 | 0 | |
| 0 | | DRIVER:  CALL DEALER 2 HOURS OUT | 0 | |
| 0 | | ESCORT | 0 | |

| PLACARDS SUPPLIED | ☐ YES ☐ NO | DRIVER'S SIGNATURE | | EMERGENCY RESPONSE PHONE NO |
|---|---|---|---|---|

| REMIT C.O.D. TO: | | C.O.D.  Amt $ | C.O.D.  FEE ☐ PREPAID ☐ COLLECT |
|---|---|---|---|

| If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight." | NOTE: Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding | Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. | TOTAL CHARGES $ |
|---|---|---|---|
| Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission. | $ _____ Per _____ | (Signature of Consignor) | Freight charges are PREPAID unless marked collect. ☐ Check box if charges are Collect. |

"This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation, according to the applicable regulations of the Department of Transportation."

Shipper, Per _____          Agent, Per _____

Permanent post office address of shipper _____

+ MARK WITH "X" TO DESIGNATE HAZARDOUS MATERIAL AS DEFINED IN TITLE 49 OF FEDERAL REGULATIONS.

When transporting hazardous materials include the technical or chemical name for n.o.s. (not otherwise specified) or generic description of material with appropriate UN or NA number as defined in US DOT Emergency Response Communication Standard (HM-126C). Provide emergency response phone number in case of incident or accident.

*Legacy Housing*

## Quality Checkout Sheet

Date / Time of Delivery ___6/22___   Serial# ___L116337___   DPU?   Yes   No
LEGACY, BENNETT, APACHE, OTHER

Sales Location Name:   **LEGACY( HILLSIDE-JOPLIN)**   Plant   Fort Worth, TX

Please help us to ensure that your home is delivered in the best condition possible by returning this form with the driver after answering these questions. Please list any applicable areas of improvement that are needed:

1. Was the home built as ordered?   Yes   No

_____

2. Was the home clean and neat?   Yes   No

_____

3. Is there any obvious transportation damage?   Yes   No
Will inspet at a/a/f. time

| | | | | |
|---|---|---|---|---|
| 4. Is all close-up plastic intact and free of tears? | | Yes | No | _____ (Driver's initials) |
| Is the home dry and free of moisture damage? | Pick up | Yes | No | _____ (Driver's initials) |
| | Delivery | Yes | No | _____ (Driver's initials) |

5. Grade your Satisfaction with the home:   Satisfied   Unsatisfied

_____

6. Were keys in House Pack?   Yes   No
Material purchases sent in home(if any): _____

_____
_____

_____   _____
Dealer Signature        Driver Signature

*4901 Mark IV Parkway • Fort Worth, TX 76106 • Phone: (817) 624-7565 Fax: (817) 624-7573*

Scanned with CamScanner

# EXHIBIT 6

Filed 10/8/2020 3:25 PM
Cheryl Fulcher
District Clerk
Hopkins County, Texas

Heather Harrison

CAUSE NO. **CV44471**

| | | |
|---|---|---|
| **MICHAELEA DIANNE MOSS** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **FOR 62nd JUDICIAL DISTRICT** |
| | § | |
| | § | |
| **GERALD WAYNE FIELDEN, and** | § | |
| **GKD MANAGEMENT, LP d/b/a** | § | |
| **A&G COMMERCIAL TRUCKING** | § | |
| **Defendants** | § | **HOPKINS COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION AND
## DISCOVERY REQUESTS TO DEFENDANTS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES **MICHAELEA DIANNE MOSS**, (hereinafter "PLAINTIFF"), complaining of **GERALD WAYNE FIELDEN** (hereinafter "DEFENDANT FIELDEN") **and GKD MANAGEMENT d/b/a A&G TRUCKING** (hereinafter "DEFENDANT GKD"), and for cause of action would respectfully show unto the Court and jury the following, to-wit:

## I.
## PARTIES

1.      Plaintiff, MICHAELEA DIANNE MOSS, is a citizen of the State of Texas, whose address is 304 Kelli Circle, Sulphur Springs, Texas 75482.

2.      In accordance with CPRC 30.014, MICHAELEA DIANNE MOSS has been issued a driver's license. Without regard to when said license was issued, whether it is still in effect, or where it was issued (none of which are required by CPRC 30.014), the last three (3) numbers (although without regard to the sequence as they appear on the license, which is likewise not required by CPRC 30.014) are 402.

---

3.      Further, MICHAELEA DIANNE MOSS has been issued a social security number. Without regard to when said social security number was issued, whether it is still in effect, or where it was issued (none of which are required by CPRC 30.014) the last three (3) numbers (although without regard to the sequence as they appear, which is likewise not required by CPRC 30.014) are 831.

4.      Defendant, GERALD WAYNE FIELDEN**,** is an individual residing in Texas and may be served with process at his place of residence via deputy of sheriff at his residence which is located at 200 Hollie Circle, Sulphur Springs, Texas 75482.

5.      Defendant, GKD MANAGEMENT d/b/a A&G TRUCKING, is a foreign company doing business in the State of Texas and may be served with process by serving its Registered Agent for Service, Rosemary Wilhelm, 521 Main Street, Sulphur Springs, Texas 75482-2700 by certified mail, return receipt requested.

## II.
## CASE LEVEL ASSIGNMENT

6.      Plaintiff would show discovery in this cause should be conducted pursuant to Level 3 of the Discovery Control Plan, as set forth in Rule 190 of the Texas Rules of Civil Procedure, in that Plaintiff affirmatively pleads that he seeks monetary relief aggregating $100,000.00 or more, excluding costs, pre-judgment interest and attorneys' fees.

## III.
## JURISDICTION AND VENUE

7.      Venue is proper in Hopkins County, Texas pursuant to §15.002 (a)(2) because Defendant, GERALD WAYNE FIELDEN, resided in Hopkins County, Texas at the time of the cause of action accrued.

**IV.**
**STATUTE OF LIMITATIONS**

8.     Plaintiff alleges this lawsuit has been filed within the time period of the appropriate statute of limitations from the date of the occurrence. In the alternative, Plaintiff alleges the statute of limitations is tolled because this lawsuit has been filed within two (2) years of the date Plaintiff knew or should have known of the existence of a cause of action, or any delay is the result of direct threats or fraud on the part of the Defendant.

**V.**
**FACTS OF THE CASE**

9.     On or about June 23, 2020, Plaintiff, Michaelea Moss was a passenger in the 1998 International Tractor, bearing VIN Number 2HSLAHN7WC043153; and bearing Texas License Plate Number E285HV, on US Highway 271  in Choctaw County, Oklahoma, when Defendant FIELDEN lost control of his vehicle, causing the 1998 International Tractor to roll over into the median of the highway. The Defendant, FIELDEN, failed to keep such a lookout as would have been kept by a person exercising ordinary care and prudence under the same or similar circumstances; was traveling at a faster rate of speed than a person exercising ordinary care and prudence would have traveled under the same or similar circumstances, which caused him to wreck the vehicle he and Plaintiff were traveling in, causing Plaintiff to sustain severe permanent and disabling injuries. At the time of the collision in question, the Defendant, GERALD WAYNE FIELDEN, was driving with permission, in the course and scope of his employment with his employer, Defendant, GKD MANAGEMENT d/b/a A&G TRUCKING.

10.    At all times relevant to this lawsuit, Defendant, FIELDEN was operating a "commercial motor vehicle" in "interstate commerce", as per 49 C.F.R. parts 383, 387, and 390-399.

11.     At all times relevant to this lawsuit, Defendant, GKD MANAGEMENT d/b/a A&G TRUCKING was a "motor carrier" as per 49 C.F.R. parts 383, 387, and 390-399.

12.     At all times relevant to this lawsuit, Defendant, GKD MANAGEMENT d/b/a A&G TRUCKING was a "motor carrier" as defined by 49 U.S.C. §13102(14).

13.     At all times relevant to this lawsuit, Defendant, GKD MANAGEMENT d/b/a A&G TRUCKING was an "employer" as defined by 49 C.F.R. §390.5.

14.     At all times relevant to this lawsuit, Defendant, GERALD WAYNE FIELDEN was an "employee" of Defendant, GKD MANAGEMENT d/b/a A&G TRUCKING, as per 49 C.F.R. §390.5.

15.     Plaintiff would further show that at the time of the accident made the basis of this lawsuit and all times material hereto, Defendant, FIELDEN was an employee working for Defendant, GKD.

16.     Further, at the time the accident made the basis of this lawsuit and at all times material hereto, Defendant, FIELDEN, was an employee of Defendant GKD and was operating a motor vehicle on behalf of Defendant GKD under and by the authority of Defendant GKD and operating a commercial motor vehicle on behalf of Defendant, GKD, under and by the authority of Defendant, GKD, pursuant to Defendant, GKD.'s, Federal DOT Number 857474.

## VI.
## CAUSE OF ACTION

17.     Plaintiff alleges that Defendant FIELDEN, through his acts and omissions, was negligent, and such negligence was a proximate cause of the incident and injuries in question.  Plaintiff's resulting injuries and damages were proximately caused by one or more of the following acts of negligence on the part of the Defendant FIELDEN:

     a.     In negligently operating the vehicle in question;

b.    In failing to maintain control of his vehicle;

c.    In failing to maintain a proper lookout;

d.    In failing to apply his brakes as would have been done by a person exercising ordinary care and prudence under the same or similar circumstances;

e.    In traveling at an excessive rate of speed as would have been done by a person exercising ordinary care and prudence under the same or similar circumstances;

f.    In failing to watch out for traffic in front of Defendant's vehicle as would have been done by a person exercising ordinary care and prudence under the same or similar circumstances.

g.    In failing to control the speed of his vehicle.

h.    In engaging in conduct that was distracting;

i.    In failing to reduce his speed driving in inclement weather conditions;

j.    Defendant was negligent in other respects.

18.    Plaintiff alleges that the acts and/or omissions by Defendant was negligent and also violated statutory law and regulations and gives rise to negligence per se, which was a proximate cause of the incident and injuries in question in one or more of the following ways[1]:

a.    In violating 49 CFR 392.14 by failing to exercise extreme caution during hazardous conditions;

b.    In violating 49 CFR 392.3 which provides, No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him to begin or continue to operate a commercial motor vehicle, which constitutes negligence.

c.    In violating Oklahoma Statute 47-11-310;

d.    In violating Oklahoma Statute 47-11-801;

e.    In violating Oklahoma Statute 47-11-901;

f.    In violating Oklahoma Statute 47-11-901b;

g.    In violating Oklahoma Statute 47-11-901c;

h.    In violating Oklahoma Statute 47-11-901d; and

i.    In violating Oklahoma Statute 47-11-403.1;

19.    Plaintiff further alleges that Defendant, FIELDEN, by and through his acts and/or omissions as set forth and plead above, exceeded the test for negligence and committed acts and/or omissions of gross negligence that amounted to more than momentary thoughtlessness, inadvertence or error

---

[1] Plaintiff asserts that in the event any of these allegations and statutes plead do not constitute negligence per se, said statutes are being plead for the purpose of setting out the standard of care which the Defendant at all times material hereto, was required to adhere to and a violation of same would have constituted negligence under common law.

of judgment.  Plaintiff alleges that said acts and/or omissions amounted to such an entire want of care as to establish that the act of omission was the result of actual conscious indifference to the rights, safety or welfare of Plaintiff. Plaintiff further alleges that the Defendant's acts and/or omissions of gross negligence created an extreme degree of risk to Plaintiff.  Plaintiff further alleges that Defendant's acts and/or omissions of gross negligence, when viewed objectively from the standpoint of the Defendant at the time of its occurrence, involved an extreme degree of risk considering the probability and magnitude of potential harm to others, including Plaintiff.  Plaintiff further alleges that the Defendant had actual subjective awareness of the risk involved but, nevertheless, proceeded with conscious indifference to the rights, safety and welfare of Plaintiff. In this regard, Plaintiff therefore seeks punitive and/or exemplary damages.

## VII.
## RESPONDEAT SUPERIOR

20.     Plaintiff would further show that at the time the accident made the basis of this lawsuit occurred, Defendant, FIELDEN was an employee of Defendant GKD and acting within the course and scope of his employment for Defendant, GKD and in the furtherance of the business interests and pursuits of said Defendant.  In this regard, Plaintiff hereby invokes the doctrine of *respondeat superior* and therefore alleges and contends that each negligent act and/or omission on the part of Defendant, FIELDEN is imputed to Defendant GKD and they are vicariously liable for all negligent acts and/or omissions alleged herein to have been perpetrated by its employee driver.

## VIII.
## PERMISSIVE USE

21.     Plaintiff would further show that prior to the time the collision occurred Defendant GKD was the owner and/or was in the possession, custody and control of the vehicle ultimately driven by Defendant FIELDEN on the date of the wreck made the basis of this lawsuit.  On or about June

23, 2020, Defendant GKD directed Defendant FIELDEN to use the motor vehicle in question for the purpose of operating it on the public streets and highways of Texas and, therefore, Defendant FIELDEN, operated said vehicle with the knowledge, consent and permission of Defendant GKD.

## IX.
## NEGLIGENT AND GROSS NEGLIGENT ENTRUSTMENT

22.     Plaintiffs would further show that Defendant GKD was the owner of the vehicle that was being driven by Defendant FIELDEN at the time of the occurrence made the basis of this lawsuit. Plaintiffs would also show that Defendant GKD was negligent and grossly negligent in entrusting the commercial motor vehicle to Defendant FIELDEN who was a careless, incompetent and reckless driver. Defendant GKD knew or should have known that Defendant FIELDEN was a careless, incompetent and reckless driver. Plaintiffs would further show that Defendant GKD was negligent and grossly negligent in entrusting the vehicles to its employee, Defendant FIELDEN which in turn was a proximate cause of the collision and the occurrence made the basis of this lawsuit and the resulting injuries and damages to Plaintiff set out below.

23.     Further Defendant FIELDEN's negligent acts and/or omissions were a primary and direct cause of the wreck.  Defendant GKD owed a duty of care, or alternatively, a high duty of care, to the motoring public, including Plaintiff, to entrust their vehicles with the degree of care that a commercial motor carrier would use under the same or similar circumstances. Defendant GKD's various incidents, accidents, and violations of the FMCSRs placed Defendant GKD, on actual notice (or it reasonably should have known) that Defendant FIELDEN, was an unsafe, careless, reckless, and incompetent driver who was an accident waiting to happen. Defendant FIELDEN, based on the evidence uncovered in this case had a history of unsafe acts and/or omissions that Defendant GKD knew or should have known made Defendant GKD was a severe risk to himself

and the motoring public. Defendant GKD, entrusted the 1998 International Tractor that is the subject of this lawsuit to Defendant FIELDEN. Defendant FIELDEN was an incompetent, reckless, or careless driver and Defendant GKD knew or should have known that Defendant FIELDEN was an incompetent, reckless or careless driver. Defendant GKD was negligent per se by violating numerous federal and state statutes and regulations. Defendant FIELDEN's negligent acts and/or omissions on the occasion in question proximately caused injuries and damages to Plaintiff as more fully set out below. Defendant GKD aided and abetted the unsafe and dangerous practices of Defendant FIELDEN which Defendant FIELDEN knew presented a severe risk of serious injury or death and which Defendant GKD. also knew or should have known about. The conduct of Defendant GKD and Defendant FIELDEN both before and after the collision made the basis of this lawsuit evidences a clear pattern and practice of dangerous and unsafe conduct demonstrating they simply did not care. Each of these acts and/or omissions was a proximate cause of the injuries and damages as set out below.

## X.
## NEGLIGENT AND GROSS NEGLIGENT HIRING, RETENTION, TRAINING AND CONTROL

24.     Plaintiffs further allege that Defendant GKD through its acts and/or omissions, was negligent and grossly negligent, and such negligence was a proximate cause of the occurrence in question and injuries and damages as set out below. Plaintiff's resulting injuries and damages were proximately caused by one or more of the following acts of actual or gross negligence on the part of Defendant GKD:

    a.     In hiring and/or retaining its employee driver Defendant FIELDEN

    b.     In allowing Defendant FIELDEN to drive the vehicle in question.

    c.     In failing to instruct, supervise, and control its employee driver.

d.   In failing to properly train the driver and his supervisors regarding the Federal Motor Carrier Safety Regulations.

e.   In failing to properly train the driver and his supervisors regarding industry safety practices applicable to motor carriers and commercial vehicle operators.

f.   In failing to enforce the DOT Compliance Manual, industry standards, and the Federal Motor Carrier Safety Regulations and the Texas Transportation Code applicable to the operation in question.

g.   In failing to superintend, monitor and audit the performance of the operator and its supervisor given the habitual unsafe acts and practices that preceded and post-dated the wreck.

h.   In failing to issue any disciplinary action, including terminating the driver regarding the unsafe practices that Defendant FIELDEN knew were unsafe.

i.   Such other and further acts or omissions that give rise to gross neglect.

## XI.
## MALICE

25.   Plaintiff further alleges that Defendant GKD by and through its acts and/or omissions, and employees, exceeded the test for negligence and committed acts and/or omissions of gross negligence that amounted to more than momentary thoughtlessness, inadvertence or error of judgment. Plaintiff alleges that said acts and/or omissions set out above amounted to such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety or welfare of Plaintiff.  Plaintiff further alleges that Defendant FIELDEN's acts and/or omissions of gross negligence created an extreme degree of risk to Plaintiff. Plaintiff further alleges that the Defendant's acts and/or omissions of gross negligence, when viewed objectively from the standpoint of Defendant FIELDEN at the time of its occurrence, involved an extreme degree of risk considering the probability and magnitude of potential harm to others, including Plaintiff. Plaintiff further alleges that Defendant FIELDEN had actual subjective awareness of the risk involved but, nevertheless, proceeded with conscious indifference to the

rights, safety and welfare of Plaintiff.  In this regard, Plaintiff therefore seeks punitive and/or exemplary damages as to Defendant FIELDEN.

## XII.
## DAMAGES

26.    Plaintiff's damages include past and probable future loss, which includes:

      a.    Physical pain and mental anguish and suffering, including the loss of enjoyment of life;

      b.    Physical and mental impairment;

      c.    Disfigurement;

      d.    Necessary medical, psychological, psychiatric, therapeutic, pharmaceutical and hospital care, including rehabilitative services and devices.

      e.    loss of wages and wage-earning capacity;

      f.    prejudgment interest at the maximum legal rate.

27.    Plaintiff alleges that the wreck and/or occurrence in question made the basis of this lawsuit, and Plaintiff's injuries and resulting damages were proximately caused as a result of the wrongful conduct and negligent conduct of the Defendant as alleged and set forth herein.

28.    Plaintiff alleges that her damages exceed the minimum jurisdictional limits of this Court.

29.    All these damages to Plaintiff are within the jurisdictional limits of this Court and Plaintiff would ask that a fair, reasonable and impartial jury assess the amount of damages in this case properly recoverable by the Plaintiff.  The amount of actual damages awarded should be subject to the evaluation of the evidence by a fair and impartial jury and is clearly in excess of $1,000,000.00.

## XIII.
## CLAIM FOR PRE-JUDGMENT AND POST-JUDGMENT INTEREST

30.    Plaintiff would further show that she is entitled to recover interest for all elements of damages recovered for which the law provides, for pre-judgment interest beginning on either (1) the 180th day after the Defendant received written notice of claim, or (2) the day suit is filed, whichever is earlier, and ending on the day preceding the date judgment is rendered, at the pre-

judgment interest rate governed by VTCA Finance Code 304.102, et seq. Plaintiff are also entitled to recover post-judgment interest at the lawful rate.

## XIV.
## RULE 193.7 NOTICE

31.     Pursuant to Texas Rule of Civil Procedure 193.7 Plaintiff hereby gives actual notice to Defendant that any and all documents produced may be used against Defendant at any pretrial proceeding and/or at the trial of this matter without the necessity of authenticating the documents.

## XV.
## JURY DEMAND

32.     Plaintiff requests that a jury be convened to try the factual issues in this cause.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final trial, Plaintiff have judgment of, from, and against the Defendants jointly and severally for the actual damages, costs of Court, prejudgment and post-judgment interest, punitive and/or exemplary damages, as set out hereinabove all to be determined by a fair and impartial jury that has fully weighed the evidence and facts and delivered its verdict in accordance with the Judge's instructions, in amounts as set out above, together with costs of suit, pre-judgment interest, post-judgment interest and for such other and further relief which they may show themselves to be justly entitled.

## DEFINITIONS AND INSTRUCTIONS

1.      "**DOCUMENTS**".  When the word "document(s)" or "documentation" is used in these discovery requests, it means any written, typed, printed, graphic or photographic matter, or sound reproductions however produced or reproduced, including copies of computer or data processing input or output in whatever form, including electronic and magnetic data.  Without limiting the generality of the foregoing, all letters, telegrams, cables, wires, notes, memoranda, accounts, ledgers, books, statements, drafts, transcripts, agreements, contracts, policies, minutes, records, diaries, journals, logs, manuals, calendars, governmental forms, computer or data processing input or output, maps, plats, moving or still pictures, diagrams, plans, drawings, specifications, measurements, microfilm, written statements or reports, recordings, e-mail reduced to hard copy, samples or other physical objects of whatever nature now or formerly in the possession, custody or control of the party to whom these Discovery Requests are directed.

(a)      The terms **"writing"** or **"written"** are intended to include, but not necessarily be limited to the following: hand writing, typewriting, computer printouts, printing, photographing, e-mail reduced to hard copy, and every other means of recording upon any tangible thing or any form of communication, including letters, words, pictures, sounds or symbols or combinations thereof; and it further includes any oral communications later reduced to writing or confirmed by a letter.

(b)      Whenever the identification of documents or objects is called for in these discovery requests, the party to whom these discovery requests are directed shall provide the date of the document, model and serial number of the object, if any, the brand of the object, name of manufacturer and date of manufacture.  In lieu of identification as stated above, Defendant may produce for inspection and copying such documents or objects and/or manuals identifying such objects.

(c)      With regard to documents requested to be produced, please produce the original of said documents for inspection and copying or provide complete and clear legible copies of same with immediate opportunity to review the originals.

(d)    If the party to whom these interrogatories and requests are directed contends that the content of a document or the answer to an interrogatory is protected from disclosure by virtue of a privilege, or if the party objects to such discovery on any other grounds, it is intended and requested that the party shall, nevertheless, with respect to such document or answer requested, provide a description thereof, including:

    (1)    A statement of the privilege or objection whereby they contend that such discovery is protected from disclosure;

    (2)    Each and every fact upon which they rely to support such claim of privilege or objection;

    (3)    The type of document (e.g., letter, memorandum, telegraph, telefax, note);

    (4)    The date of each such document or writing;

    (5)    The author of each such document or writing;

    (6)    The person or persons to whom each such writing or document was directed;

    (7)    The person or persons to whom each such writing or document was supplied; and

    (8)    The general subject matter of each such document or writing.

2.    **"IDENTITY" "IDENTIFY"** or **"IDENTIFICATION"**:

(a)    **When used in reference to a natural person**, "identity" "identify" or "identification" means to state his or her full name and present or last known address, present employer (if employed by the party to whom this Discovery is directed, then identify the particular organization for whom he or she worked), present employer, specifying in each instance the title or position and the dates so held.

(b)    **When used with respect to a document**, "identity", "identify" or "identification" means to state the date, subject and substance, author, all recipients, type of document (e.g., letter, telegraph, memorandum, computer printout, sound reproduction, chart, etc.), its present location and the identity of its present custodian. This shall include documents with respect to which a privilege is or may be claimed, if such document was, but no longer is, in your possession or subject to your control, state whether it is (1) missing or lost; (2) has been destroyed; (3) has been transferred voluntarily to others; or (4) has been otherwise disposed of.

In each such instance explain the circumstances surrounding an authorization for such disposition.

(c)     **When used with respect to an occasion**, **event, meeting or conversation**, "identity", "identify" or "identification" means to state the date, place, duration and persons attending or participating.

3.     **"PERSON"** or **"PERSONS"** includes natural persons, including agents, servants and/or employees of this Defendant, firms, partnerships, associations, joint ventures, corporation and any other form of business organization or arrangement, as well as governmental or quasi-governmental agencies.  If other than a natural person, include all natural persons associated with such entity.

4.     **"YOU"** or **"YOUR"** means the Defendant answering the requests.

5.     **"ACCIDENT," "THE INCIDENT" or "THE OCCURRENCE IN QUESTION"** means the incident made the basis of this lawsuit that occurred on or about June 23, 2020 as more fully set out in Plaintiff's Original Petition.

6.     **"THIS SUIT," "THIS LAWSUIT," or "THE LAWSUIT"** shall mean the lawsuit referenced in the above-entitled and numbered cause.

In the event that your answer to any discovery request is "not applicable" or any similar phrase or answer, please explain in detail why that discovery request is not applicable.

In the event that your answer to any discovery request is "don't know" or "unknown" or any similar phrase or answer, please explain in detail all efforts made by you or your attorneys or representatives to obtain the response to that discovery request.

When a discovery request asks that you or your attorney provide information concerning what a witness may testify about, that request is intended to elicit a summary of any and all information that any witness may have provided to you regardless of whether they may so testify at trial.

These discovery requests should be deemed continuing in nature and you are requested to update your responses periodically to reflect any information obtained after the discovery requests are initially responded to, to include all information up to, and including, the date of trial in this action, in accordance with the Texas Rules of Civil Procedure.

Unless otherwise stated, answers to these discovery requests shall be given for the time period ending with the date answers or responses hereto are served.  To the extent that such answers or responses may be enlarged, diminished or otherwise modified by information acquired or discovered by you subsequent to service of initial answers or responses, you are directed to promptly thereafter serve supplemental answers or responses reflecting such information.

You are further notified that your answers and responses to these discovery requests may be offered in evidence at the trial of this case.  You are further advised that your answers or responses to these requests must be supplemented (not less than 30 days prior to the beginning of trial) when you obtain information upon the basis of which:

(1)    You know an answer or response was incorrect when made or incomplete when made;

(2)    You know that the answer or response, though correct when made, is no longer true and complete, and the circumstances are such that to fail to amend your answers or responses would be, in substance, misleading; or

(3)    If the party expects to call an expert witness whose identity and subject matter of such witness' testimony has not been previously disclosed in response to an appropriate discovery request, such answer must be supplemented and/or amended to include the name, address and telephone number of the expert witness and the substance of the expert witness' expected testimony.  This should be done as soon as practical, but in no event less than thirty (30) days prior to the beginning of trial except for good cause granted by leave of Court.

**<u>Document Authentication</u>**. We will assume that each document you produce is authentic. We hereby notify you that we will use each document you produce in pretrial proceedings or at trial. If you contend a document you produce to us is not authenticated, within 10 days after you produce the document, you must serve us with your specific objection to the authenticity of the document.

Your objection must be either on the record or in writing and must have a good faith factual and legal basis. Your objection to the authenticity of only part of a document does not affect the authenticity of the remainder. If you make an objection, we hereby request a reasonable opportunity to establish its authenticity and to inspect the original document. TRCP 193.7 and 196.3(b)

## <u>REQUESTS FOR PRODUCTION TO GERALD WAYNE FIELDEN</u>

1.  All documents, videotapes or recordings containing or summarizing any statement made by Plaintiff as defined by the Texas Rules of Civil Procedure.

2.  All letters or correspondence that occurred prior to suit being filed between the Plaintiff and the Defendant which relate to the subject matter of this lawsuit.

3.  All documents, photographs, videotapes, tape recordings, slides or films relating to any surveillance of the Plaintiff.

4.  Any photographs, films, videotapes, tape recordings, drawings, and diagrams that relate to the subject matter of this lawsuit.

5.  All reports, photographs, videotapes, tape recordings, and other documentary information from anyone who was directed by the Defendant to investigate or research the Plaintiff's accident prior to the date this lawsuit was filed.

6.  All reports, photographs, videotapes, tape recordings, and other documentary information from anyone who was <u>not</u> directed by the defendant to investigate or research the Plaintiff, Michaelea Moss, accident.

7.  A copy of the Defendant's driver's license.

8.  A copy of the title to the vehicle Defendant was driving at the time of the collision made the basis of this suit.

9.  Any and all photographs that Defendant has of any vehicle involved in the accident in question following the collision.

10. A copy of any damage appraisal made of the vehicle Defendant was operating at the time of the collision in question.

11. Any and all drawings, maps or sketches of the scene of the accident which has been made the basis of this lawsuit.

12. A copy of any contract of employment that would govern the Defendant's relationship with any other party or bear on the issue of course and scope of employment.

13. A copy of any cellular phone statements or billing records which would reflect telephone calls either made by you or received by you for the two-week period before and after the accident made the basis of this lawsuit.

14. Please execute and return the attached Application for Copy of Driver's Record.

15. Please execute and return the attached Cellular Telephone authorization.

16.    If any "person with knowledge of relevant facts" identified in any party's disclosure in this case has been convicted in the last ten years of a crime that was a felony or involved moral turpitude, within the meaning of Tex. R. Evid. 609, produce all documents relating to each criminal conviction of each such person.

17.    Produce copies of all documents you obtained through a subpoena in this case. TRCP 176 and 205.

18.    Produce copies of all testimony and documents you obtained through a deposition upon written questions in this case. TRCP 200.

19.    Produce copies of all testimony and documents you obtained through a deposition in a foreign jurisdiction in this case. TRCP 201.

20.    Produce copies of all testimony and documents you obtained through a deposition before suit or to investigate claims relating to the subject of this lawsuit. TRCP 202.

21.    Produce copies of all business records accompanied by affidavit you obtained in this case pursuant to Tex. Rule Evid. 902 (10).

22.    Produce copies of all affidavits, controverting affidavits, and business records you obtained in this case pursuant to Tex. Civ. Prac. & Rem. Code Ch. 18.

23.    All documents, photographs, videotapes, tape recordings, slides or films relating to any surveillance of the Plaintiff.

24.    Any photographs, films, videotapes, tape recordings, drawings, and diagrams that relate to the subject matter of this lawsuit.

25.    All documents which reflect, in whole or in part, any alcohol or drug screening performed on GERALD WAYNE FIELDEN as a result of the accident made the basis of this suit.

26.    All documents which reflect, in whole or in part, any alcohol or drug screening performed on GERALD WAYNE FIELDEN at any time in the past.

## INTERROGATORIES TO GERALD WAYNE FIELDEN

1.  State your name, current address, telephone number, date of birth, social security number, driver's license number and any other names you have gone by during your lifetime.

2.  State the name, address and telephone number of any potential party to this lawsuit.

3.  Identify by stating full name, address and telephone number, all persons whom you expect to call to testify at trial.

4.  If Defendant is alleging any negligence or failure to mitigate damages on the part of Plaintiff, state the factual basis for your contentions.

5.  Is the Defendant correctly named in the petition on file in this cause?  If not, please state the full and correct name of the defendant, and if the Defendant is a corporation, please disclose the state of incorporation and Defendant's principal place of business.

6.  Is Defendant or Defendant's attorney aware of any surveillance of Plaintiff? If the answer is yes, please state:
    (a)     the name and address of person conducting surveillance; and

    (b)     whether the Defendant has any photographs, videotapes, tape recordings, slides or films of Plaintiff.

7.  What specific date did the Defendant conclude that there was a substantial chance that litigation would ensue as a result of the occurrence made the basis of this lawsuit?

8.  State the name and address of the owner and all occupants of the vehicle which you were operating at the time of the collision.

9.  State where you had been just prior to the collision, where you were going at the time of the collision, and the purpose of the trip.

10.  Describe in your own words how the collision occurred providing what the claim or contention of the Defendant will be regarding any cause of the collision, including a statement of the facts or information upon which the contention is based.

11.  State the speed of the vehicle you were operating at all times material to the collision/wreck in question, including specifically your speed at the time of impact, and if your brakes were on at the time of impact, please state your speed before applying your brakes.

12  Describe what damage, if any, was done to the vehicle you were operating in the collision/wreck and state the cost of repair to such vehicle.

13.  Describe what injuries, if any, you received in the collision.

14.     Describe any conversation you have had with the Plaintiff or Plaintiff's representatives following the collision.

15.     Describe any information you have indicating or any reason you have to believe that there was any defect or failure on the part of any vehicle or equipment involved in the collision.

16.     Identify all criminal convictions of Plaintiff and/or any witnesses which you intend to use at trial for impeachment purposes pursuant to Rule 609 TX. R. Civ. Evid.

17.     State whether or not you were acting within the course and scope of any agency, employment, or service at the time of the collision, and describe the type of relationship of the persons or entities involved.

18.     Please list each employer for whom you have worked for the past ten (10) years, and include with your answer the following information:
        a.      Name, address and telephone number of the employer;
        b.      Position held with each employer and a description of your job duties;
        c.      dates of employment; and
        d.      Reason for termination of employment with each employer.

19.     If you own or are provided a cellular phone or other cellular device on the date of the subject accident, please provide the following information:
        a.      the telephone number;
        b.      the service provider.

20.     State in detail what intoxicating beverages, if any, you had consumed and what drugs or medications, prescription or nonprescription, if any, you had taken during the 24-hour period immediately preceding the collision.

21.     Describe any traffic citation you received as a result of this collision by stating the name and location of the court involved, the violations of the law charged in that citation, and the date, place and manner (i.e., type of plea, bail, forfeit, trial, etc.) of disposition of the citation.

22.     Describe any criminal record you may have, including the nature of the charge, date and place of arrest, and conviction, if any.

23.     Have you had any oral communications with any of Plaintiff(s) relating to the subject of this lawsuit? If so, as to each such communication, state to the fullest extent of your recollection –
        a.      The names of all persons involved in the communication;
        b.      The date and time the communication began and ended;
        c.      The subject of the communication; and
        d.      What each person said in the communication.

## REQUEST FOR DISCLOSURE
## TO DEFENDANT GERALD WAYNE FIELDEN

Pursuant to Rule 194, you are requested to disclose within fifty (50) days of service of this request and petition herewith, the information or material described below.

(a)     The correct names of the parties to this lawsuit.

(b)     The names, addresses, and telephone numbers of any potential parties to this lawsuit.

(c)     The legal theories and, in general, the factual basis of the responding party's claims or defenses.

(d)     The amount and any method of calculating of economic damages.

(e)     The name, address and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

(f)     For any testifying expert:

    (1)     The expert's name, address and telephone number;

    (2)     The subject matter on which the expert will testify.

    (3)     The general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information.

    (4)     If the expert is retained by, employed by or otherwise subject to the control of the responding party:

        (A)     all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

        (B)     the expert's current resume and bibliography.

(g)     Any discoverable indemnity and insuring agreements.

(h)     Any discoverable settlement agreements.

(i)     Any discoverable witness statements.

(j)     All medical records and bills that are reasonably related to the injuries and damages asserted or in lieu thereof, an authorization permitting the disclosure of such medical records and medical bills.

(k)     All medical records and medical bills obtained by the responding party by virtue of an authorization furnished by the requesting party.

(l)     The name, address and telephone number of any person who may be designated as a responsible third party.

## REQUESTS FOR PRODUCTION TO GKD MANAGEMENT, LP D/B/A A&G COMMERCIAL TRUCKING

**Document Authentication**. We will assume that each document you produce is authentic. We hereby notify you that we will use each document you produce in pretrial proceedings or at trial. If you contend a document you produce to us is not authenticated, within 10 days after you produce the document, you must serve us with your specific objection to the authenticity of the document. Your objection must be either on the record or in writing and must have a good faith factual and legal basis. Your objection to the authenticity of only part of a document does not affect the authenticity of the remainder. If you make an objection, we hereby request a reasonable opportunity to establish its authenticity and to inspect the original document. TRCP 193.7 and 196.3(b)

1.  The entire personnel file and its contents and/or any other personnel records of GERALD WAYNE FIELDEN, including, but not limited to, evaluations, testing, qualifications, driving records, pre-employment physicals, follow-up physicals, applications for employment, employment agreements and all other records, including records from other entities in their entirety.
**RESPONSE:**

2.  Any and all documents, writings, complaint forms, reprimand forms or any other types of documents that reflect any complaints or reprimands relating to GERALD WAYNE FIELDEN, at any time.
**RESPONSE:**

3.  Any and all documents, books, records, and papers in the possession of the Defendant pertaining to the physical and mental health of GERALD WAYNE FIELDEN, including, but not limited to, any long-form physical examination, done for any purpose in accordance with Section 391.41 of the Federal Motor Carrier Safety Regulations.
**RESPONSE:**

4.  Any and all documents which reflect, in whole or in part, any alcohol or drug screening performed on GERALD WAYNE FIELDEN, at any time in the past.
**RESPONSE:**

5.  Any and all notices of convictions, if any, regarding GERALD WAYNE FIELDEN, that Defendant is expected and required to prepare and maintain pursuant to Sec. 383.31 of the Federal Motor Carrier Safety Regulations.
**RESPONSE:**

6.  Any and all notices of driver's license suspensions, if any, regarding GERALD WAYNE FIELDEN, pursuant to Sec. 383.33 of the Federal Motor Carrier Safety Regulations.
**RESPONSE:**

7.      Any and all employment information collected or retrieved by Defendant and/or provided to Defendant by GERALD WAYNE FIELDEN, pursuant to Sec. 383.35 of the Federal Motor Carrier Safety Regulations.

**RESPONSE:**

8.      Any and all contents of the "driver qualification file" for GERALD WAYNE FIELDEN, pursuant to Sec. 391.51 of the Federal Motor Carrier Safety Regulations.

**RESPONSE:**

9.      Any and all pre and post-employment tests, quizzes, evaluations and/or examinations that were given to or performed on GERALD WAYNE FIELDEN throughout his entire employment with Defendant.

**RESPONSE:**

10.    Any and all documents reflecting, in whole or in part, any pre-employment testing, post-employment testing, quizzes, evaluations or examinations that were given to or performed on any of the Defendant's employees within the past five (5) years. The term "employee" in this request means any person employed in the capacity of a truck driver for Defendant.

**RESPONSE:**

11.    Any and all time cards, time logs, driver's daily logs and/or any other type of logs for GERALD WAYNE FIELDEN for the period January 1, 2020 through June 30, 2020.

**RESPONSE:**

12.    Any and all documents reflecting compensation paid to GERALD WAYNE FIELDEN for the period January 1, 2020 through June 30, 2020.

**RESPONSE:**

13.    Any and all records reflecting reimbursement to GERALD WAYNE FIELDEN, by Defendant for expense advanced in pursuit of its business for the period January 1, 2020 through June 30, 2020.

**RESPONSE:**

14.    Any and all operator and/or commercial driver's licenses in the possession of Defendant issued at any time by any licensing authority permitting GERALD WAYNE FIELDEN to operate a motor vehicle of any type in force, expired, or revoked by the issuing authority.

**RESPONSE:**

15.    Any and all documents reflecting correspondence between Defendant and any issuing authority for an operator and/or commercial driver's license for motor vehicles for GERALD WAYNE FIELDEN, within the last five (5) years.

**RESPONSE:**

16.     Any and all reports or forms required to be completed by GERALD WAYNE FIELDEN within the scope of his employment with Defendant.

**RESPONSE:**

17.     The daily log book or books prepared, kept or maintained by GERALD WAYNE FIELDEN, during the six months preceding the date of the accident made the basis of this lawsuit, through and including the date of the accident on June 23, 2020.

**RESPONSE:**

18.     Any and all documents relating to the 1998 International Tractor, bearing VIN Number 2HSLAHN7WC043153, including, but not limited to, acquisition papers, registrations and leasing documents, repair and/or service orders, invoices or reports.

**RESPONSE:**

19.     Any and all photographs, videos, motion pictures or other tangible evidence of Defendant's vehicle, and any other vehicle which was involved in the accident made the basis of this suit.

**RESPONSE:**

20.     Any and all photographs, videos, motion pictures or other tangible photographic representations of Plaintiff, including any surveillance of Plaintiff.

**RESPONSE:**

21.     Any and all drawings, photographs, pictures, videotapes, and any other types of visual representation made or in the possession of Defendant concerning the collision in question.

**RESPONSE:**

22.     Any and all testing results regarding GERALD WAYNE FIELDEN, pursuant to the post-accident testing requirement set forth in Sec. 382.303 of the Federal Motor Carrier Safety Regulations.

**RESPONSE:**

23.     Any and all testing results regarding GERALD WAYNE FIELDEN, pursuant to the requirement set forth in Sec. 382.301 of the Federal Motor Carrier Safety Regulations.

**RESPONSE:**

24.     Any and all documents or records concerning GERALD WAYNE FIELDEN, pursuant to Sections 395.1 through 395.18 of the Federal Motor Carrier Safety Regulations.

**RESPONSE:**

25.     Any and all accident reports, investigation reports or any other type of reports or documents prepared in the ordinary course of Defendant's business dealing, in whole or in part, with the accident made the basis of this lawsuit.

**RESPONSE:**

26.     Any and all reports by Defendant or its employees to others of "reportable accidents" (as that term is defined in Section 390.5 and 390.15 of the Federal Motor Carriers Safety Regulations) involving GERALD WAYNE FIELDEN.
**RESPONSE:**

27.     Any and all reports of violations furnished by GERALD WAYNE FIELDEN, with any motor carrier at any time in compliance with Section 391.27 of the Federal Motor Carrier Safety Regulations.
**RESPONSE:**

28.     Any and all records and recordings by tachograph or speedograph or other recording devices reflecting information about the operation of the vehicle in question including, but not limited to, information about the date, time, and rate of speed of the vehicle in question.
**RESPONSE:**

29.     Any and all documents related to GERALD WAYNE FIELDEN's trip on June 23, 2020, including, but not limited to, bills of lading, manifests and other documents relating to the vehicle in question and the contents of the load being hauled.
**RESPONSE:**

30.     Please produce complete and clearly readable copies of all inspection reports (during one year preceding and the date of the accident) for all inspections performed on the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.
**RESPONSE:**

31.     Please produce a complete and clearly readable copy of any and all Certificates of Title to the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.
**RESPONSE:**

32.     Please produce a complete and clearly readable copy of the Owner's Manual for the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.
**RESPONSE:**

33.     Please produce a complete and clearly readable copy of the Maintenance Record and/or other documents regarding maintenance and/or repairs of the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.
**RESPONSE:**

34.     Please produce a complete and clearly readable copy of any and all contracts and/or agreements pertaining to the use of the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.
**RESPONSE:**

35.     Please produce a complete and clearly readable copy of any and all tachometer records from the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

36.     Please produce a complete and clearly readable copy of any and all on-board computer records from the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.  This includes, but is not limited to, e-mails, dispatch records, GPS data or transmissions or documents of any type.

**RESPONSE:**

37.     Please produce a complete and clearly readable copy of any and all dispatch records (in your possession) from the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

38.     Please produce a complete and clearly readable copy of any and all mobile radio records (in your possession) from the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

39.     Please produce a complete and clearly readable copy of any and all licenses for the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

40.     Please produce a complete and clearly readable copy of the registration documents pertaining to the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

41.     Please produce a complete and clearly readable copy of any and all out-of-service orders pertaining to the truck GERALD WAYNE FIELDEN was driving at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

42.     Please produce a complete and clearly readable copy of any and all National Transportation Safety Board and Interstate Commerce Commission (ICC), Department of Transportation (DOT), Department of Public Safety (DPS), local police departments, fire departments, and/or EMS investigative reports pertaining to and/or involving the vehicle was driving and/or the persons injured or killed at the time of the incident made the basis of this lawsuit.

**RESPONSE:**

43.     Please produce complete and clearly readable copies of your company's manuals covering truck safety, maintenance, fleet safety programs and driver's standards.  This request includes documents relating to any of the following topics: defensive driving; driving in

inclement weather; following distances; space management; speed; fatigue; stopping distances; night driving; accident reporting; accident investigation; and driver's rates of pay.

**RESPONSE:**

44.     Please produce complete and clearly readable copies of any and all accident reconstruction reports, including all drafts, raw data, diagrams, charts, underlying documentation, photographs, videotapes, audiotapes, film, movies, or any other intelligible information or documents collected to conduct such accident reconstruction of the incident made the basis of this lawsuit.

**RESPONSE:**

45.     Please produce any and all photographs, videotapes, audiotapes, film, movies, diagrams, charts, or any other intelligible information or documents collected at any type of examination, demonstration, reenactment, or inspection of the scene and/or the vehicles or persons involved in the incident made the basis of this lawsuit.

**RESPONSE:**

46.     Any and all documents reflecting Defendant's procedures for communication between Defendant and GERALD WAYNE FIELDEN while he was driving for Defendant.

**RESPONSE:**

47.     Any and all documents reflecting Defendant's procedures for determining work schedule and/or dispatch orders for GERALD WAYNE FIELDEN.

**RESPONSE:**

48.     Any and all of the records of duty, status, or daily logs filed by GERALD WAYNE FIELDEN with Defendant since his employment.

**RESPONSE:**

49.     Any and all traffic citations issued to GERALD WAYNE FIELDEN, or any other document evidencing, in whole or in part, any violations, tickets, citations or infractions by the Texas Department of Public Safety or any other authority, whether or not he was driving and operating a vehicle owned by Defendant, at any time in the past.

**RESPONSE:**

50.     Any and all manuals and other documents given by Defendant to GERALD WAYNE FIELDEN, reflecting its rules and procedures for operation of its vehicles.

**RESPONSE:**

51.     Any and all manuals and other documents given by Defendant for the orientation of new drivers at the commencement of their relationship with Defendant.

**RESPONSE:**

52.     Any and all training manuals or any other types of documents or writings dealing, in whole or in part, with the training of GERALD WAYNE FIELDEN received while he was under the employment of Defendant.

**RESPONSE:**

53.     Any and all corporate policy and procedure manuals, corporate safety manuals, standard operating procedure manuals or any other types of manuals of Defendant, however titled or identified, which deal, in whole or in part, with safe driving practices and/or procedures to be followed by Defendant's employee drivers.

**RESPONSE:**

54.     Any and all safety meeting memoranda, notes, agendas, notices, log-in sheets, safety sheets, and other documents reflecting the occurrence of any and all safety meetings of Defendant for its drivers for the years 2015-2020.

**RESPONSE:**

55.     Any and all memoranda, notes, agendas, video tapes, audio tapes, study materials, reference materials, books, brochures, pamphlets, hand-outs, and other documents made available to attendees and/or used by the instructors of any safety meetings of Defendant for its drivers for the years  2015 – 2020.

**RESPONSE:**

56.     Any and all petitions, complaints or other documents evidencing any lawsuits which have been filed in any court of the United States against Defendant, by any person and at any time, in which injuries and/or damages have been alleged as a result of an accident or occurrence involving GERALD WAYNE FIELDEN.  In the alternative, you make attach a list setting forth:  (1) cause number of the case and designating the court the action was filed in; (2) name and address of the parties and the attorney representing each party; and, (3) general nature of the allegations and damages each Plaintiff claimed to receive.

**RESPONSE:**

57.     Any and all documents or records of any kind or nature evidencing complaints or claims of injuries or damages and the names, addresses and telephone numbers of all persons or entities who have contended injuries or damages as a result of a collision or occurrence involving GERALD WAYNE FIELDEN.

**RESPONSE:**

58.     Any and all tax returns filed by Defendant for the years 2015 – 2020.
**RESPONSE:**

59.     Any and all documents or records of any kind or nature evidencing Defendant's assets and/or net worth including, but not limited to, annual statements, financial statements, balance sheets, audited or unaudited reports, certified or otherwise, including exhibits, for the period  2015 – 2020.

**RESPONSE:**

60.     Any and all documents, reports and records which the Defendant has filed regarding Defendant, its subsidiaries, with the Securities and Exchange Commission including, but not limited to, 10-K reports and shareholder reports, including exhibits, for the period 2015 – 2020.
**RESPONSE:**

61.     Any and all documents, reports, records, daily log books, log pages, or any other writings that reflect the number of hours, the time period, days, the miles, the routes, and the trips that were driven by or worked by GERALD WAYNE FIELDEN, for the 30 days preceding the accident made the basis of this lawsuit, including the day of the accident in question.
**RESPONSE:**

62.     Any and all cell phone records for the month of May 2020 and June 2020 for any cell phone provided by Defendant to GERALD WAYNE FIELDEN.
**RESPONSE:**

63.     Any and all electronically or digitally stored GPS (global positing systems) data pertaining to the vehicle owned by Defendant involved in the accident made the basis of this lawsuit regarding the time period of the incident made the basis of this lawsuit.  If electronic or digitally stored data are not available, all available data stored via alternative format, including, but not limited to, paper records, photocopies of paper records or scanned images of paper records or printouts.
**RESPONSE:**

64.     if any "person with knowledge of relevant facts" identified in any party's disclosure in this case has been convicted in the last ten years of a crime that was a felony or involved moral turpitude, within the meaning of Tex. R. Evid. 609, produce all documents relating to each criminal conviction of each such person.
**RESPONSE:**

65.     Produce copies of all documents you obtained through a subpoena in this case. TRCP 176 and 205.
**RESPONSE:**

66.     Produce copies of all testimony and documents you obtained through a deposition upon written questions in this case. TRCP 200.
**RESPONSE:**

67.     Produce copies of all testimony and documents you obtained through a deposition in a foreign jurisdiction in this case. TRCP 201.
**RESPONSE:**

68.     Produce copies of all testimony and documents you obtained through a deposition before suit or to investigate claims relating to the subject of this lawsuit. TRCP 202.
**RESPONSE:**

69.     Produce copies of all business records accompanied by affidavit you obtained in this case
        pursuant to Tex. Rule Evid. 902 (10).
**RESPONSE:**

70.     Produce copies of all affidavits, controverting affidavits, and business records you obtained
        in this case pursuant to Tex. Civ. Prac. & Rem. Code ch. 18.
**RESPONSE:**

71.     All documents, photographs, videotapes, tape recordings, slides or films relating to any
        surveillance of the Plaintiffs.
**RESPONSE:**

72.     Any photographs, films, videotapes, tape recordings, drawings, and diagrams that relate to
        the subject matter of this lawsuit.
**RESPONSE:**

73.     Produce any and all documents, photographs, videotapes, tape recordings, slides or films
        relating to any surveillance of the Plaintiffs.
**RESPONSE:**

74.     Produce any and photographs, films, videotapes, tape recordings, drawings, and diagrams
        that relate to the subject matter of this lawsuit.
**RESPONSE:**

**INTERROGATORIES TO GKD MANAGEMENT D/B/A A&G TRUCKING**

1.  Please identify the person(s) (including the name, title, address, and phone number) providing answers to these Interrogatories for this Defendant, including the identity of the person verifying said answers.

2.  Please describe fully and completely Defendant's procedure for: (1) hiring drivers, including qualifications necessary for hire; (2) orientating drivers; and (3) training its drivers at the present date and state whether or not the same procedures have been utilized since 2010 to the present time.  If there have been any changes, please enumerate each and every change in said procedures.  Include in the response the complete and full details of hiring, orientation and training that Defendant's drivers are put through.

3.  Please identify those managers, supervisors and/or employees of Defendant who have been charged with the responsibility for overseeing Defendants drivers, including but limited to GERALD WAYNE FIELDEN in each of the following areas:
    a.    Safety
    b.    Training
    c.    Personnel
    d.    Dispatching
    e.    Supervising

4.  State whether or not the 1998 International Tractor, which was operated by the Defendant, GERALD WAYNE FIELDEN and which was involved in the collision made the basis of this lawsuit and all equipment on said vehicle on the date of the occurrence made the basis of this suit was in good operating condition.  If said vehicles or any equipment was not in good operating condition, please fully explain the defect or malfunction, the last time the equipment was serviced, the nature of the service involved and the person and/or entity that last serviced the equipment.

5.  Please state all facts upon which Defendant will rely that its negligence and gross negligence did not proximately cause the collision in question.

6.  If Defendant has alleged or will allege any negligence on the part of Plaintiff, please state the factual basis for your contention that Plaintiff was negligent.

7.  Please describe fully and completely the trip in progress and/or to be made by Defendant's driver which resulted in the accident made the basis of this lawsuit.  Include in your response a description of the entire route involved, time schedule to be followed, stops to be made and deliveries and/or pickups involved at each site from beginning to end for the period of 48 hours prior to the accident in question and 48 hours after the accident in question.

8.  Please describe the work schedule for GERALD WAYNE FIELDEN for the seven-day period immediately preceding the accident made the basis of this lawsuit.  Include in the response the total number of hours the driver had been driving Defendant's vehicle

immediately prior to the collision, and any and all rest periods, time off and other driving time within the said seven-day period.

9.   Please state all facts regarding how the accident and collision in question occurred.

10.   Please describe in detail all investigation that was conducted by Defendant GKD MANAGEMENT D/B/A A&G TRUCKING, or its agents, servants or employees, which dealt, in whole or in part, with the accident made the basis of this lawsuit, prior to the filing of Plaintiff's Original Complaint.

11.   As to Defendant, GERALD WAYNE FIELDEN, please state the following information:
   a.   Full name and any other names or aliases used;
   b.   Current residence address;
   c.   Date and place of birth;
   d.   Social Security Number;
   e.   All Driver's license numbers and the name of all states that have issued said driver a driver's license;
   f.   Current employer and business address;
   g.   Employment history (include names and addresses of each employer, job titles, duties, rate and method of compensation and reason for termination from each employer since high school);
   h.   Job title and description of duties as an employee of Defendant; and
   i.   The rate(s) and method of compensation received during his employment with Defendant.

12.   As to any and all traffic citations received by Defendant, GERALD WAYNE FIELDEN, please state the following:
   a.   The date, time, and place where such traffic citation was received;
   b.   A description of the violation of law for which he was cited;
   c.   The name of the authority that issued such citation; and
   d.   The manner of disposition of each such citation.

13.   Has Defendant, GERALD WAYNE FIELDEN ever been involved in any other vehicular accident, whether during his course and scope of employment and/or owner/operator status with Defendant or not?  If so, please state the following:
   a.   The date, time, and place where each such accident occurred;
   b.   Names and addresses of all parties and witnesses involved;
   c.   The name of any law enforcement agency investigating said accident;
   d.   Whether such accident resulted in personal injuries to any person; and
   e.   The aftermath of each accident (i.e. whether any litigation ensued, claims were made, settlement of any claim reached, insurance proceeds paid, etc.)

14.   As to Defendant GKD MANAGEMENT D/B/A A&G TRUCKING, identified in Plaintiff's Original Complaint, please further set forth:
   a.   The date and place of incorporation;
   b.   The principal place of business of the Defendant company;

      c.     The home office address of the Defendant company;

      d.     The type of business conducted by the Defendant company;

      e.     The name, business and residence address, and telephone number of each owner of the Defendant company at the date of the occurrence made the basis of this lawsuit; and

      f.     The name, business and residence address, and telephone number of each owner of the Defendant company at the date of the occurrence made the basis of this lawsuit.

15.     Was Defendant, GERALD WAYNE FIELDEN acting within the course and scope of his employment with Defendant, GKD MANAGEMENT D/B/A A&G TRUCKING on June 23, 2020, at the time the accident made the basis of this lawsuit occurred?

16.     Please provide the dates of all inspections from June 23, 2019 to June 23, 2020 of the 1998 International Tractor truck which Defendant was operating at the time of the incident in question.

17.     Please identify any and all contracts and/or agreements with any Defendant hereto and/or any other entity or individual relating to the use of the 1998 International Tractor truck Defendant, GERALD WAYNE FIELDEN was operating at the time of the incident made the basis of this lawsuit.

18.     Please identify any documents regarding GKD MANAGEMENT D/B/A A&G TRUCKING'S policies, guidelines, rules, regulations or recommendations pertaining to its use of its trucks by its employees including but not limited to Defendant, GERALD WAYNE FIELDEN.

19.     Please identify any and all photographs, audiotapes and videotapes in the possession of this Defendant pertaining to the vehicle driven by Defendant, GERALD WAYNE FIELDEN on the date of the incident made the basis of this lawsuit, the persons involved and/or the scene of the incident made the basis of this lawsuit, including the identification of the person who took each of the photographs and/or made each of the audiotapes and videotapes, the dates taken or made, and who has possession of each.

20.     Identify by stating  full name, address and telephone number, all persons whom you expect to testify at trial.

21.     Please state whether the vehicle driven by Defendant, GERALD WAYNE FIELDEN on the date of the incident made the basis of this lawsuit had an on-board computer or other device that gathered data or monitored the vehicle in any way.  If so, please identify the type, model and purpose of each said device and whether any information was gathered during the week preceding the date of the incident and on the date of the incident made the basis of this lawsuit.

22. State whether or not the truck operated by Defendant, GERALD WAYNE FIELDEN at the time of the collision made the basis of this lawsuit had a GPS or any other type of tracking device on it at the time of the collision made the basis of this lawsuit.  If so, please state the following:
   a. Manufacturer, model and serial number of the GPS or tracking device;
   b. Whether or not information was recorded by the GPS or other tracking device on the date and time of the collision made the basis of this lawsuit;
   c. How the information is stored; and
   d. Where the information is stored.

23. Please state the exact legal name, address and telephone number of the person, firm, corporation or entity which was the legal owner of the 1998 International Tractor truck which Defendant, GERALD WAYNE FIELDEN was operating at the time of the accident made the basis of this lawsuit.

24. Identify all criminal convictions of Plaintiff and/or any witnesses which you intend to use at trial for impeachment purposes pursuant to Rule 609 TX. R. Civ. Evid.

25. Have you had any oral communications with the Plaintiff relating to the subject of this lawsuit? If so, as to each such communication, state to the fullest extent of your recollection
   a. The names of all persons involved in the communication;
   b. The date and time the communication began and ended;
   c. The subject of the communication; and
   d. What each person said in the communication.

## REQUEST FOR ADMISSIONS TO GKD MANAGEMENT D/B/A A&G TRUCKING

**DEFINITIONS**

"INCIDENT MADE THE BASIS OF THIS LAWSUIT" as used in these requests for admissions means the accident which occurred on June 23, 2020 on Highway 271, in Choctaw County, Oklahoma when the 1998 International Tractor Truck being operated by the Defendant, GERALD WAYNE FIELDEN, bearing VIN Number 2HSLAHN7WC04316; and bearing Texas License Plate Number E285HV rolled into the median of the highway.

### ADMISSIONS

1.   Do you admit to the judge and jury in this case that the Defendant, GKD MANAGEMENT D/B/A A&G TRUCKING was the owner of the 1998 International Tractor, bearing VIN Number 2HSLAHN7WC04316; and bearing Texas License Plate Number E285HV, on the date of the incident made the basis of this lawsuit?

2.   Do you admit to the judge and jury in this case that the Defendant, GERALD WAYNE FIELDEN, was driving the 1998 International Tractor, bearing VIN Number 2HSLAHN7WC04316; and bearing Texas License Plate Number E285HV, at the time of the incident made the basis of this lawsuit?

3.   Do you admit to the judge and jury in this case that the Defendant, GERALD WAYNE FIELDEN, was driving the 1998 International Tractor truck being operated by the Defendant, GERALD WAYNE FIELDEN, bearing VIN Number 2HSLAHN7WC04316; and bearing Texas License Plate Number E285HV, on the day of the incident made the basis of this lawsuit?

4.   Do you admit to the judge and jury in this case that the Defendant,  GKD MANAGEMENT D/B/A A&G TRUCKING entrusted the 1998 International Tractor truck being operated by the Defendant, GERALD WAYNE FIELDEN, bearing VIN Number 2HSLAHN7WC04316; and bearing Texas License Plate Number E285HV to the defendant, GERALD WAYNE FIELDEN on the day of the incident made the basis of this lawsuit?

5.   Do you admit to the judge and jury in this case that the defendant, GERALD WAYNE FIELDEN had permission to use and operate the 1998 International Tractor truck being operated by the Defendant, GERALD WAYNE FIELDEN, VIN Number 2HSLAHN7WC04316; and bearing Texas License Plate Number E285HV on the day of the incident made the basis of this lawsuit?

6.   Do you admit to the judge and jury in this case that defendant, GERALD WAYNE FIELDEN was an employee of defendant, GKD MANAGEMENT D/B/A A&G TRUCKING at the time of the incident made the basis of this lawsuit?

7. Do you admit to the judge and jury in this case that defendant, GERALD WAYNE FIELDEN was an employee of defendant, GKD MANAGEMENT D/B/A A&G TRUCKING on June 23, 2020?

8. Do you admit to the judge and jury in this case that Defendant, GERALD WAYNE FIELDEN was in the course of his employment for Defendant, GKD MANAGEMENT D/B/A A&G TRUCKING at the time of the incident made the basis of this lawsuit?

9. Do you admit to the judge and jury in this case that defendant, GERALD WAYNE FIELDEN was in the scope of his employment for defendant, GKD MANAGEMENT D/B/A A&G TRUCKING at the time of the incident made the basis of this lawsuit?

10. Do you admit to the judge and jury in this case that Plaintiff, MICHAELEA MOSS was not negligent in causing the incident made the basis of this lawsuit?

11. Do you admit to the judge and jury in this case that Defendant, GERALD WAYNE FIELDEN, was negligent in the operation of the 1998 International Tractor truck on the date and time of the incident made the basis of this lawsuit?

12. Do you admit to the judge and jury in this case that Defendant, GERALD WAYNE FIELDEN'S negligence in the operation of the 1998 International Tractor truck was a proximate cause of the incident made the basis of this lawsuit?

## REQUEST FOR DISCLOSURE
## TO DEFENDANT GKD MANAGEMENT D/B/A A&G TRUCKING

Pursuant to Rule 194, you are requested to disclose within fifty (50) days of service of this request and petition herewith, the information or material described below.

(a)     The correct names of the parties to this lawsuit.

(b)     The names, addresses, and telephone numbers of any potential parties to this lawsuit.

(c)     The legal theories and, in general, the factual basis of the responding party's claims or defenses.

(d)     The amount and any method of calculating of economic damages.

(e)     The name, address and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

(f)     For any testifying expert:

    (1)     The expert's name, address and telephone number;

    (2)     The subject matter on which the expert will testify.

    (3)     The general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information.

    (4)     If the expert is retained by, employed by or otherwise subject to the control of the responding party:

        (A)     all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

        (B)     the expert's current resume and bibliography.

(g)     Any discoverable indemnity and insuring agreements.

(h)     Any discoverable settlement agreements.

(i)     Any discoverable witness statements.

(j)     All medical records and bills that are reasonably related to the injuries and damages asserted or in lieu thereof, an authorization permitting the disclosure of such medical records and medical bills.

(k)     All medical records and medical bills obtained by the responding party by virtue of an authorization furnished by the requesting party.

   a.   The name, address and telephone number of any person who may be designated as a responsible third party.


                              Respectfully submitted,

                              /s/ *Joe M. Worthington*_____
                              Jimmy M. Negem
                              State Bar No. 14865500
                              Joe M. Worthington
                              State Bar No. 22009950
                              NEGEM & WORTHINGTON
                              1828 ESE Loop 323
                              Suite R – 1A
                              Tyler, Texas 75701
                              903.595.4466 (Telephone)
                              903.593.3266 (Facsimile)
                              Joe@Negemlaw.com
                              **ATTORNEYS FOR PLAINTIFF**

# EXHIBIT 7



**STRONG & HANNI**
LAW FIRM

A PREMIER BUSINESS & LITIGATION LAW FIRM

SANDY OFFICE

9350 SOUTH 150 EAST, SUITE 820
SANDY, UT  84070

T   (801) 532-7080
F   (801) 596-1508

WWW.STRONGANDHANNI.COM

ESTABLISHED 1888

PAUL M. BELNAP
STUART H. SCHULTZ
MARK S. SWAN
BRIAN C. JOHNSON
STEPHEN J. TRAYNER
STANFORD P. FITTS
BRADLEY W. BOWEN
PETER H. CHRISTENSEN
ROBERT L. JANICKI
REID W. LAMBERT
N. BURT RINGWOOD
ELIZABETH R. LOVERIDGE
ZACHARY T. SHIELDS
KRISTIN A. VANORMAN
KENT M. BROWN
PETER H. BARLOW
MICHAEL L. FORD
GRADEN P. JACKSON
N. SCOTT JACOBSON
MICHAEL J. MILLER
ANDREW D. WRIGHT
BYRON C. MARTIN

BENJAMIN P. THOMAS
LANCE H. LOCKE
MICHAEL O. STANGER
A. JOSEPH SANO
JAMES C. THOMPSON
KARMEN C. SCHMID
LORI A. JACKSON
WILLIAM B. INGRAM
RYAN P. ATKINSON
JENNIFER R. CARRIZAL
JOHN M. ZIDOW
ANDREW B. McDANIEL
SADIE A. TURNER
CASEY W. JONES
RYAN C. BULLOCK
NICHOLAS A. BENDER
KATHLEEN J. ABKE
MARSHALL J. HENDRICKSON
CHET W. NEILSON
S. SPENCER BROWN
KATHRYN T. SMITH
RON W. HAYCOCK, JR.

MATTHEW A. JONES
JOSEPH SHAPIRO
ANDREW D. DAY
MATT W. HARRISON
NICHOLAS E. DUDOICH
JASON L. DEFOREST
JESSICA J. JONNSTON
AXEL TRUMBO
SCARLET R. SMITH
IAN L. QUIEL
STEVEN W. EDMONDS
JACK DAVID SMART
R. JESSE DAVIS
NICHOLAS R. REMKES
KAILEEN M. BALZANO
AARON H. SMITH
DUSTIN M. JOHNSON
SPENCER W. YOUNG
SARAH M. PERKINS
MICHAEL A. STEVENS

† ALSO MEMBER ARIZONA BAR
ALSO MEMBER CALIFORNIA BAR
§ ALSO MEMBER COLORADO BAR
‡ ALSO MEMBER DISTRICT OF COLUMBIA BAR
‖ ALSO MEMBER IDAHO BAR
# ALSO MEMBER MONTANA BAR
¤ ALSO MEMBER NEBRASKA BAR
Δ ALSO MEMBER NEVADA BAR
¶ ALSO MEMBER NEW MEXICO BAR
‖ ALSO MEMBER NEW YORK BAR
‡‡ ALSO MEMBER OREGON BAR
¶¶ ALSO MEMBER VIRGINIA BAR
◊◊ ALSO MEMBER WASHINGTON BAR
‡ ALSO MEMBER WISCONSIN BAR
†† ALSO MEMBER WYOMING BAR

OF COUNSEL:

HENRY E. HEATH
PHILIP R. FISHLER
ROGER H. BULLOCK
STEVEN T. DENSLEY
MARK H. HOWARD

GORDON R. STRONG (1909-1969)
GLENN C. HANNI (1923-2015)

September 14, 2020

GKD Management LP
d/b/a A&G Commercial Trucking
4092 US Highway 64
Crump, TN 38327

Re: Fielden v. GKD Management LP
Claim No.: SC191009750970

Dear Insured:

Prime Insurance Company ("Prime") has asked me to address this letter to you with respect to insurance coverage in the above-referenced matter. Upon investigation, Prime has determined there are certain issues that may impact coverage for this claim. The purpose of this letter is to inform you of those issues and to reserve all rights under the law and under the policy. **Please understand this letter is not a denial of this claim and that my client will continue to investigate and handle this matter subject to the reservations set forth below.**

## I. FACTUAL BACKGROUND:

As far as my client understands, this claim arises out of an accident that occurred on June 23, 2020. At the time of the accident, Gerald Fielden was "dead heading" in a 1998 International when he allegedly swerved to miss a vehicle that had braked suddenly in front of him and ultimately lost control of the truck, rolling it. Mr. Fielden was driving under the authority of GKD Management LP d/b/a A&G Commercial Trucking ("GKD") at the time of the above accident, pursuant to a contract with Mark Russell, who owned the truck. Mr. Fielden had a female passenger with him at the time of the accident, identified as Michaelea Moss. Mr. Fielden and Ms. Moss have both allegedly sustained injuries as a result of the June 23, 2020 accident. Ms. Moss apparently has yet to make a claim. However, in a letter dated July 1, 2020, an attorney informed you that he represents Mr. Fielden for injuries sustained in the accident. (That attorney has subsequently



SALT LAKE OFFICE — 102 SOUTH 200 EAST, SUITE 800, SALT LAKE CITY, UTAH  84111
SANDY OFFICE — 9350 SOUTH 150 EAST, SUITE 820, SANDY, UTAH  84070

GKD Management L.P.
September 14, 2020
Page 2

withdrawn his representation.) Mr. Fielden presumably intends to make an uninsured motorist ("UM") claim based on the purported involvement of the other vehicle.

## II. THE POLICY:

Prime issued commercial business auto insurance coverage to GKD in the form of Policy No. SC19100975, with a policy period of October 15, 2019 through October 15, 2020 (the "Policy"). The Policy contains several provisions that relate to the coverage issues in this case. First, the insuring language states as follows with respect to the scope of coverage provided:

### SECTION 1 – LIABILITY COVERAGE

A.    Insuring Agreement

1.    Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any SIR that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy applies if caused by an Accident and resulting from the ownership, maintenance, or use of an Insured Auto as identified in the Policy, on the Declarations or any Endorsement if:

. . .

e.    The Insured Auto is in Commercial Business Use at the time of the Accident; and

(Policy, PCA-00-06, p. 1.)

The Policy includes the following relevant definitions:

B.    Liability Exclusions

In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage required under the financial responsibilities laws, in place of the invalid exclusion, for such Claim.

This Policy does not cover, and we will not be obligated to defend you against or pay Damages on your behalf for any of the following:

. . .

11.    Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

GKD Management LP
September 14, 2020
Page 3

. . .

    c.    The violation of any statute, ordinance, or regulation relating to the sale, gift, distribution, or use of alcoholic beverages or controlled substances; or

    d.    The use of alcohol, narcotics, intoxicants, or illegal drugs.

. . .

30.    Bodily Injury or Property Damage arising from the maintenance or use of an Insured Auto by anyone under the influence of alcohol, other intoxicants, controlled substances, or narcotics, unless administered by the advice of a physician.

. . .

33.    Bodily Injury to any passenger in the Insured's vehicle.

(Policy, PCA-00-06, pp. 4-5, 8.)

Furthermore, the Policy defines "commercial business use" as follows:

### SECTION VIII – DEFINITIONS

. . .

K.    "Commercial Business Use"

    1.    If you are a motor carrier engaged in the business of transporting passengers or goods for hire, "Commercial Business Use" means the Insured Auto is being operated pursuant to the Insured's assignment to haul a specified load or is on standby for further deliveries. An Insured Auto is no longer in commercial business use when a delivery assignment has been completed and the Insured Auto is no longer under dispatch.

(Policy, PCA-00-06, p. 20.)

Finally, the Policy includes an Uninsured Motorists Coverage Endorsement that states as follows, in relevant part:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

GKD Management LP
September 14, 2020
Page 4

## TENNESSEE UNINSURED MOTORISTS COVERAGE

. . .

**A.**   **Coverage**

1.   We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured", or "property damage" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

. . .

**F.**   **Additional Definitions**

. . .

2.   The following are added to the **Definitions** section:

. . .

c.   "Uninsured motor vehicle" means a land motor vehicle or "trailer":

. . .

(4)   For which neither the driver nor owner can be identified. The vehicle or "trailer" must either:

(a)   Hit an "insured", a covered "auto" or a vehicle an "insured" is "occupying"; or

(b)   Cause "bodily injury" or "property damage" without hitting an "insured", a covered "auto" or a vehicle an "insured" is "occupying".

If there is no physical contact with such vehicle or "trailer", the facts of the "accident" must be proven by clear and convincing evidence. We will only accept corroborating evidence of the claim other than the evidence provided by occupants in the covered "auto" or in the vehicle an "insured" is "occupying".

GKD Management LP
September 14, 2020
Page 5

(Policy, CA 21 20 10 13, pp. 1, 5.)

### III. RESERVATION OF RIGHTS:

The Policy requires all disputes relating to coverage to be determined in accordance with Utah law by a court within the State of Utah. Under Utah law, insurance policy language is construed pursuant to its ordinary meaning. Accordingly, under the plain terms of the Policy, the following issues may impact coverage for the claims arising out of the June 23, 2020 accident.

#### A. There may be no coverage for any injury to Ms. Moss inasmuch as she was a passenger.

As set forth above, Exclusion 33 of the Policy establishes no liability coverage shall be provided for "Bodily Injury to any passenger in the Insured's vehicle." Therefore, in the event Ms. Moss asserts a claim, coverage may be precluded for that claim inasmuch as she was a passenger in Mr. Fielden's truck at the time of the June 23, 2020 accident.

There may be no coverage under the Policy for any claim made by Ms. Moss inasmuch as she was a passenger at the time of the accident. Accordingly, my client reserves all rights under the law and under the Policy, including but not limited to the right to deny coverage on this basis, to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues.

#### B. There may be no coverage to the extent Mr. Fielden was not operating the truck in GKD's commercial business use at the time of the accident.

Liability coverage only applies under the Policy to accidents that occur while an insured auto is in commercial business use. The Policy then explains that the auto "is no longer in commercial business use when a delivery assignment has been completed and the Insured Auto is no longer under dispatch." It is Prime's understanding that Mr. Fielden may not have been under dispatch at the time of the June 23, 2020 accident. Accordingly, coverage may also be precluded for Ms. Moss's potential claim on that basis.

There may be no coverage under the Policy for any claim made by Ms. Moss to the extent Mr. Fielden was not operating the truck in GKD's commercial business use at the time of the accident. Accordingly, separate and apart from the reservations set forth above, my client reserves all rights under the law and under the Policy, including but not limited to the right to deny coverage on this basis, to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues.

#### C. There may be no coverage to the extent the June 23, 2020 accident arises out of the use of alcohol.

The Policy contains several Exclusions which make it clear no coverage is intended for claims arising out of the use of alcohol. First, Exclusion 30 excludes bodily injury "arising from

GKD Management LP
September 14, 2020
Page 6

the maintenance or use of an Insured Auto by anyone under the influence of alcohol . . ." Similarly, Exclusion 11 bars coverage for bodily injury resulting from the use of alcohol or the violation of a statute related to the same. Therefore, in the event it is determined alcohol was involved with the June 23, 2020 accident, coverage may be precluded on that basis.

There may be no coverage under the Policy for any claim made by Ms. Moss to the extent the June 23, 2020 accident arises out of the use of alcohol. Accordingly, separate and apart from the reservations set forth above, my client reserves all rights under the law and under the Policy, including but not limited to the right to deny coverage on this basis, to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues.

**D. There may be no coverage for anyUM claim to the extent it cannot be established by clear and convincing independent evidence.**

The Policy's Uninsured Motorists Coverage Endorsement establishes that in accidents where the driver/owner of the other vehicle cannot be identified, and the other vehicle did not make physical contact with the insured vehicle, "the facts of the 'accident' must be proven by clear and convincing evidence." Furthermore, that evidence must be something other than evidence provided by the occupants of the insured vehicle. Therefore, in the event no such evidence exists, there may be no coverage for any UM claim under the Policy.

There may be no coverage under the Policy for any UM claim to the extent it cannot be established by clear and convincing independent evidence. Accordingly, separate and apart from the reservations set forth above, my client reserves all rights under the law and under the Policy, including but not limited to the right to deny coverage on this basis, to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues.

## IV. CONCLUSION:

As discussed above, there are several issues that may impact coverage under the Policy for the potential claims arising out of the June 23, 2020 accident. First, there may be no coverage for any injury to Ms. Moss inasmuch as she was a passenger. Second, coverage may be precluded for the Moss claim to the extent Mr. Fielden was not operating the truck in GKD's commercial business use at the time of the accident. Third, there may be no coverage for the Moss claim to the extent the June 23, 2020 accident arises out of the use of alcohol. And fourth, coverage may be precluded for any UM claim to the extent it cannot be established by clear and convincing independent evidence.

In light of those issues, Prime reserves all rights under the law and under the Policy, including but not limited to the right to deny coverage, to recoup any costs, charges and/or expenses which it may incur with respect to this claim and/or to initiate declaratory judgment proceedings to resolve any coverage issues. It also reserves the right to deny coverage on any grounds in addition to those set forth above. Nothing in this letter should be construed as a waiver,

GKD Management LP
September 14, 2020
Page 7

estoppel, or forfeiture of any right or defense that Prime may have under the Policy, any regulation, or law, or otherwise.

My client is not denying coverage at this time, it merely reserves the right to do so. As such, it will continue to investigate this claim. As such, you should promptly inform us in the event any additional claims are made against you. You should also be aware you are entitled to consult with counsel, or your local department of insurance, regarding the preceding coverage issues.

Furthermore, even if it is determined there is no coverage under the terms of the Policy, Prime issued an MCS-90 Endorsement in conjunction with the Policy. To the extent that Endorsement applies in this instance, Prime may have an obligation to defend and/or indemnify GKD against Ms. Moss's claim, despite the above coverage issues. However, the MCS-90 Endorsement states the terms and conditions of the Policy remain effective as between Prime and GKD and "[t]he insured agrees to reimburse the company . . . for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." **Accordingly, if Prime issues payment as a result of any obligations under the MCS-90 Endorsement, it reserves the right to initiate steps to obtain reimbursement from GKD for the amounts paid.**

Finally, if you have any additional information you would like my client to consider relating to matters of coverage, or if you believe the facts and conclusions stated above are in error in any way, please forward that information to me at your earliest convenience. I would be happy to discuss the above issues with you in greater detail.

Very truly yours,

STRONG & HANNI

By _____

Andrew D. Wright
Andrew B. McDaniel

cc:     Prime Insurance Company

cc:     McGriff Insurance Services
        4400 Harding Pike, Suite 400
        Nashville, TN 372015